# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

**STACEY SHORE**

        **Plaintiff,**                                **Case No. 18-cv-01893-JA-DCI**

                                                   **AMENDED COMPLAINT**

**v.**

**GREENSPOON MARDER, P.A.**

        **Defendant.**

---

### AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff STACEY SHORE ("Plaintiff" or "Shore") and, by way of this Amended Complaint pursuant to Fed. R. Civ. P. 15(a), by and through DC Capital Law, LLP, against the Defendant GREENSPOON MARDER, PA. ("Defendant" or "GM"), says:

### I. PRELIMINARY STATEMENT

1.     The Plaintiff alleges that Defendant's collection practices violate the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692, *et seq.* ("FDCPA") and The Florida Consumer Collection Practices Act ("FCCPA"), § 559.55 *et seq.*

2.     According to the Federal Trade Commission instruction on Consumer Information, a "right to use" vacation interval interest, which includes a "Floating Use" timeshare plan or interest where an "owner" is subject to a "first come, first served" reservation system, the interest you own is considered personal property. Federal Trade Commission, Consumer Information, Timeshares and Vacation Plans, *https://www.consumer.ftc.gov/articles/0073-timeshares-and-vacation-plans*. **Please see Exhibit**

**4**.

3.      Defendant GM threatened and pursued Plaintiff with placing a lien for a false debt amount on the public file of Plaintiff and further foreclosed on an *in personam* property interest through an *in rem* proceeding in Osceola County, Florida, in violation of the FDCPA and FCCPA. **Please see Exhibit 1 and Exhibit 2**.

4.      Such violative collection practices include, *inter alia*, Defendant GM sending Plaintiff written communications that:

    (a)    make false, deceptive, and misleading representations that Defendant is allowed and permitted by law to place a lien against the name of the Plaintiff "*in rem*" as stated by Defendant GM in **Exhibit 1** when the same was not true pursuant to the Declaration Defendant prepared and created at **Exhibit 6**; and

    (b)    stating in the communication to the Plaintiff that she risked "losing ownership of the timeshare interest through the trustee foreclosure procedure established in Section 721.856" when the use of Section 721.856 was premised on a non-judicial foreclosure sale not applicable to personal property here; and

    (c)    stating it is "a non-judicial foreclosure proceeding to permit Obligee to pursue its remedies under Florida law" when that was not the case given a personal property timeshare is not subject to a non-judicial remedy and obtaining a lien on the property *in rem*.

    (d)    collecting and attempting to increased costs and legal fees on a debt and foreclosure that is not legally or contractually possible against the Plaintiff

in the form of **Exhibit 1** and then doing so in **Exhibit 2**;

(e)    Contact public records with false debt amounts and exposing false and private debt information to the public and third parties in violation of 15 U.S.C. §§ 1692c(b) with the animating purpose to collect a payment but without the mandatory mini-miranda of 15 U.S.C. §§ 1692e(11) required of subsequent debt collection communications, such as **Exhibit 2** (Seeking Payment, with the Plaintiff's address and name in Bold).

## II. JURISDICTION AND VENUE

5.    Jurisdiction arises under 15 U.S.C. § 1692k(d) and 28 U.S.C. §§ 1331, 1337.

6.    Supplemental jurisdiction for Plaintiff's state law claims arises under 28 U.S.C. § 1367. The factual basis of the FCCPA claim is the same as the factual basis for the FDCPA claim and this district court has supplemental jurisdiction over all other claims that are so related to the claims in the action which such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. 28 U.S.C. § 1367(a).

7.    Declaratory relief is available pursuant to 28 U.S.C. §§ 2201, 2202.

8.    Venue is appropriate in this federal district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred within this federal judicial district at the time the action was commenced.

## III. PARTIES

9.    Plaintiff Shore is a natural person and resident of the City of Indianapolis, State of Indiana. The personal property that is the subject of this lawsuit is in Osceola County, State of Florida. **Please see Exhibit 3**. At all relevant times, Plaintiff has been a "consumer" under the FDCPA and a "debtor" or "consumer" under the FCCPA.

10.     At all times relevant to this complaint, Greenspoon Marder, LLP ("GM") is a debt collector under the FDCPA and the FCCPA collecting on timeshare and condominium association debt and is incorporated in the State of Florida with a Florida Resident Agent at Greenspoon Marder, PA, 201 E. Pine Street, Suite 500, Orlando, Florida 32801.

11.     Defendant GM regularly collects debts. In its "FAIR DEBT COLLECTION PRACTICES ACT DISCLOSURE" Defendant GM states "This a communication from a debt collector. Specifically, this law firm is a Debt Collector. The Debt Collector can be contacted through the information provided at the top of this letter. The Debt Collector is attempting to collect a debt and any information will be used for that purpose."

## IV. FDCPA STATUTORY STRUCTURE

12.     The FDCPA regulates the behavior of collection agencies attempting to collect a debt on behalf of another. The United States Congress has found abundant evidence of the use of abusive, deceptive, and unfair debt collection practices by many debt collectors, and has determined that abusive debt collection practices contribute to a number of personal bankruptcies, marital instability, loss of jobs, and invasions of individual privacy. Congress enacted the FDCPA to eliminate abusive debt collection practices by debt collectors, to ensure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote uniform State action to protect consumers against debt collection abuses. 15 U.S.C. § 1692(a)-(e).

13.     The FDCPA gives consumers a private right of action to enforce its provisions against debt collectors. 15 U.S.C. § 1692k(a). To state a claim under the FDCPA, Plaintiff must allege in the complaint: (1) Plaintiff has been the object of collection activity arising from consumer debt; (2) the Defendant is a debt collector as defined by the FDCPA; and (3)

Defendant is engaged in an act or omission prohibited by the FDCPA.

14. The FDCPA is a strict liability statute, which provides for actual or statutory damages upon the showing of one violation. Courts use the "least sophisticated consumer" standard, an objective test, when assessing whether particular conduct violates the FDCPA. "A debt collector's failure to provide the information required by § 1692g is actionable as a violation of § 1692e `if the variance is one that would tend to mislead the least sophisticated consumer.'" *See Caceres v. McCalla Raymer, LLC, 755 F.3d 1299, 1304 (11th Cir. 2014).*

15. Allegations of FDCPA violations are evaluated using the "least sophisticated consumer" perspective, which assumes the consumer "posses[es] a rudimentary amount of information about the world and a willingness to read a collection notice with some care." *See LeBlanc v. Unifund CCR Partners, 601 F.3d 1185, 1193-94 (11th Cir. 2010); Jeter v. Credit Bureau, Inc.*, 760 F.2d 1168, 1175 (11th Cir. 1985)). Using this standard, the FDCPA protects "naïve consumers" while at the same time "prevent[ing] liability for bizarre or idiosyncratic interpretations of collections notices by preserving a quotient of reasonableness." *Id.*

16. In *Wilson v. Draper & Goldberg, P.L.L.C.,* the Fourth Circuit held that the Defendants were not excluded from the definition of "debt collector" under 15 U.S.C.A. § 1692a(6)(F)(i) merely because they were acting as trustees foreclosing on a property pursuant to a deed of trust, and Defendants can still be "debt collectors" even if they were also enforcing a security interest. 443 F. 3d 373, 379 (4th Cir., 2006).

17. To prohibit deceptive practices, the FDCPA outlaws the use of false, deceptive, and misleading collection letters and names a non-exhaustive list of certain *per se* violations of false and deceptive collection conduct. See 15 U.S.C. § 1692e. Among these *per se* violations prohibited by that section are: false representations concerning the character, amount, or legal

status of any debt, 15 U.S.C. §1692e(2)(A); and the use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer, 15 U.S.C. § 1692e (10).

18.     The FDCPA's substantive provisions indicate that debt collection is performed through either "communication," 15 U.S.C. § 1692c; "conduct," *id.* § 1692d; or "means," *id.* §§ 1692e, 1692f. "Communication" means "the conveying of information regarding debt directly or indirectly to any person through any medium." *Id.* § 1692a (2).

19.     The FDCPA encompasses foreclosures. "In fact, *every* mortgage foreclosure, judicial or otherwise, is undertaken for the very purpose of obtaining payment on the underlying debt, either by persuasion (i.e, forcing a settlement) or compulsion (i.e., obtaining a judgment of foreclosure, selling the home at auction, and applying the proceeds from the sale to pay down the outstanding debt)." *Glazer v. Chase Home Fin. LLC*, 704 F.3d 453, 461 (6th Cir. 2013)(emphasis in original); *see also Goodrow v. Friedman & MacFadyen, P.A.*, 788 F. Supp. 2d 464, 471 (E.D.Va. 2011) ("[A] debt collector must comply with the FDCPA while complying with a state foreclosure law."); *Romea v. Heiberger & Assocs.*, 163 F.3d 111, 118 (2d Cir. 1998).

20.     Among the *per se* violations prohibited by the FDCPA is 15 U.S.C. § 1692c(b):

> (b) COMMUNICATION WITH THIRD PARTIES.  Except as provided in section 804, without the prior consent of the consumer given directly to the debt collector, or the express permission of a court of competent jurisdiction, or as reasonably necessary to effectuate a post judgment judicial remedy, *a debt collector may not communicate, in connection with the collection of any debt, with any person other than a consumer, his attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector*.

21.     Among the *per se* violations prohibited by the FDCPA is 15 U.S.C. § 1692f (6):

> **(6)** Taking or threatening to take any nonjudicial action to effect dispossession or disablement of property if—

    **(A)**    there is no present right to possession of the property claimed as collateral through an enforceable security interest;

    **(B)**    there is no present intention to take possession of the property; or

    **(C)**    the property is exempt by law from such dispossession or disablement.

## V. FCCPA STATUTORY STRUCTURE

22.    The Florida Consumer Collection Practices Act ("FCCPA"), § 559.55 *et seq.* is an act to regulate the collection practices of certain persons; to provide for the powers and duties of certain state agencies; and to provide penalties and civil fines.

23.    Under the FCCPA, a person who suffers injury, loss, or damage, or from whom money was collected by the use of a method, act, or practice in violation of this act may bring an action for actual damages and for additional statutory damages of up to $1,000, together with court costs and reasonable attorney's fees incurred by the plaintiff. See FLA. STAT. § 559.77 (2018). In an action so brought, in determining the Defendant's liability for any additional statutory damages, the court shall consider the nature of the Defendant's noncompliance with § 559.72, the frequency and persistence of such noncompliance, and the extent to which such noncompliance was intentional. *Id.*

24.    A "debt collector" means any person who uses any instrumentality of commerce within this state, whether initiated from within or outside this state, in any business the principal purpose of which is the collection of debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another. The term "debt collector" includes any creditor who, in the process of collecting her or his own debts, uses any name other than her or his own which would indicate that a third person is collecting or attempting to collect such debts. *Id.* § 559.55(7). Defendant GM is a debt collector under the FCCPA and FDCPA.

25.     "Debtor" or "consumer" means any natural person obligated or allegedly obligated to pay any debt. *Id.* § 559.55(8).  Plaintiff is a "debtor" or "consumer" under the FCCPA and a "consumer" FDCPA.

26.     Prohibited acts by any person attempting to collect a consumer under Florida Statutes, Sections 559.72, include violations where here:

a.  Defendant violated 559.72 (7) by willfully communicating with the debtor with false information to force debtor to pay more than is legally or contractually owed by the debtor in violation of Florida's Timeshare Statute.

b.  Defendant violated 559.72 (13) threatening to advertise the sale of the timeshare property of Plaintiff to enforce payment of a debt.

c.  Defendant violated 559.72 (14) threatening to communicate and publish private and false debt information to the public generally to enforce or attempt to enforce consumer debt.

27.     "Communication" under the FCCPA means the conveying of information regarding a debt directly or indirectly to a person through any medium. *Id.* § 559.55(2). GM is communicating the demand for payment of a debt through its letters at **Exhibit 1** and through the public records showcasing liens and foreclosures at **Exhibit 2**.

28.     Importantly, "in applying and construing" the FCCPA, "due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to the federal Fair Debt Collection Practices Act." *Id.* § 559.77(5).

29.     In a foreclosure context, "[T]he statutes are largely identical and "the FCCPA is construed in accordance with the FDCPA." *Lilly v. Bayview Loan Servicing, LLC*, No: 2:17-cv-00345, 2017 WL 4410040 at *2 (M.D. Fla. 2017) (citing *Oppenheim v. I.C. System, Inc.*, 627 F.3d 833, 839 (11th Cir., 2010)). The relevant provisions of the FCCPA and FDCPA are

concerned with debt collection activity, which in periodic statements is indicated by "debt collection language." *Brown v. Select Portfolio Servicing, Inc.*, No. 16-62999, 2017 WL 1157253, at *3 (S.D. Fla. March 24, 2017).

30.     In due consideration that the FCCPA gives to the FTC as stated in the statute at FLA. STAT. § 559.75(5), in the Federal Trade Commission's (FTC) "Timeshares and Vacation Plans" at **Exhibit 5**, the FTC differentiates between Deeded Timeshare Ownership and a "Right to Use" Vacation Interval Option that Ms. Shore has:

**Deeded Timeshare Ownership.** In a timeshare, you either own your vacation unit for the rest of your life, for the number of years spelled out in your purchase contract, or until you sell it. Your interest is legally considered real property. You buy the right to use a specific unit at a specific time every year, and you may rent, sell, exchange, or bequeath your specific timeshare unit. You and the other timeshare owners collectively own the resort property.

**"Right to Use" Vacation Interval Option.** In this option, a developer owns the resort, which is made up of condominiums or units. Each condo or unit is divided into "intervals" — either by weeks or the equivalent in points. You purchase the right to use an interval at the resort for a specific number of years — typically between 10 and 50 years. *The interest you own is legally considered personal property*. The specific unit you use at the resort may not be the same each year. In addition to the price for the right to use an interval, you pay an annual maintenance fee that is likely to increase each year. (emphasis added).

Within the "right to use" option, several plans can affect your ability to use a unit:

•      **Fixed or Floating Time.** In a fixed time, option, you buy the unit for use during a specific week of the year. In a floating time option, you use the unit within a certain season of the year, reserving the time you want in advance; *confirmation typically is provided on a first-*

*come, first-served basis*. (emphasis added)    *https://www.consumer.ftc.gov/articles/0073-timeshares-and-vacation-plans.*

## V. FLORIDA TIMESHARE STATUTORY STRUCTURE

31.    A personal property timeshare plan at FLA. STAT. § 721.05(39) encompasses the following:

(39)    "Timeshare plan" means any arrangement, plan, scheme, or similar device, other than an exchange program, whether by membership, agreement, tenancy in common, sale, lease, deed, rental agreement, license, or right-to-use agreement or by any other means, whereby a purchaser, for consideration, receives ownership rights in or a right to use accommodations, and facilities, if any, for a period of time less than a full year during any given year, but not necessarily for consecutive years. The term "timeshare plan" includes:

(a)    A "personal property timeshare plan," which means a timeshare plan in which the accommodations are comprised of personal property that is not permanently affixed to real property[.]

32.    Under Florida Statutes 721.05(36), a "Timeshare interest" means a timeshare estate, a personal property timeshare interest, or a timeshare license.

33.    Under Florida Statutes 721.05(28), Personal Property Timeshare interest means "a right to occupy an accommodation located on or in or comprised of personal property that is not permanently affixed to real property, whether or not coupled with a beneficial or ownership interest in the accommodations or personal property."

34.    Under Florida Statutes 721.05(34), "Timeshare estate" means *a right to occupy a timeshare unit*, coupled with a freehold estate or an estate for years with a future interest in a timeshare property or a specified portion thereof, or coupled with an ownership interest in a condominium unit pursuant to s. 718.103, an ownership interest in a cooperative unit pursuant to s. 719.103, or a direct or indirect beneficial interest in a trust that complies in all respects with s. 721.08(2)(c)4. or s. 721.53(1)(e), provided that the trust does not contain any personal property

-10-

timeshare interests. A timeshare estate is a parcel of real property under the laws of this state.

35.     Notably, Florida law does not define either a "floating" use timeshare interest or a "floating vacation ownership plan."

36.     Black's Law Dictionary defines real property as "land and anything growing on, attached to, or erected on it, excluding anything that may be severed without injury to the land." Real Property, Black's Law Dictionary (10th ed. 2014).

37.     Real Property does not "Float."

## VI. FACTS CONCERNING PLAINTIFF

38.     Defendant GM has threatened Plaintiff with placing a lien on the public file of Plaintiff and foreclosing on an *in personam* interest through an *in rem* proceeding in Osceola County in violation of the FDCPA and FCCPA. **Please see Exhibit 1**.

39.     On or about August 28, 2012, Plaintiff allegedly incurred a financial obligation on the purchase of two floating timeshare interests from the SELLER/DEVELOPER, Westgate Vacation Villas, LLC ("Westgate"), at Westgate Town Center. **Please see Exhibit 3**. Plaintiff received a titled *WARRANTY DEED AND LIEN ON REAL PROPERTY* claiming to transfer property from Westgate to Plaintiff in Osceola County, Florida. **Please see Exhibit 5**.

40.     The *Warranty Deed* at **Exhibit 5** stated that the Plaintiff agreed that she "hereby expressly assumes and agrees to be bound by and to comply with all of the covenants, terms, conditions and provisions set forth and contained in the ***Declaration***, including, but not limited to, the obligation to make payment for assessments or the maintenance and operation of the Resort which may be levied against the above Time Share Interest, and the obligation to pay the indebtedness as described below, subject to the lien granted and reserved herein." (emphasis added).

41.     A review of the "Declaration of Covenants, Conditions and Restrictions for

-11-

Westgate Town Center, A Time Share Resort" ("Declaration") that was prepared by Defendant GM and is referred to in the Warranty Deed between the parties that the Plaintiff agreed to be bound by at **Exhibit 6** reveals that deed at **Exhibit 5** has no validity, value or ability to transfer anything to the Plaintiff as real property.

42.     The Declaration at **Exhibit 6** is separated into two "ownership" plans: A Time-Sharing Plan and a Floating Use Plan.

43.     In the "Time Sharing Plan" for of Ownership at Page 9 of the Declaration at **Exhibit 6** the owner received an ownership in fee simple of a divided interest in a building in the Resort Facility:

> **1.   Time Sharing Plan.   Developer** shall convey to each Owner by Warranty Deed the ownership in fee simple of an undivided interest in a building in the Resort Facility as a tenant in common with other Owners which interest shall constitute said Owner's Time Share Interest.   One Time Share Interest shall be equal to a fraction, the numerator of which is one (1), and the denominator of which is equal to the number of Time Share Interests in the building in the Resort Facility in which the Time Share Interest is being conveyed.   Notwithstanding the fact that each

44.     The "Time Sharing Plan" consists of "Fixed Unit Weeks," where the Owner purchases a specific unit, which the Owner must occupy, during a specific week when the Owner must occupy. Such right to use a specific unit at a specific time every year must be selected by the Owner at the point of sale. The Owner has no right to use any other unit during any other week.

45.     In the "Floating Use Plan," at Page 10 of **Exhibit 6** of the Declaration, the "Owner" receives no property rights or interest and in fact, any possession and use rights or interests are "released" or lost and in return, the "Owner" receives the right to request reservations in a pool of non-assigned or owned "Floating Unit Weeks" on a first come, first serve basis.

46.     The Declaration at **Page 4 at Exhibit 6** defines "Floating Use Plan" as "the arrangement pursuant to which ***the right to use, possess, and occupy a specific Floating Unit Week in a specific Unit is released*** in consideration for receiving the right to request a reservation for any Floating Unit Week in accordance with the terms of the Declaration and the Floating Use Plan Rules and Regulations, as the same may be amended from time to time." (emphasis added).

47.     More specifically, the Declaration further states on **Page 10 of Exhibit 6** that an owner releases the possession and use rights he receives from the Warranty Deed: "The owner of a Floating Unit Week shall be assigned to a specific Unit Week in a specific Unit. However, owners of Floating Unit Weeks shall not be entitled to possession and use of the specific Unit or the specific Unit Week assigned, but instead, ***such possession and use rights are released in consideration for receiving the right to request a reservation annually*** (or biennially, for owners of Biennial Floating Unit Weeks) for a Floating Unit Week within the Floating Use Plan system and during which the Owner may occupy a Unit in accordance with the terms and conditions of the Floating Use Plan and the use restrictions set forth in or promulgated pursuant to the provisions of this Declaration." (emphasis added).

48.     "Pursuant to the Floating Use Plan all Floating Unit Weeks shall be available for use by all Owners at all times on a "***first come, first served***" reservation basis in accordance with this Declaration and the Floating Use Plan Rules and Regulations, as they may be amended from time to time, an initial copy of which is attached hereto as Exhibit 'C'." (emphasis added). **Please see Exhibit 6 Page 9-10.**

49.     Under Florida Statutes 721.05(36), a "Timeshare interest" means a timeshare estate, a personal property timeshare interest, or a timeshare license.

-13-

50.     Under Florida Statutes 721.05(34), "Timeshare estate" means *a right to occupy a timeshare unit*, coupled with a freehold estate or an estate for years with a future interest in a timeshare property or a specified portion thereof, or coupled with an ownership interest in a condominium unit pursuant to s. 718.103.

51.     The Declaration at **Page 4 at Exhibit 6** defines "Floating Use Plan" as "the arrangement pursuant to which *the right to use, possess, and occupy a specific Floating Unit Week in a specific Unit is released* in consideration for receiving the right to request a reservation for any Floating Unit Week in accordance with the terms of the Declaration and the Floating Use Plan Rules and Regulations, as the same may be amended from time to time.

52.     Plaintiff's right to occupy a timeshare unit under the Warranty Deed is released pursuant to the Declaration at **Exhibit 6** (that GM prepared and created) so the property is not a Timeshare Estate.

53.     So, the timeshare interest Plaintiff received at **Exhibit 5** that Defendant GM threatens to foreclose upon through "a non-judicial foreclosure proceeding to permit Obligee to pursue it remedies under Florida law at **Exhibit 1** is not a Timeshare Estate under Florida law.

54.     Under Florida Statutes 721.05(28), Personal Property Timeshare interest means "a right to occupy an accommodation located on or in or comprised of personal property that is not permanently affixed to real property, whether or not coupled with a beneficial or ownership interest in the accommodations or personal property."

55.     The Declaration governing the timeshare interest Plaintiff purchased grants no ownership interest or exclusive right to use or possess anything besides the ability of the "owner" to request a reservation for a unit assigned by management.

56.     Plaintiff purchased nothing attached to real property. Their rights are "Floating"

-14-

and dependent on a "first come, first served" reservation system. Ms. Shore can't even occupy the unit for the week mentioned in their deed. Plaintiff only owns the right to reserve a unit under Fl. St. 721.05(4).

57.     Real Property does not Float.

58.     Despite what Plaintiff's Warranty Deed at **Exhibit 5** states, Plaintiffs have no right to use and *occupy* the property as deeded:

"2 Time Share Interest(s) All Season-Float Week/Float Unit according to the Time Sharing Plan for the Westgate Town Center recorded in Official Records Book 1564, at Page 1479, of the Public Records of Osceola County, Florida (the Plan).

Together with the *right to occupy*, pursuant to the Plan, Building(s)/Units(s)/Unit Week(s)/Assigned Year(s),

5900/104B/31/WHOLE,5900/103A/45/WHOLE. **Please see Exhibit 5**.

59.     Instead, Plaintiffs have only a right to make a reservation, which is in of itself an illusory right conditioned upon availability, in whatever unit the Westgate Association decides.

60.     There is no proof that "right to reserve a unit" is attached to any piece of real property.

61.     Thus, the net effect of the Plaintiffs' Warranty Deed was a conveyance of a conditional right to use a personal property interest under Florida Statutes 721.05(28) and can only be foreclosed upon *in personam* or through a judicial sale.

62.     Appropriately, Plaintiff as a Personal Property Timeshare and no lien can be created or executed unless a civil judgment is first found from any judicial sale.

63.     Defendant Greenspoon Marder prepared and created the Warranty Deed at **Exhibit 5** in 2012 and was fully aware that the Warranty deed promised and granted "the right to

occupy, pursuant to the Plan" with the "Plan" meaning the rules and regulation of the Declaration at **Exhibit 6** (created in 1999) which specifically states that *the right to use, possess, and __occupy__ a specific Floating Unit Week in a specific Unit __is released__* in consideration for receiving the right to request a reservation for any Floating Unit Week in accordance with the terms of the Declaration.

64.     Defendant Greenspoon Marder and Michael E. Marder, a partner and co-founder of Greenspoon Marder prepared the Declaration at **Exhibit 6** so Defendant was fully aware of the rules and regulations mandated by the Declaration and the fact that the right to use and possess the timeshare unit was "*released*" in favor of a reservation right based upon a "first come, first serve" reservation system when it created the Warranty Deed granting the right that the Plan released.

65.     Further, under Florida law, a deed that does not sufficiently describe a parcel of real property is void. *Davis v. Hinson*, 67 So. 3d 1107, 1111 (Fla. Dist. Ct. App. 2011) ("A deed which contains a description so vague that a surveyor would not be able to locate the land is considered a nullity."). "[T]he description of the premises conveyed must be sufficiently definite and certain to enable the land to be identified; otherwise it will be void for uncertainty." *Hoodless v. Jernigan*, 35 So. 656, 660 (1903); see also *Mitchell v. Thomas*, 467 So. 2d 326, 328 (Fla. Dist. Ct. App. 1985) (same).

66.     There are no statutory exceptions for the legal description requirement. Fla. Stat. § 689.02(1) provides a form of a warranty deed that expressly requires the description of the land conveyed.

67.     There is no definite or certain description of what is being conveyed in the Warranty Deed at **Exhibit 5**.

68.     The "land" described by Defendant Greenspoon in the Warranty Deed at **Exhibit 5** defies any clarity or specificity as to what is being transferred especially given that the Declaration voids the very thing supposedly transferred *(right to occupy*, pursuant to the Plan). Again, the following description in the warranty deed is not "land."

> "2 Time Share Interest(s) All Season-Float Week/Float Unit according to the Time Sharing Plan for the Westgate Town Center recorded in Official Records Book 1564, at Page 1479, of the Public Records of Osceola County, Florida (the Plan).
> Together with the *right to occupy*, pursuant to the Plan, Building(s)/Units(s)/Unit Week(s)/Assigned Year(s),
> 5900/104B/31/WHOLE,5900/103A/45/WHOLE.

69.     Whatever Defendant Greenspoon attempted to show being transferred in **Exhibit 5**, it was not a parcel of property under the laws of the state of Florida.

70.     In **Exhibit 4**, the FTC differentiates between Deeded Timeshare Ownership and a "Right to Use" Vacation Interval Option:

**Deeded Timeshare Ownership.** In a timeshare, you either own your vacation unit for the rest of your life, for the number of years spelled out in your purchase contract, or until you sell it. Your interest is legally considered real property. You buy the right to use a specific unit at a specific time every year, and you may rent, sell, exchange, or bequeath your specific timeshare unit. You and the other timeshare owners collectively own the resort property.

**"Right to Use" Vacation Interval Option.** In this option, a developer owns the resort, which is made up of condominiums or units. Each condo or unit is divided into "intervals" — either by weeks or the equivalent in points. You purchase the right to use an interval at the resort for a specific number of years — typically between 10 and 50 years. The interest you own is legally considered personal property. The specific unit you use at the resort may not be the same each year. In addition to the price for the right to use an

-17-

interval, you pay an annual maintenance fee that is likely to increase each year.

Within the "right to use" option, several plans can affect your ability to use a unit:

- **Fixed or Floating Time.** In a fixed time option, you buy the unit for use during a specific week of the year. In a floating time option, you use the unit within a certain season of the year, reserving the time you want in advance; *confirmation typically is provided on a first-come, first-served basis.* (emphasis added) Please <u>see Exhibit 4</u>.

71.    The Declaration at **Exhibit 6** differentiates between a deeded interest ("Time Sharing Plan") and a Right to Use or Floating interest ("Floating Use Plan"). Pursuant to the FTC regulations and the Declaration, Plaintiff's Floating Use Plan interest is "legally considered personal property." **Please see Exhibit 4**.

72.    Pursuant to Florida law, non-judicial foreclosures can only be pursued in an *in rem* proceeding with a notice of intent to lien and then foreclose allowed before a judgment or decision is entered. Here, Plaintiff's property is personal and can only be "taken" from her *in personam* that would require a judgment be entered judicially prior to a lien being granted on the judgment.

73.    Under Section 721.16(6), Plaintiff's personal property interest would not be able to be foreclosed upon as real property and as GM threatened Plaintiff with at **Exhibit 1** and later pursued at **Exhibit 2**.

74.    Defendant GM wrote a debt collection letter to Ms. Shore threatening her with foreclosure and recordation of a lien in Osceola County that would result in recording fees and legal fees in addition to the $12,770.08 the Defendant was seeking on behalf of Westgate Vacation Villas, LLC. **Please see Exhibit 1**.

75.    Defendant GM was seeking a $12,770.08 payment and gave Ms. Shore 35 days to

make the payment. This is an attempt to collect a payment of a debt under the FDCPA and FCCPA.

76.    Defendant GM threated to sell the property *in rem* and foreclose on the "All Season-Float Week/Float Unit" knowing it was not real property, where owners had released the use and possession of a unit in return for the "floating use" right to make a reservation from a pool of units. Please see the letter at **Exhibit 1** and the Declaration at **Exhibit 6**.

77.    Defendant GM sent Plaintiff a Notice of Trustee's Sale notifying Plaintiff of a trustee sale on July 27, 2018. This notice demanded payment when it gave Plaintiff an opportunity to cure the default by paying an amount of $35,462.22. However, such Notice of Trustee's Sale contained neither the § 1692g notice nor the § 1692e(11) disclosures required under the FDCPA.

78.    Further, the Defendant GM went ahead and foreclosed on the "property" of Ms. Shore through a non-judicial foreclosure at **Exhibit 2** on an *in personam* personal property.

79.    Defendant GM is, at all times relevant to this complaint and by its own admission in the communication to Plaintiff at **Exhibit 1**, "Specifically, this law firm is a Debt Collector," engaged in the act and/or practice of "debt collection" as that term is contemplated by 15 U.S.C. § 1692a(6), as stated in its letter at **Exhibit 1**.

80.    GM is not a "creditor" as defined by 15 U.S.C. § 1692a (4).

81.    The letters from GM are each a "communication" as defined by the FDCPA and FCCPA. This case involves an obligation, or an alleged obligation, primarily for personal, family, or household purposes, and arising from a transaction under both the FDCPA and the FCCPA.

82.    Defendant is exposing Plaintiff's private financial information to third-parties and

the public in general in violation of 15 U.S.C. §1692c(b) by using a non-judicial foreclosure proceeding to place the debt information of Plaintiff into the public records of Osceola County. **Please see Exhibit 2**.

83.    Defendant GM is not immune from being a debt collector liability as a Trustee. Defendant GM was brought in by the Westgate Vacation Villas, LLC for the sole purpose of collecting money and pursuing foreclosure actions, both of which fall squarely within the purview of the FDCPA and FCCPA. *Harris v. Liberty Community Mgmt., Inc.*, 702 F.3d 1298 (11th Cir. 2012).

84.    Trustee immunity from the FDCPA opens the door for further collection abuse of debtors and home owners by Defendants like Defendant GM under the pretense of just supplying a Foreclosure Notice as it appears to have been done with Plaintiff's debt collection and foreclosure.

85.    The Eleventh Circuit Court of Appeals reached a similar conclusion in *In re Martinez*, 311 F.3d 1272, (11th Cir.2002) (adopting a District Court opinion reported at 271 B.R. 696 (S.D.Fla.2001)), citing *Piper v. Portnoff Law Associates, Ltd.*, 396 F. 3d 227, 235 (3rd Cir., 2005). "We agree with the District Court that "[i]f a collector was able to avoid liability under the FDCPA simply by choosing to proceed *in rem* rather than *in personam,* it would undermine the purpose of the FDCPA." *Piper,* 274 F.Supp.2d at 687.

86.    Defendant GM is using that false information and the wrong foreclosure proceeding to collect on the underlying debt and provide the same information to the Heritage Florida Jewish News and the County of Osceola for publishing the private debt information online and throughout the State of Florida, in violation of the FDCPA, while using a communication that fails to provide the Mini-Miranda of the FDCPA required after the initial

communication to homeowners. 15 U.S.C. § 1692e(11). **Please see Exhibit 2**.

87.     In violation of the FDCPA and as the animating purpose of the advertised Notice of Trustee Sale placed in the Heritage Florida Jewish News was to collect money, ($35,462.22) and Ms. Shore's name (in Bold) and address are in the Notice, and the notice was a subsequent communication from **Exhibit 1** that had the Mini Miranda inside of the letter, under the FDCPA there must be a mini miranda in the Notice at **Exhibit 2** as there was in **Exhibit 1** that states that Defendant GM is a "Debt Collector attempting to collect a debt and any information will be used for that purpose." 15 U.S.C. § 1692e(11).

88.     The Florida Timeshare Statute does not protect Florida timeshare owners against any actions of the sort of debt collection conduct the Plaintiff faced with Defendant GM.

89.     The FCCPA and the FDCPA are harmonious in their goals of consumer protection against abusive debt collection conduct that Defendant GM committed as state above.

90.     The Florida Timeshare should be preempted here as a means to seek the timeshare interest of Plaintiff, or Defendant, as a Trustee, would be allowed to seek payments without regulation and with the avoidance of the Federal and Florida consumer protection mandates as happened here.

91.     The FDCPA allows the preemption of state statutes where the protections afforded to the consumer are greater than the state statute covering the same conduct:

**§ 816.  Relation to State laws [15 USC 1692n]**

This title does not annul, alter, or affect, or exempt any person subject to the provisions of this title from complying with the laws of any State with respect to debt collection practices, except to the extent that those laws are inconsistent with any provision of this title, and then only to the extent of the inconsistency. For purposes of this section, *a State*

*law is not inconsistent with this title if the protection such law affords any consumer is greater than the protection provided by this title.*

92.     Even if the Defendant was following the Florida Timeshare Lien Foreclosure Act, the FDCPA clearly prevails in any conflict because of the superior protections and remedies. "It is the provisions of the FDCPA that by and of themselves determine what debt collection activities are improper under federal law." *Romea v. Heiberger & Assocs.*, 163 F.3d 111, 119 (2d Cir. 1998). "A debt collector must comply with the FDCPA while complying with a state foreclosure law." *Romea at 118.*

93.     The goal of the FDCPA is to eliminate abusive debt collection practices.   *See Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 587 (2010)."

94.     The goal of the Florida Timeshare Statute is to speed up the foreclosure process by obtaining the timeshare interest through a non-judicial process.

95.     Defendant is misrepresenting the law and the information to Ms. Shore in **Exhibit 1** as it prepared and created the Warranty Deed and Declaration that specifically prevented a foreclosure *in rem* that the Defendant represented would happen and that Defendant GM was a Trustee under an *in rem* proceeding to Ms. Shore specifically with the goal to take the timeshare interest quickly under the timeshare statute it references in its communication at Fl. St. 721.856.

96.     That the notices at **Exhibit 2** were published to comply with Florida's Timeshare Statute does not immunize Defendant GM from an FDCPA violation. Please see 15 U.S.C. § 1692n.

97.     Plaintiff has suffered an injury in fact and still faces or has been subject to damage to their financial and public reputation, recording costs and increased attorney fees if they don't pay as directed by **Exhibit 1** and did suffer such injuries stated here and in Paragraph 41 through Paragraph 98 as stated above because of the illegal foreclosure in **Exhibit 2** and

Notices to the Public through newspapers and county notices of the Plaintiff's name in bold, her address and that she owes money ($35,462.22).

98.     In **Exhibit 1**, Defendant is pursuing Plaintiff with the wrong foreclosure proceeding and Plaintiff is harmed by not receiving her day in court and due process to stop her private information be placed before the public with a recorded lien *in rem* on *in personam* property at **Exhibit 2** in violation of the FDCPA and FCCPA.

99.     The false, deceptive, and misleading representations employed by Defendant GM as set forth above in connection with the collection communications through the letter **at Exhibit 1** and Notices at **Exhibit 2** are material to the due process rights of the Plaintiff—who is facing a wrongful foreclosure proceeding and having her private information quickly placed in the Public Records with false documentation and verifications— in being able to properly respond, and, but-for these material misrepresentations, Plaintiff would have been able to assert meritorious defenses in a judicial foreclosure proceeding.

## VII. FIRST CAUSE OF ACTION
### VIOLATIONS OF THE FDCPA

100.    Plaintiff realleges and incorporates by reference the allegations in paragraphs 1-21 and 38-100 of this Amended Complaint as if stated fully herein and further states:

101.    Plaintiff is and has been, at all times relevant to this Amended Complaint, a "consumer."

102.    Defendant GM is and has been, at all times relevant to this Amended Complaint, a "debt collector."

103.    Plaintiff purchased the timeshare property for personal, family, or household use. The debt arising out of said purchase is an FDCPA debt.

104.    Each of the notices from Defendant GM was a "communication" under the FDCPA.

105.    In violation of 15 U.S.C. § 1692c(b), Defendant GM exposed Plaintiff's private financial information to third-parties and the public in general by using a non-judicial foreclosure proceeding to place the name of Ms. STACEY A. SHORE (in bold letters) when the Foreclosure statute does not require bold letters, the Shore debt amount of $35,462.22 owed and her address into the public records of Osceola County. **Please see Exhibit 2 newspaper listing**.

106.    In violation of 15 U.S.C. § 1692e(5), Defendant GM threatened the use of a non-judicial remedy or sale against plaintiff when the threat cannot be legally taken given the dictates of the Declaration at **Exhibit 6** that Plaintiff has no real property rights to foreclose upon *in rem*.

107.    In violation of 15 U.S.C. § 1692e(11), Defendant GM failed to provide the "mini-miranda" disclosures in the Notice of Trustee's Sale sent to the Plaintiff.

108.    In violation of 15 U.S.C. § 1692g, Defendant GM failed to provide the 1692g verification and dispute notices in the Notice of Trustee's Sale sent to the Plaintiff. Defendant GM demanded payment of $35,462.22 without providing Plaintiff the opportunity to dispute.

109.    In violation of 15 U.S.C. § 1692e(2)(A), Defendant GM made deceptive and misleading representations regarding the amount of debt allegedly owed. In its Notice of Default and Intent to Foreclose, Defendant GM identified an amount of $12,770.08, which increased to $35,462.22 in the Notice of Trustee's Sale, without opportunities for Plaintiff to seek verification or to dispute, in the form of a public lien with the false use of an *in rem* proceeding.

110.    In violation of 15 U.S.C. § 1692e(10), Defendant GM used false representations and/or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer in violation of 15 U.S.C. § 1692e(10) when Defendant GM knew the

-24-

information it communicated was false in **Exhibit 1** and contradicted by **Exhibit 6** (**which GM prepared and created**).

111.    In violation of 15 U.S.C. § 1692f, Defendant GM used unfair and unconscionable means to collect or attempt to collect any debt when Defendant GM threatened, pursued, and in fact foreclose on property, incurring extra costs and fees, that was impossible to foreclose non-judicially by Florida law.

## VIII.  SECOND CAUSE OF ACTION
## VIOLATIONS OF THE FCCPA

112.    Plaintiff realleges and incorporates by reference the allegations in paragraphs 1-11 and 22-99 of this Amended Complaint as if fully set forth herein and further states:

113.    Plaintiff is and has been, at all times relevant to this Amended Complaint, a "debtor" or a "consumer."

114.    Defendant GM is and has been, at all times relevant to this Amended Complaint, a "consumer collection agency" and "debt collector," as those terms are defined by Florida Statutes, Sections 559.55(3) and 559.55(7).

115.    Plaintiffs purchased the timeshare property for personal, family, or household use. Any debt arising out of such purchases constitutes a "consumer debt" under the FCCPA.

116.    Defendant GM is and has been, at all times relevant to this Amended Complaint, a "person" collecting consumer debt pursuant to FLA. STAT. § 559.72.

117.    Defendant GM violated FLA. STAT. §§ 559.72(7), 559.72(13), 559.72(14), 559.72(5) in the following ways:

a.    Defendant GM violated 559.72(5) in the form attached at **Exhibit 2** by exposing private debt information to the Public Record and in the Heritage Florida Jewish News in a manner not authorized by the original Declaration

-25-

agreement at Exhibit 6 and the Florida Timeshare Act; and

b. Defendant GM violated 559.72(7) in the form attached at **Exhibit 1 and Exhibit 2** by collecting on a debt in violation of the FDCPA and with knowledge it had no legal right to use the *in rem* proceeding it used to place Plaintiff's private debt information on the Public Record; and

c. Defendant GM violated 559.72(13) in the form attached at **Exhibit 2** by use of an *in rem* proceeding on an *in personam* debt; and

d. Defendant GM violated 559.72(14) in the form attached at **Exhibit 2** publishing and posting private debt information of the Plaintiff (in Bold letters) in the Public Record based upon false collection procedures using an *in rem* proceeding that the Defendant knew it could not apply and then publicizing the debt and debtors address and the amount to the world.

## IX. PRAYER FOR RELIEF

118.   WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor as follows:

A.   **For the FIRST CAUSE OF ACTION:**

(i)   An award of the maximum statutory damages for Plaintiff pursuant to 15 U.S.C. § 1692k(a)(2)(A);

(ii)   An award of actual damages for Plaintiff pursuant to 15 U.S.C. § 1692k(a)(1);

(iii)   For declaratory relief, pursuant to 28 U.S.C. §§ 2201, 2202 adjudging Defendant's foreclosure, which is attached hereto as **Exhibit 1 and Exhibit 2**, and which is complained of herein, violates the FDCPA;

(iv)   Damages for illegal threats to the Plaintiff's credit report;

-26-

(v)     Attorney's fees, litigation expenses, and costs pursuant to 15 U.S.C. § 1692k(a)(3); and

(vi)    For such other and further relief as may be just and proper.

B.    **For the SECOND CAUSE OF ACTION:**

a) Awarding Plaintiff actual and statutory damages; and

b) Awarding Plaintiff additional statutory damages pecuniary or otherwise beyond statutory and actual; and

c) Awarding Plaintiff such equitable relief as the Court deems necessary or proper; and

d) Awarding Plaintiff counsel reasonable attorneys' fees and costs incurred in this action; and

e) Awarding Plaintiff pre-judgment and post judgment interest as permissible by law; and

f) Awarding such other and further relief as the Court may deem just and proper.

## X. JURY DEMAND

Plaintiff hereby demands that this case be tried before a Jury.

Respectfully submitted this 3rd day of January 2019.

/s/ Brian P. Parker
Brian P. Parker – *Trial Counsel*
**DC Capital Law, LLP**
Florida Bar No. 0980668
700 12th Street NW Ste 700
Washington, D.C. 20005
bparker@dccapitallaw.com
202-793-4433
*Attorney for Plaintiff Shore*

## <u>CERTFICATE OF SERVICE</u>

I HEREBY CERTIFY that on January 3, 2019, the foregoing was electronically filed
with the Clerk of the Court using the CM/ECF Portal, which will send notice of filing and
a service copy to all counsel of record.


*/s/ Sydney Whittington*

# EXHIBIT #1

# GreenspoonMarder

Capital Plaza I, Suite 500
201 East Pine Street
Orlando, Florida 32801-2718

April 11, 2018

34
<u>VIA FIRST CLASS & CERTIFIED MAIL</u>

## <u>NOTICE OF DEFAULT AND INTENT TO FORECLOSE</u>

TO:    **Stacey A Shore**

Indianapolis, i

Re:    **WESTGATE VACATION VILLAS, LLC**
Account No. 2801766    Our File No. 29203.0243 (SHORE)

Dear Stacey A Shore:

Pursuant to Section 721.856, Florida Statutes, the undersigned Trustee as appointed by **WESTGATE VACATION VILLAS, LLC** (hereinafter referred to as "Westgate") hereby formally notifies you that you are in default due to your failure to pay the payments due on **December 1, 2016** under the Note and Mortgage (as defined below), and you now owe **WESTGATE $12,770.08**, which amount includes interest, late fees, and other charges. Additional interest continues to accrue at the rate of **$6.30** per day, with regard to the following real property located in Osceola County, Florida:

2 Time Share Interest(s) All Season-Float Week/Float Unit according to the Time Sharing Plan for WESTGATE TOWN CENTER, recorded in Official Records Book 1564, at Page 1479, of the Public Records of Osceola County, Florida (the "Plan").

Together with the right to occupy, pursuant to the Plan, Building(s)/Unit(s) 5900-103A, 5900-104B, during Unit Week(s) 45, 31, during Assigned Year(s) - WHOLE, WHOLE.

7700 Westgate Blvd., Kissimmee, FL 34747 (herein "Time Share Plan (Property) Address")

As a result of the aforementioned default, **WESTGATE** hereby elects to sell the Property pursuant to Section 721.856, Florida Statutes. Please be advised that in the event that the debt owed to **WESTGATE** is not paid within thirty-five (35) days after receipt of this notice, the undersigned Trustee shall proceed with the sale of the Property as provided in Section 721.856, Florida Statutes. Pursuant to Section 721.856, Florida Statutes, the undersigned Trustee shall: (1) Provide you with written notice of the sale, including the date, time and location thereof; (2) Record the notice of sale in the Public Records of Osceola County, Florida; and (3) Publish a copy of the notice of sale two (2) times, once each week, for two (2) successive weeks, in an Osceola County newspaper, provided such a newspaper exists at the time of publishing.

If you fail to cure the default as set forth in this notice or take other appropriate action with regard to this foreclosure matter, all sums due and owing under the Note and Mortgage shall be accelerated and will become immediately due and payable. Additionally, as a result of the default, you risk losing ownership of your timeshare interest through the trustee foreclosure procedure established in Section 721.856, Florida Statutes. Any right you may have to reinstate the mortgage after acceleration will be pursuant to the terms of the mortgage. You may choose to sign and send to the undersigned trustee the enclosed objection form, exercising your right to object to the use of the trustee foreclosure procedure. Upon the undersigned trustee's receipt of your signed objection form, the foreclosure of the mortgage with respect to the default specified in this notice shall be subject to the judicial foreclosure procedure only. You have the right to cure your default in the manner set forth in this notice at any time before the trustee's sale of your timeshare interest. If you do not object to the use of the trustee foreclosure procedure, you will not be subject to a deficiency judgment even if the proceeds from the sale of your timeshare interest are insufficient to offset the amounts secured by the lien.

Boca Raton | Denver | Ft. Lauderdale | Las Vegas | Miami | Miami Beach | Naples | New York
Orlando | Port St. Lucie | San Diego | Tallahassee | Tampa | West Palm Beach

In New York Greenspoon Marder, P.A. practices under the name Greenspoon Marder, P.A. P.C.
In California Greenspoon Marder LLP practices using the fictitious name and trademark Greenspoon Marder under license from Greenspoon Marder, P.A.

34

## FAIR DEBT COLLECTION PRACTICES ACT DISCLOSURE

This is a communication from a debt collector.  Specifically, this law firm is the Debt Collector.  The Debt Collector can be contacted through the information provided at the top of this letter.  The Debt Collector is attempting to collect a debt and any information obtained will be used for that purpose.

Pursuant to 15 U.S.C. §1692g (the Fair Debt Collection Practices Act), the Debt Collector hereby discloses the following information:

1.  The Debt Collector is attempting to collect a debt and any information obtained will be used for that purpose.

2.  The name of the creditor to whom the debt is owed is: **WESTGATE VACATION VILLAS, LLC**

3.  As of the date of this letter, the amount of the debt you owe is **$12,770.08**.  Because of interest, late charges, and other charges that may vary from day to day, the amount due on the day you pay may be greater.  Hence, if you pay the amount shown above, an adjustment may be necessary  after the creditor receives your check or payment, in which event the creditor will inform you before depositing the check or payment for collection.  For further information, write the Debt Collector, or call the creditor at **1-800-375-8122** (within the United States) or 1-407-355-2002 (international).  If a Bankruptcy has been previously filed, contact 1-407-355-1004 or 1-888-999-0101 x51004.

4.  Unless you, within thirty days after receipt of this notice, dispute the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the Debt Collector:

5.  If you notify the Debt Collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the Debt Collector will obtain verification of the debt or a copy of a judgment against you and a copy of such verification or judgment will be mailed to you by the Debt Collector before proceeding with the foreclosure.

6.  Upon your written request within the thirty-day period, the Debt Collector will provide you with the name and address of the original creditor, if different from the current creditor.

This is a non-judicial foreclosure proceeding to permit Obligee to pursue its in rem remedies under Florida law.

Very truly yours,

GREENSPOON MARDER, LLP, Trustee

By: _____
Amanda L. Chapman

SBW/cs

### BANKRUPTCY NOTICE

IF YOU HAVE FILED A BANKRUPTCY CASE UNDER THE UNITED STATES BANKRUPTCY CODE, PLEASE BE ADVISED THAT THIS LETTER IS BEING SENT TO YOU ON BEHALF OF WESTGATE VACATION VILLAS, LLC TO PERMIT WESTGATE VACATION VILLAS, LLC TO PURSUE ITS *IN REM* RIGHTS ONLY.   WESTGATE VACATION VILLAS, LLC IS NOT SEEKING THE COLLECTION OF ANY MONIES FROM YOU, AND WESTGATE VACATION VILLAS, LLC IS NOT SEEKING TO OBTAIN AN *IN PERSONAM* JUDGMENT, DEFICIENCY JUDGMENT, OR ANY OTHER TYPE OF MONEY JUDGMENT AGAINST YOU.  ANY STATEMENTS REGARDING ANY AMOUNTS DUE UNDER THE SUBJECT NOTE, OR UNDER THE SUBJECT MORTGAGE SECURING PAYMENT OF THE NOTE, ARE BEING MADE TO ESTABLISH THE AMOUNT DUE TO PERMIT WESTGATE VACATION VILLAS, LLC TO PURSUE ITS *IN REM* RIGHTS AGAINST THE SUBJECT PROPERTY.  THIS BANKRUPTCY NOTICE IS NOT A WAIVER OF ANY AND ALL LEGAL AND EQUITABLE RIGHTS AND REMEDIES AVAILABLE TO WESTGATE VACATION VILLAS, LLC PARTICULARLY IF YOU HAVE NOT FILED A BANKRUPTCY CASE, OR IF YOUR BANKRUPTCY CASE HAS BEEN OR WILL BE DISMISSED, ALL SUCH RIGHTS AND REMEDIES ARE HEREBY EXPRESSLY RESERVED.

34

**GREENSPOON MARDER, LLP, Trustee**
201 E. Pine Street, Suite 500
Orlando, FL  32801

Re:     **WESTGATE VACATION VILLAS, LLC**
         Kissimmee, Osceola County, Florida
         Building/Unit 5900-103A, 5900-104B / Week 45, 31 / Assigned Year WHOLE, WHOLE
         Our File No. 29203.0243 (SHORE)

Dear Trustee,

         The undersigned obligor(s) exercises the obligor's right to object to the use of the trustee foreclosure
procedure contained in section 721.856, Florida Statutes.


_____                    Dated:  _____

Stacey A Shore
4139 Eagle Lake Dr
Indianapolis, IN 46254


k:foreclosure\29203.wg Town Center (nj)\shore.0243\nodv.1-shore

# EXHIBIT #2

### CERTIFICATE OF COMPLIANCE
### WESTGATE TOWN CENTER
### 29203.0243 SHORE

**STATE OF FLORIDA**
**COUNTY OF ORANGE**

GREENSPOON MARDER, LLP, Trustee, pursuant to that Appointment of Trustee recorded on March 26, 2018, in O.R. Book 5306, at Page 2461, of the Public Records of Osceola County, Florida, certifies the following:

1. A Notice of Default and Intent to Foreclose with an Objection Form was served on those obligors identified on the Affidavit of Service (By Registered Agent) dated June 1, 2018. The Affidavit of Service (By Registered Agent) is attached hereto as Exhibit "A".

2. The default was not cured by any of the Obligors identified in paragraph 1 above. The Trustee has not received any written objections from said Obligors and none of the timeshare interests have been redeemed.

3. The Notice of Trustee's Sale was published in the Heritage Florida Jewish News, a newspaper of general circulation in Osceola County, Florida, once a week for two (2) consecutive weeks prior to the date of the sale with the last publication date occurring at least five (5) calendar days before the sale. The original Affidavit of Publication for the Notice of Trustee's Sale is attached hereto as Exhibit "B".

4. The Trustee is in possession of the original Promissory Note executed by the Obligor(s) or in possession of a Lost Note Affidavit, as applicable.

5. A copy of the Notice of Trustee's Sale was mailed by first-class mail, postage prepaid, within three (3) business days after the date it was submitted for recording, to the notice addresses for the Obligors and any junior lienholders identified on the Exhibit "A" – Notice of Trustee's Sale attached hereto as part of Exhibit "C".

6. The Notice of Trustee's Sale was recorded on June 27, 2018, in O.R. Book 5357, at Page 2218, of the Public Records of Osceola County, Florida. A copy of the recorded Notice of Trustee's Sale is attached hereto as Exhibit "C".

Dated: July 27, 2018

GREENSPOON MARDER, LLP, Trustee

AMANDA L CHAPMAN, Authorized Agent

**STATE OF FLORIDA**
**COUNTY OF ORANGE**

The foregoing instrument was acknowledged before me this 27th day of July, 2018, by AMANDA L CHAPMAN, who is personally known to me.

SERIAL NO.:

VANISA A RICHARDS
Notary Public - State of Florida
Commission # FF 989199
My Comm. Expires May 5, 2020
Bonded through National Notary Assn.

Notary Public, State of Florida

## AFFIDAVIT OF SERVICE (BY REGISTERED AGENT)
### WESTGATE TOWN CENTER - FILE NO. 29203.0243

**STATE OF FLORIDA**
**COUNTY OF ORANGE**

BEFORE ME, the undersigned authority, personally appeared AMANDA L. CHAPMAN, who was sworn and says:

1.  That I am an authorized agent of the Trustee appointed by **WESTGATE VACATION VILLAS, LLC**, a Florida limited liability company, in this matter and, in such capacity, I am authorized to make the statements contained in this Affidavit.

2.  I have personal knowledge of the facts stated in this Affidavit.

3.  Each of the Obligors on the attached Acceptance of Service of Process By Registered Agent Designated Pursuant to Section 721.84, Florida Statutes, executed, at the time of purchase, a Notice of Appointment of Registered Agent designating WGR Registered Agents, Inc., as their registered agent upon whom may be served any notice, process or pleading in any action or proceeding against Obligors arising out of or in connection with the foreclosure of the lien interest against the timeshare estate arising out of mortgages executed in favor of WESTGATE VACATION VILLAS, LLC.

4.  On April 11, 2018, Trustee sent by First-Class Mail & Certified Mail true copies of the Notice of Default and Intent to Foreclose with an Objection Form to WGR REGISTERED AGENTS, INC., 2801 OLD WINTER GARDEN ROAD, OCOEE, FL 34761, on behalf of the Obligors listed on the attached Acceptance of Service of Process By Registered Agent Designated Pursuant to Section 721.84, Florida Statutes. The described process was mailed by First Class Mail & Certified Mail, Return Receipt Requested and said return receipt was signed on April 16, 2018, by WGR Registered Agents, Inc. on behalf of Obligors, as required by the provisions of Florida Statute §721.826. A copy of the Return Receipt is attached hereto.

5.  Based upon searches of the data banks of the Department of Defense Manpower Data Center, it has been determined that none of the Obligors contained herein are members of the military service of the United States or any of its allies within the Soldiers and Sailors Relief Act of 1944, as amended.

FURTHER AFFIANT SAYETH NAUGHT.

GREENSPOON MARDER, LLP, Trustee

By: _____
AMANDA L. CHAPMAN

**STATE OF FLORIDA**
**COUNTY OF ORANGE**

The foregoing instrument was acknowledged before me this 1 day of June, 2018, by AMANDA L. CHAPMAN, who is personally known to me.

SERIAL NO.:

_____
Notary Public, State of Florida

e:\arportb\active\o45347144830_1.docx



VANESA A RICHARDS
Notary Public - State of Florida
Commission # FF 988199
My Comm. Expires May 5, 2020
Bonded through National Notary Assn.

EXHIBIT
A



**ACCEPTANCE OF SERVICE OF PROCESS BY
REGISTERED AGENT DESIGNATED PURSUANT
TO SECTION 721.84, FLORIDA STATUTES**

WGR Registered Agents, Inc.
2801 Old Winter Garden Road
Ocoee, FL 34761

TO:   WGR REGISTERED AGENTS, INC.

Re:   WESTGATE TOWN CENTER
Our file No.: 29203.0243 (SHORE)

Pursuant to the Timeshare Lien Foreclosure Act, codified at 721.80 - 721.86, Florida Statutes, WESTGATE VACATION VILLAS, LLC hereby delivers to you, as Registered Agent duly appointed pursuant to section 721.84, Florida Statutes, by and for each Obligor named in the above-styled cause, service of process of the Notice of Default and Intent to Foreclose and the Objection Form filed in the above-styled cause.

To acknowledge this service, please sign below and return this Acceptance of Service to:

WESTGATE VACATION VILLAS, LLC
Attn: Timeshare Foreclosures
Greenspoon Marder, LLP
201 East Pine Street, Suite 500
Orlando, FL 32801

Thank you for your prompt attention to this matter.

WGR REGISTERED AGENTS, INC. does hereby acknowledge receipt of service of process in accordance with the Timeshare Lien Foreclosure Act for the Obligor:

| Account Number | | Unit | Week |
|---|---|---|---|
| 2801706909 | Stacey A Shore | 5900-103A, 5900-104D | 45 WHOLE, 31 WHOLE |
| 9020439409 | | 5900-109B, 5900-209B | 23 WHOLE, 33 WHOLE |
| 9019636909 | | 6200-12AB, 6200-12CD | 42, 42 WHOLE, WHOLE |
| 9019736209 | | 6200-13AB, 6200-13CD | 4 WHOLE, 4 WHOLE |
| 9019791609 | | 6200-13AB, 6200-13CD | 21 WHOLE, 21 WHOLE |
| 9020302709 | | 6200-23AB, 6200-23CD | 51 WHOLE, 51 WHOLE |
| 93115160373 | | 6200-33AB, 6200-33CD | 16 EVEN, 16 EVEN |
| 3701245109 | | 6200-34AB, 6200-34CD | 52 WHOLE, 52 WHOLE |
| 71981377311 | Celso Inuisan | 6200-43AB, 6200-43CD | 36 ODD, 36 ODD |
| 13147360438 | | 6200-53AB, 6200-53CD | 27 ODD, 27 ODD |
| 9019669909 | | B-1109, B-1109 | 5 EVEN, 49 EVEN |
| 9018185909 | | B-1119, B-1121 | 20 ODD, 20 ODD |
| 73035980538 | | B-1200, B-1202 | 49 ODD, 3 ODD |
| 88136377186 | | B-1210, B-1211 | 43 EVEN, 40 EVEN |
| 2102825909 | | B-1219, B-1221 | 36 EVEN, 36 EVEN |
| 9018074909 | | B-1123, B-1311 | 42 ODD, 42 ODD |
| 9020490209 | | B-1308, B-1622 | 50 ODD, 37 ODD |
| 7059054909 | | B-1607, B-1811 | 9 EVEN, 21 EVEN |
| 43413134710 | | B-1815, B-1816 | 48 WHOLE, 48 WHOLE |

WGR Registered Agents, Inc. shall serve any notice, process or pleading, served with this Acceptance on the Obligor(s) at the last known address of the Obligor(s) by first class mail, or international airmail, to the Obligor (s) within five (5) days of receipt.

Dated this 11th day of April, 2018.

WGR REGISTERED AGENTS, INC.

By: _____
Julia Willman, Registered Agent

K:\FORECLOSURE\29203.WG Town Center (NJ)\Acceptance

## HERITAGE FLORIDA JEWISH NEWS

Published Weekly
## KISSIMMEE, OSCEOLA COUNTY, FLORIDA

### STATE OF FLORIDA
### COUNTY OF OSCEOLA

Before the undersigned authority personally appeared Jeffrey Gaeser, who on oath says he is the publisher of the *HERITAGE Florida Jewish News*, a weekly newspaper published at Kissimmee in Osceola County, Florida, that the attached copy of advertisement, being a

### NOTICE OF TRUSTEE'S SALE -

In the matter of
On 07/27/2018 at 11:00 am, GREENSPOON MARDER, LLP, 201 E. Pine Street, Suite 500, Orlando, Florida 32801, as Trustee pursuant to that Appointment of Trustee recorded on 03/26/2018 in Official Records Book 5306, and Page 2461, of the Public Records of OSCEOLA County, Florida

in the Circuit Court, was published in said newspaper in the issues of

### July 13, 20, 2018

Affiant further says that the said *HERITAGE Florida Jewish Newspaper* is a newspaper published at Kissimmee, in said Osceola County, Florida, and that the said newspaper has heretofore been continuously published in said Osceola County, Florida, each week and has been entered as periodical matter at the post office in Kissimmee in said Osceola County, Florida, for a period of 1 year next preceding the first publication of the attached copy of advertisement; and affiant further says that he has neither paid nor promised any person, firm or corporation any discount, rebate, commission or refund for the purpose of securing this advertisement for publication in the said newspaper.

_____
Signature of Affiant

Sworn to and subscribed before me this   **20th**   day of   **July**   2018.

_____
Signature of Notary

Personally known  **X**  or produced identification
Type of identification produced
Name of Notary typed printed or stamped



PAULETTE C. ALFONSO
MY COMMISSION # GG 081653
EXPIRES: March 20, 2021
Bonded Thru Notary Public Underwriters



EXHIBIT
B



RECORD AND RETURN TO:
FORECLOSURE DEPARTMENT
GREENSPOON MARDER, LLP
201 EAST PINE STREET, SUITE 500
ORLANDO, FLORIDA 32801
(407) 425-6559

**NOTICE OF TRUSTEE'S SALE**
**WESTGATE TOWN CENTER**
29203.0243 (SHORE)

On July 27, 2018 at 11:00 am, GREENSPOON MARDER, LLP, 201 E. Pine Street, Suite 500, Orlando, Florida 32801, as Trustee pursuant to that Appointment of Trustee recorded on March 26, 2018, in Official Records Book 5306, and Page 2461 of the Public Records of OSCEOLA County, Florida, by reason of a now continuing default by Mortgagor(s), (See Exhibit "A"), whose address is (See Exhibit "A"), in the payment or performance of the obligations secured by a Mortgage recorded in O.R. Book (See Exhibit "A"), at Page (See Exhibit "A"), of the Public Records of OSCEOLA County, Florida, including the breach or default, notice of which was set forth in a Notice of Default and Intent to Foreclose provided to the last known address of Mortgagor(s), (See Exhibit "A"), by Certified/Registered Mail or by publication by the undersigned Trustee, will sell at public auction to the highest bidder for lawful money of the United States of America, on the front steps of the Osceola County Courthouse, 2 Courthouse Square, Kissimmee, Florida 34741, all right, title and interest in the property situated in the County of OSCEOLA, Florida, described as:

(SEE EXHIBIT "A") Time Share Interest(s) (SEE EXHIBIT "A") according to the Time Sharing Plan for WESTGATE TOWN CENTER, recorded in Official Records Book 1564, at Page 1479, of the Public Records of Osceola County, Florida (the "Plan"). Together with the right to occupy, pursuant to the Plan, Building(s)/Unit (s) (SEE EXHIBIT "A"), during Unit Week(s) (SEE EXHIBIT "A"), during Assigned Year(s) - (SEE EXHIBIT "A").

7700 Westgate Boulevard Kissimmee, FL 34747 ("Timeshare Property Address")

Said sale will be made (without covenants, or warranty, express or implied, regarding the title, possession or encumbrances) to pay the unpaid principal balance due under the mortgage in the amount of (See Exhibit "A"), with interest accruing at the rate of (See Exhibit "A") per day, pursuant to the Mortgage, advances, if any, under the terms of said Mortgage, charges and expenses of the Trustee and of the trusts created by said Mortgage.

Mortgagor(s) shall have the right to cure the default and any junior lienholder shall have the right to redeem its interest up to the date the Trustee issues the Certificate of Sale by paying the amounts due as outlined in the preceding paragraph.

This is a non-judicial foreclosure proceeding to permit WESTGATE VACATION VILLAS, LLC to pursue its in rem remedies under Florida law.

Dated   June   27,   2018

By: 
Amanda L. Chapman, Authorized Agent

STATE OF FLORIDA
COUNTY OF ORANGE

The foregoing instrument was sworn to and subscribed before me this 27 day of June, 2018 by Amanda L. Chapman, the Authorized Agent of GREENSPOON MARDER, LLP, Trustee, for the purposes herein expressed. S/e is personally known to me and did not take an oath.

_____ Notary Public Seal

Typed, printed or stamped name of Notary
My Commission Expires:



SHARON E. WARNER
MY COMMISSION # GG 002999
EXPIRES: October 15, 2020
Bonded Thru Notary Public Underwriters



# EXHIBIT #3

# CONTRACT FOR PURCHASE AND SALE

**WESTGATE TOWN CENTER, a Time Share Resort**
2770 Old Lake Wilson Road
Kissimmee, Florida 34747

**SELLER/DEVELOPER**
WESTGATE VACATION VILLAS, LLC
a Florida limited liability company
2801 Old Winter Garden Road
Ocoee, Florida 34701

Purchaser:   Stacey A Shore, A Single Woman

Address:           KE DR

Home Telephone                                      Business Telephone: 2174084380

Purchaser (a) agree (s) to purchase and Seller agrees to sell to Purchaser one (1) or more Westgate Timeshare Interests in the Timeshare Accommodations known as WESTGATE TOWN CENTER, located at 2770 Old Lake Wilson Road, Kissimmee, Florida 34747, pursuant to the terms and conditions of this Contract for Purchase and Sale and the TimeSharing Plan, a copy of which is included with the Public Offering Statement that each Purchaser receives upon execution of a contract for Purchase and Sale, together with all improvements, easements, rights, privileges and appurtenances pertaining to said Time Share Interest, as set forth in the Time Sharing Plan and all Exhibits thereto.
2 - BEDROOM DELUXE LOCK OFF   2 - BEDROOM DELUXE LOCK OFF

Number of Time Share Interests Purchased: 2          Fixed or Floating:  All Season - Float Week / Float Unit
Assigned Unit(s) / Unit Week(s) / Year(s):             First Available Occupancy Date: 2013
5900-304B / 31 / WHOLE, 5900-103A / 45 / WHOLE

Estimated Ad Valorem Tax Assessments: Even Years $ 275.00          Odd Years $  275.00
Estimated Maintenance Assessments: Even Years $ 376.90             Odd Years $  376.90

| | |
|---|---|
| 1. Purchase Price | $ 65,000.00 |
| 2. Closing Charges | $ 444.00 |
| 3. Exchange Membership Dues (In the event Purchaser elects to become a member of the exchange program) | $ 0.00 |
| 4. Debt Waiver For Loss of Life* _____ Signature | $ 3,263.02 |
| 5. Debt Waiver For Involuntary Unemployment* _____ Signature | $ N/A |
| 6. Total (1+2+3+4+5) | $ 58,707.02 |
| 7. Deposit Made this Date | $ 10,762.50 |
| 8. Additional Deposit Due | $ 0.00 |
| 9. Total Down Payment (7+8) | $ 0.00 |
| 10. Amount Financed (6 minus 9 ) | $ 47,428 * |

* Additional information regarding credit life insurance and involuntary unemployment insurance is available upon request.
THIS AGREEMENT is subject to the terms and conditions set forth on the reverse side hereof which by reference is made a part hereof.

THE DEVELOPER HAS LIMITED YOUR RESALE RIGHTS. ANY FUTURE PURCHASER (OTHER THAN A TRANSFER AS THE RESULT OF DEATH, DIVORCE OR TO AN IMMEDIATE FAMILY MEMBER) WHO BUYS YOUR TIMESHARE INTEREST FROM YOU WILL HAVE SEVERELY LIMITED OPPORTUNITY TO RESERVE OCCUPANCY IN THIS TIMESHARE PLAN.

FOR THE PURPOSE OF AD VALOREM ASSESSMENTS, TAXATION AND SPECIAL ASSESSMENTS, THE MANAGING ENTITY WILL BE CONSIDERED THE TAXPAYER AS YOUR AGENT PURSUANT TO SECTION 192.037, FLORIDA STATUTES.

YOU MAY CANCEL THIS CONTRACT WITHOUT ANY PENALTY OR OBLIGATION WITHIN TEN (10) CALENDAR DAYS AFTER THE DATE YOU SIGN THIS CONTRACT OR THE DATE ON WHICH YOU RECEIVE THE LAST OF ALL DOCUMENTS REQUIRED TO BE GIVEN TO YOU PURSUANT TO SECTION 721.07(6), FLORIDA STATUTES, WHICHEVER IS LATER.

IF YOU DECIDE TO CANCEL THIS CONTRACT, YOU MUST NOTIFY THE SELLER IN WRITING OF YOUR INTENT TO CANCEL. YOUR NOTICE OF CANCELLATION SHALL BE EFFECTIVE UPON THE DATE SENT AND SHALL BE SENT TO WESTGATE VACATION VILLAS, LLC, 2801 OLD WINTER GARDEN ROAD, OCOEE, FLORIDA 34761. ANY ATTEMPT TO OBTAIN A WAIVER OF YOUR CANCELLATION RIGHTS IS VOID AND OF NO EFFECT. WHILE YOU MAY EXECUTE ALL CLOSING DOCUMENTS IN ADVANCE, THE CLOSING, AS EVIDENCED BY DELIVERY OF THE DEED OR OTHER DOCUMENT, BEFORE EXPIRATION OF YOUR TEN (10) DAY CANCELLATION PERIOD, IS PROHIBITED.

DATE OF EXECUTION:

_____ Signature of Purchaser        (As to Purchaser)  August 28, 2012
Stacey A Shore

_____ Signature of Purchaser        (As to Developer)  August 28, 2012

_____ Signature of Purchaser        Signature on Behalf of Seller

_____ Signature of Purchaser        2801706909-009 RAC
                                    MICHAEL R GALLUP 44448
                                    ALEX NAVARRETE 43362
                                    KEVIN WHIPPLE 38418
                                    11:48 AM

* "Notify", for purposes of Sections 721.06(1)(x) and 721.065(2)(d), Florida Statutes, shall mean that a written notice of cancellation is delivered, by any means which may include certified mail return receipt requested, to the entity designated to receive the notice of cancellation in the statement required by Sections 721.06(1)(x) or 721.065(2)(d), Florida Statutes.

TC003A 7/10

# EXHIBIT #4



**FEDERAL TRADE COMMISSION**

## Consumer Information

consumer.ftc.gov

# Timeshares and Vacation Plans

The thought of owning a vacation home may sound appealing, but the year-round responsibility — and expense — that come with it may not. Buying a timeshare or vacation plan may be an alternative. If you're thinking about opting for a timeshare or vacation plan, the Federal Trade Commission (FTC), the nation's consumer protection agency, says it's a good idea to do some homework. If you're not careful, you could end up having a hard time selling your timeshare.

- The Basics of Buying a Timeshare (#basics)

- Before You Buy a Timeshare (#before)

- Timeshare Exchange Systems (#timeshare)

- Selling a Timeshare Through a Reseller (#selling)

## The Basics of Buying a Timeshare

Two basic vacation ownership options are available: timeshares and vacation interval plans. The value of these options is in their use as vacation destinations, not as investments. Because so many timeshares and vacation interval plans are available, the resale value of yours is likely to be a good deal lower than what you paid. Both a timeshare and a vacation interval plan require you to pay an initial purchase price and periodic maintenance fees. The initial purchase price may be paid all at once or over time; periodic maintenance fees are likely to increase every year.

**Deeded Timeshare Ownership.** In a timeshare, you either own your vacation unit for the rest of your life, for the number of years spelled out in your purchase contract, or until you sell it. Your interest is legally considered real property. You buy the right to use a specific unit at a specific time every year, and you may rent, sell, exchange, or bequeath your specific timeshare unit. You and the other timeshare owners collectively own the resort property.

Unless you've bought the timeshare outright for cash, you are responsible for paying the monthly mortgage. Regardless of how you bought the timeshare, you also are responsible for paying an annual maintenance fee; property taxes may be extra. Owners share in the use and upkeep of the units and of the common grounds of the resort property. A homeowners' association usually handles management of the resort. Timeshare owners elect officers and control the expenses, the upkeep of the resort property, and the selection of the resort management company.

**"Right to Use" Vacation Interval Option.** In this option, a developer owns the resort, which is made up of condominiums or units. Each condo or unit is divided into "intervals" — either by weeks or the equivalent in points. You purchase the right to use an interval at the resort for a specific number of years — typically between 10 and 50 years. The interest you own is legally considered personal property. The specific unit you use at the resort may not be the same each year. In addition to the price for the right to use an interval, you pay an annual maintenance fee that is likely to increase each year.

Within the "right to use" option, several plans can affect your ability to use a unit:

- **Fixed or Floating Time.** In a fixed time option, you buy the unit for use during a specific week of the year. In a floating time option, you use the unit within a certain season of the year, reserving the time you want in advance; confirmation typically is provided on a first-come, first-served basis.

- **Fractional Ownership.** Rather than an annual week, you buy a large share of vacation ownership time, usually up to 26 weeks.

- **Biennial Ownership.** You use a resort unit every other year.

- **Lockoff or Lockout.** You occupy a portion of the unit and offer the remaining space for rental or exchange. These units typically have two to three bedrooms and baths.

- **Points-Based Vacation Plans.** You buy a certain number of points, and exchange them for the right to use an interval at one or more resorts. In a points-based vacation plan (sometimes called a vacation club), the number of points you need to use an interval varies according to the length of the stay, size of the unit, location of the resort, and when you want to use it.

## Before You Buy a Timeshare

In calculating the total cost of a timeshare or vacation plan, include mortgage payments and expenses, like travel costs, annual maintenance fees and taxes, closing costs, broker commissions, and finance charges. Maintenance fees can rise at rates that equal or exceed inflation, so ask whether your plan has a fee cap. You must pay fees and taxes, regardless of whether you use the unit.

To help evaluate the purchase, compare these costs with the cost of renting similar accommodations with similar amenities in the same location for the same time period. If you find that buying a timeshare or vacation plan makes sense, comparison shopping is your next step.

- Evaluate the location and quality of the resort, as well as the availability of units. Visit the facilities and talk to current timeshare or vacation plan owners about their experiences. Local real estate agents also can be good sources of information. Check for complaints about the resort developer and management company with the state Attorney General (http://www.naag.org) and local consumer protection officials (http://www.usa.gov/directory/stateconsumer/index.shtml).

- Research the track record of the seller, developer, and management company before you buy. Ask for a copy of the current maintenance budget for the property. Investigate the policies on management, repair, and replacement furnishings, and timetables for promised services. You also can search online for complaints.

- Get a handle on all the obligations and benefits of the timeshare or vacation plan purchase. Is everything the salesperson promises written into the contract? If not, walk away from the sale.

- Don't act on impulse or under pressure. Purchase incentives may be offered while you are touring or staying at a resort. While these bonuses may present a good value, the timing of a purchase is your decision. You have the right to get all promises and representations in writing, as well as a public offering statement and other relevant documents.

- Study the paperwork outside of the presentation environment and, if possible, ask someone who is knowledgeable about contracts and real estate to review it before you make a decision.

- Get the name and phone number of someone at the company who can answer your questions — before, during, and after the sales presentation, and after your purchase.

- Ask about your ability to cancel the contract, sometimes referred to as a "right of rescission." Many states — and maybe your contract — give you a right of rescission, but the amount of time you have to cancel may vary. State law or your contract also may specify a "cooling-off period" — that is, how long you have to cancel the deal once you've signed the papers. If a right of rescission or a cooling-off period isn't required by law, ask that it be included in your contract.

- If, for some reason, you decide to cancel the purchase — either through your contract or state law — do it in writing. Send your letter by certified mail, and ask for a return receipt so you can document what the seller received. Keep copies of your letter and any enclosures. You should receive a prompt refund of any money you paid, as provided by law.

- Use an escrow account if you're buying an undeveloped property, and get a written commitment from the seller that the facilities will be finished as promised. That's one way to help protect your contract rights if the developer defaults. Make sure your contract includes clauses for "non-disturbance" and "non-performance." A non-disturbance clause ensures that you'll be able to use your unit or interval if the developer or management firm goes bankrupt or defaults. A non-performance clause lets you keep your rights, even if your contract is bought by a third party. You may want to contact an attorney who can provide you with more information about these provisions.

Be wary of offers to buy timeshares or vacation plans in foreign countries. If you sign a contract outside the U.S. for a timeshare or vacation plan in another country, you are not protected by U.S. laws.

## Timeshare Exchange Systems

An exchange allows a timeshare or vacation plan owner to trade units with another owner who has an equivalent unit at an affiliated resort within the system. Here's how it works: A resort developer has a relationship with an exchange company, which administers the service for owners at the resort. Owners become members of the exchange system when they buy their timeshare or vacation plan. At most resorts, the developer pays for each new member's first year of membership in the exchange company, but members pay the exchange company directly after that.

To participate, a member must deposit a unit into the exchange company's inventory of weeks available for exchange. When a member takes a week from the inventory, the exchange company charges a fee.

In a points-based exchange system, the interval is automatically put into the inventory system for a specified period when the member joins. Point values are assigned to units based on length of stay, location, unit size, and seasonality. Members who have enough points to secure the vacation accommodations they want can reserve them on a space-available basis. Members who don't have enough points may want to investigate programs that allow banking of prior-year points, advancing points, or even "renting" extra points to make up differences.

Whether the exchange system works satisfactorily for owners is another issue to look into before buying. Keep in mind that you will pay all fees and taxes in an exchange program whether you use your unit or someone else's.



(https://www.consumer.ftc.gov/articles/0368-timeshare-resale-scams-infographic)
Timeshare Resale Scams Infographic

## Selling a Timeshare Through a Reseller

If you're thinking of selling a timeshare, the FTC cautions you to question resellers — real estate brokers and agents who specialize in reselling timeshares. They may claim that the market in your area is "hot" and that they're overwhelmed with buyer requests. Some may even say that they have buyers ready to purchase your timeshare, or promise to sell your timeshare within a specific time.

If you want to sell your deeded timeshare, and a company approaches you offering to resell your timeshare, go into skeptic mode:

- Don't agree to anything on the phone or online until you've had a chance to check out the reseller. Contact the state Attorney General (http://www.naag.org/) and local consumer protection agencies (http://www.usa.gov/directory/stateconsumer/index.shtml) in the state where the reseller is located. Ask if any complaints are on file. You also can search online for complaints.

- Ask the salesperson for all information in writing.

- Ask if the reseller's agents are licensed to sell real estate where your timeshare is located. If so, verify it with the state Real Estate Commission. Deal only with licensed real estate brokers and agents, and ask for references from satisfied clients.

- Ask how the reseller will advertise and promote the timeshare unit. Will you get progress reports? How often?

- Ask about fees and timing. It's preferable to do business with a reseller that takes its fee after the timeshare is sold. If you must pay a fee in advance, ask about refunds. Get refund policies and promises in writing.

- Don't assume you'll recoup your purchase price for your timeshare, especially if you've owned it for less than five years and the location is less than well-known.

If you want an idea of the value of a timeshare that you're interested in buying or selling, consider using a timeshare appraisal service. The appraiser should be licensed in the state where the service is located. Check with the state to see if the license is current.

## Contract Caveats

Before you sign a contract with a reseller, get the details of the terms and conditions of the contract. It should include the services the reseller will perform; the fees, commissions, and other costs you must pay and when; whether you can rent or sell the timeshare on your own at the same time the reseller is trying to sell your unit; the length or term of the contract to sell your timeshare; and who is responsible for documenting and closing the sale.

If the deal isn't what you expected or wanted, don't sign the contract. Negotiate changes or find another reseller.

## Resale Checklist

Selling a timeshare is a lot like selling any other piece of real estate. But you also should check with the resort to determine restrictions, limits, or fees that could affect your ability to resell or transfer ownership. Then, make sure that your paperwork is in order. You'll need:

- the name, address, and phone number of the resort

- the deed and the contract or membership agreement

- the financing agreement, if you're still paying for the property

- information to identify your interest or membership

- the exchange company affiliation

- the amount and due date of your maintenance fee

- the amount of real estate taxes, if billed separately

To learn more about vacation ownership, contact the American Resort Development Association. It represents the vacation ownership and resort development industries. ARDA has nearly 1,000 members, ranging from privately-held companies to major corporations, in the U.S. and overseas.

American Resort Development Association
1201 15th Street N.W., Suite 400
Washington, D.C. 20005
(202) 371-6700; Fax: (202) 289-8544
www.arda.org (http://www.arda.org/)

July 2012

## Related Items

- How to File a Complaint (https://www.consumer.ftc.gov/media/video-0054-how-file-complaint)
- Rental Listing Scams (https://www.consumer.ftc.gov/articles/0079-rental-listing-scams)
- Travel Tips (https://www.consumer.ftc.gov/articles/0046-travel-tips)
- Battling Bed Bugs (https://www.consumer.ftc.gov/articles/0139-battling-bed-bugs)
- Before You Buy Paint (https://www.consumer.ftc.gov/articles/0253-you-buy-paint)
- Shopping for Light Bulbs (https://www.consumer.ftc.gov/articles/0164-shopping-light-bulbs)

# EXHIBIT #5

LEONARD S. MARK, ESQ.
GREENSPOON MARDER, P.A.
100 West Cypress Creek Road, #700
Fort Lauderdale, Florida 33309



CFN   2013146056
Bk 4503 Pg 897 (1 Pgs)
DATE: 09/17/2013  12:35:30 PM
ARMANDO RAMIREZ, CLERK OF COURT
OSCEOLA COUNTY
RECORDING FEES $10.00
DEED DOC $385.00
MTG DOC $168.00
INTANGIBLE $95.88

2801.00303-007

# WARRANTY DEED AND LIEN ON REAL PROPERTY

### Westgate Town Center

DOCUMENTARY STAMP TAXES AND INTANGIBLE TAXES HAVE
BEEN PAID PURSUANT TO FLORIDA STATUTES, 199.133(1), 201.02(1) AND 201.02(1)

Parcel Identification No.: 102527- 5452 -000 / - 0010

THIS INDENTURE made this 28TH day of August, 2012, between
**Westgate Vacation Villas LLC, a Florida limited liability company**
whose post office address is 5601 Windhover Dr., Orlando, FL 32819
organized and existing under the laws of the State of Florida, hereinafter referred to as "Grantor" or
"Lender" as appropriate, and
Stacey A Shore, A Single Woman

whose post office address is 4000 Westgate Blvd., Kissimmee, Fl. 34747 hereinafter referred to as "Grantee" or "Borrower" as appropriate.

WITNESSETH:

That the Grantor, in consideration of Ten ($10.00) Dollars and other good and valuable consideration to it paid by the Grantee, the receipt of which is acknowledged, has bargained and sold, and by these presents does grant, bargain, sell and convey unto the aforesaid Grantee, their heirs, devisees, successors and assigns, forever the following described property, (the "Property") situate and being in Osceola County, Florida:

2 Time Share Interest(s) All Season - Float Week/ Float Unit according to the Time Sharing Plan for
Westgate Town Center, recorded in Official Records Book 1564, at Page 1479, of
the Public Records of Osceola County, Florida. (the "Plan").
Together with the right to occupy, pursuant to the Plan, Building(s) / Unit(s) / Unit Week(s) / Assigned Year(s),
5900/104B / 31 / WHOLE, 5900/103A / 45 / WHOLE

4000 Westgate Blvd., Kissimmee, FL 34747 (herein "Property Address")

Grantee shall not be deemed a successor or assign of Grantor's rights or obligations under the afore described Declaration or any instrument referred to therein. Grantee, by acceptance hereof, and by agreement with Grantor, hereby expressly assumes and agrees to be bound by and to comply with all of the covenants, terms, conditions and provisions set forth and contained in the Declaration, including, but not limited to, the obligation to make payment for assessments for the maintenance and operation of the Resort which may be levied against the above described Time Share Interest, and the obligation to pay the indebtedness as described herein, subject to the lien granted and reserved herein.

And the Grantor does hereby fully warrant the title to said property and will defend the same against lawful claims of all persons whomsoever, subject to easements, conditions, restrictions, covenants and limitations of record and taxes for the year of the conveyance and subsequent years.

Grantee as Borrower acknowledges that, in connection with this conveyance, Grantee has executed a Promissory Note (the "Note") in the amount of Forty-Seven Thousand Nine Hundred Thirty-Nine Dollars & 2 Cents ($47,939.02) providing for monthly installments of principal and interest, with the balance of the indebtedness, if not sooner paid, due and payable on September 1, 2022.

Grantee as Borrower does hereby further mortgage, grant and convey to Grantee as Lender, and Lender does hereby reserve unto itself, its successors and/or assigns, a lien and security interest in the Property in order to secure repayment of the Note. Notwithstanding the provisions of paragraph 19 of the Master Form of Mortgage and Riders and Addendums attached thereto, if any, recorded in Official Records Book 2525, at Page 1568, of the Public Records of Osceola County, Florida (the "Master Mortgage"), if the Borrower fails to make timely payments under the obligation secured by this mortgage, or is otherwise deemed in uncured default of this mortgage, the lien against the Borrower's Timeshare Interest created by this mortgage may be foreclosed in accordance with either a judicial foreclosure procedure or a trustee foreclosure procedure and may result in the loss of Borrower's Timeshare Interest. If the Lender initiates a trustee foreclosure procedure, the Borrower shall have the option to object, and the Lender may proceed only by filing a judicial foreclosure action. Lender and Borrower hereby expressly adopt and incorporate by reference as if fully set forth herein and hereby agree to be bound by the covenants and agreements contained in the Master Mortgage. The lien and security interest granted herein may be assigned by Lender by separate assignment of the lien and security interest created hereby. Notwithstanding anything contained herein to the contrary, this instrument shall be deemed one instrument consisting of both a conveyance of real property and the granting and reservation of a lien and security interest.

Signed, Sealed and Delivered in the Presence of:

Westgate Vacation Villas LLC, a Florida limited liability company

Print Name:  LISA ALDERMAN

By: Westgate Resorts, Inc., a Florida corporation, its Manager

Print Name:  Milagros Irizarry

By: _____
Name: David A. Siegel  Title: President

STATE OF FLORIDA  COUNTY OF ORANGE )

The foregoing instrument before me this
He/She is personally known to me and who did/did not take an oath.

LISA M ALDERMAN
MY COMMISSION # DD991800
EXPIRES: May 13, 2014

_____ day of July 2013, by David A. Siegel.

Notary Signature and Seal

IN WITNESS WHEREOF, Borrower has executed this Mortgage.

GRANTEE/BORROWER Stacey A Shore

GRANTEE/BORROWER

GRANTEE/BORROWER  South Carolina

GRANTEE/BORROWER

STATE OF FLORIDA, COUNTY OF Osceola )

The foregoing instrument was acknowledged before me this 28TH day of August, 2012, by
Stacey A Shore
He/she is personally known to me or has produced passport/driver's license as type of identification.

State Of South Carolina
Notary Public
Kevin K. Whipple

Notary Signature and Seal
Expiration Date  My Commission Expires

Kevin K. Whipple

# EXHIBIT #6

Case 6:18-cv-01893-JA-DCI   Document 23-1   Filed 02/08/19   Page 55 of 117 PageID 704

LARRY WHALEY                      63P
CLERK OF CIRCUIT COURT
OSCEOLA COUNTY, FLORIDA

CL 99000162              OR 1564/1479
KEM  Rec. Date 01/04/99  Time 09:41

G:\DR\WTC\42700012.DEC
1/12/98

THIS INSTRUMENT PREPARED BY:
LEONARD LUBART, ESQ.
GREENSPOON, MARDER, HIRSCHFELD,
  RAFKIN, ROSS & BERGER, P.A.
Trade Centre South, Suite 700
100 West Cypress Creek Road
Fort Lauderdale, Florida 33309


## DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS

### FOR

### WESTGATE TOWN CENTER, A TIME SHARE RESORT

\* \* \*

This Declaration of Covenants, Conditions and Restrictions (the "Time Sharing Plan") ("Plan") for WESTGATE TOWN CENTER, A TIME SHARE RESORT, is made this 4th day of January, 1999, by WESTGATE VACATION VILLAS, LTD., a Florida limited partnership ("Developer").

WHEREAS, Developer is the owner in fee simple of the real property described on Exhibit "A" attached hereto and made a part hereof (the "Resort Facility") and intends to develop thereon a time share resort community to be known as WESTGATE TOWN CENTER; and

WHEREAS, Developer has established a plan of development for the Resort Facility and desires to provide for the preservation of the values and amenities hereby established for the Resort Facility, and to this end does hereby subject the Resort Facility to the land use covenants, restrictions, reservations, regulations, burdens, liens and easements hereinafter set forth; and

WHEREAS, Developer has deemed it desirable for the efficient preservation of the values and amenities established as aforesaid to have the Resort Facility managed, maintained and administered by WESTGATE TOWN CENTER OWNERS ASSOCIATION, INC. (the "Association") to which there has been delegated and assigned certain powers and duties of operation, administration, maintenance and repair of the Resort Facility and other properties which are or may be managed by the Association, the

CL 99000162          OR 1564/1480

enforcement of the covenants, restrictions and easements contained herein and the collection and disbursement of the assessments and charges hereinafter provided.

NOW, THEREFORE, in consideration of the premises and mutual covenants herein contained, Developer hereby declares that the Resort Facility shall be owned, held, used, transferred, sold, conveyed, demised and occupied subject to the conditions, covenants, restrictions, easements, reservations, regulations and burdens hereinafter set forth, all of which shall run with the Resort Facility and which shall be binding on all parties having any right, title or interest in the property so committed, and their heirs, successors and assigns.

## ARTICLE I

## DEFINITIONS

The following words and phrases when used in the Plan (unless the context should clearly reflect another meaning) shall have the following meanings:

A.   "Act" means Chapter 721, Florida Statutes, as amended prior to the recordation of these covenants, conditions and restrictions.

B.   "Annual Assessment" means the share of funds required for the payment of Common Expenses which is assessed annually against an Owner by the managing entity.

C.   "Articles" means the Articles of Incorporation of the Association.

D.   "Assigned Unit" means the Unit assigned to an Owner by Developer at the time of conveyance of a Time Share Interest which such Owner shall occupy during the Owner's "Assigned Unit Week" (as hereinafter defined).

E.   "Assigned Unit Week" means the Unit Week assigned to an Owner by the Developer at the time of conveyance of a Time Share Interest.

F.   "Association" means WESTGATE TOWN CENTER OWNERS ASSOCIATION, INC., a Florida not-for-profit corporation.

2

CL 99000162          OR 1564/1481

G.   "Biennial Time Share Interest" means the ownership in fee simple of an undivided interest as a tenant in common with the other owners in a building in the Resort Facility, which is limited to either the Odd Numbered Years or the Even Numbered Years, one-half (1/2) of a Time Share Interest being a fraction, the numerator of which is one (1) and the denominator of which is twice the denominator of the undivided interest for a Unit Week. Every reference in the Plan which states a number with regard to an Owner of a Time Share Interest, including, but not limited to, voting rights, assessment amounts and undivided interest shall be deemed to be divided in half for Owners of Biennial Time Share Interests.

H.   "Board" means the Board of Directors of the Association.

I.   "By-Laws" means the By-Laws of the Association.

J.   "Common Amenities" means those areas not included as part of the Resort Facility which are to be used by Owners of the Resort Facility as set forth in Article II (B).  A description of the land comprising the Common Amenities is attached to the Declaration of Covenants, Conditions and Restrictions as Exhibit "B". The Common Amenities may be expanded from time to time in the sole discretion of the Developer in the manner provided for in the Plan.  The Common Amenities shall also be available for use by Owners in Westgate Vacation Villas I through and including Westgate Vacation Villas XXIV.  This use of the Common Amenities by Owners in Westgate Vacation Villas is conditioned upon payment of prorata maintenance fees for management and maintenance of the Common Amenities. Such prorata maintenance fee shall be determined by multiplying the total budget for management and maintenance of the Common Amenities by a fraction, the numerator of which shall be the total number of the time share interests in Westgate Vacation Villas I through XXIV, and the denominator of which shall be the total number of time share interests included in the Resort Facility and Westgate Vacation Villas I through XXIV.  Maintenance fees shall be payable annually or such other time as may be designated by the Board.  The Westgate Vacation Villas Owners shall also be subject to special assessments as a condition of use of the Common Amenities and shall be subject to all lien rights created herein. Owners of the Resort Facility shall not acquire any direct ownership in the Common Amenities, however, the Common Amenities provided for by the Developer, as described herein, shall be transferred by the Developer to the Association pursuant to the provisions set forth herein.

K.   "Common Areas" means those portions of the Resort Facility which are not included in the Units.

3

CL 99000562          OR 1564/1482

L.    "Common Expenses" means costs incurred in the operation of the Resort Facility and includes those expenses properly incurred for the maintenance, operation and repair of the accommodations or facilities, or both, constituting the Time Share Plan.

M.    "Developer" means the creator of the Time Share Plan, that is, WESTGATE VACATION VILLAS, LTD., a Florida limited partnership, its grantees, successors and assigns. An "Owner" (as hereinafter defined) shall not solely by reason of the purchase of a "Time Share Interest" (as hereinafter defined) be deemed a grantee, successor or assign of Developer's rights or obligations under the Plan unless such Owner is specifically so designated as a successor or assign of Developer's rights or obligations in the respective instrument of conveyance or other instruments executed by Developer.

N.    "Division" as used herein shall be deemed to mean and refer to the Division of Florida Land Sales, Condominiums and Mobile Homes, Department of Business and Professional Regulation.

O.    "Even Numbered Years" means those years ending in the numbers 2, 4, 6, 8 and 0.

P.    "Fixed Unit Week" means a Unit Week that is not committed to the Floating Use Plan.

Q.    "Floating Unit Week" means a Unit Week that is committed to the Floating Use Plan.

R.    "Floating Use Plan" means the arrangement pursuant to which the right to use, possess, and occupy a specific Floating Unit Week in a specific Unit is released in consideration for receiving the right to request a reservation for any Floating Unit Week in accordance with the terms of the Declaration and the Floating Use Plan Rules and Regulations, as the same may be amended from time to time.

S.    "Floating Use Plan Rules and Regulations" means the rules and regulations respecting the reservation of Floating Unit Weeks, which rules and regulations have been adopted and/or amended from time to time in accordance herewith. A copy of the initial Floating Use Plan Rules and Regulations is attached hereto as Exhibit "C".

T.    "Managing Entity" means the person or entity responsible for operating and maintaining the Time Share Plan.

4

CL 99000162          OR  1564/1483

U.   "Odd Numbered Years" means those years ending in the numbers 1, 3, 5, 7 and 9.

V.   "Owner" means a person to whom the Developer has conveyed of record a Time Share Interest.

W.   "Plan" or "Time Sharing Plan" means this Declaration of Covenants, Conditions and Restrictions, as amended from time to time.

X.   "Preferred Mortgagee" means a bank, a federal or state savings and loan association, an insurance company, a mortgage company, a real estate investment or business trust, a pension fund, an agency of the United States government, any other lender generally recognized as an institutional type lender owning and holding a mortgage encumbering a Time Share Interest and also includes Developer or its assigns with respect to mortgages which it holds encumbering a Time Share Interest.

Y.   "Resort Facility" means the land and the buildings containing Units now or hereafter constructed upon the property described on Exhibit "A" attached hereto, including all improvements thereon (including the Units and the Common Areas and all furniture, furnishings and fixtures therein) and all easements and rights appurtenant thereto intended for use in connection therewith.  Exhibit "A" may be amended from time to time to add additional property upon which additional Units may be constructed.

Z.   "Rules and Regulations" means the Rules and Regulations of the Association.

AA.   "Service Period" means that period of time designated by the Association in its sole discretion, commencing at the end of each Unit Week and ending at the beginning of the next Unit Week to be used by the Association to clean, service and maintain a Unit and the Common Areas. The Service Period shall initially run for six (6) hours from 10:00 a.m. until 4:00 p.m. however it may be changed by the Association in its sole discretion provided however that the Service Period shall not be less than three (3) hours nor more than seven (7) hours.

AB.   "Special Assessment" means a share of funds required for the payment of Common Expenses which from time to time is assessed against an Owner in addition to the Annual Assessment.

AC.   "Time Share Interest" means the ownership in fee simple of an undivided interest as a tenant in common with the other Owners in a particular building in the Resort Facility, one Time Share Interest being

5

CL 99000162          OR 1564/1484

a fraction, the numerator of which is one (1) and the denominator of which is the number of Units in the building multiplied by fifty-two (52).   The Time Share Interest conveyed shall be limited to an undivided interest only in the building in which the Assigned Unit and Assigned Unit Week is located.

AD.   "Unit" means a part of the Resort Facility which is subject to exclusive possession.

AE.   "Unit Week" means a period of use of a Unit which shall consist of not less than seven (7) days.  Unit Weeks are computed as follows:

> Unit Week No. 1 is the Seven (7) Days commencing on the first Saturday in each year in Buildings #5100, #5200 and #5400; and, Unit Week No. 1 is the Seven (7) Days commencing on the first Sunday in each year in Building #5300.
> Unit Week No. 2 is the Seven (7) Days succeeding. Additional Unit Weeks, up to and including Unit Week No. 51, are computed in a like manner.
> Unit Week No. 52 contains the Seven (7) Days succeeding the end of Unit Week No. 51, without regard to the month or year.  Any excess days not otherwise assigned shall remain the property of the Developer.  Unit Weeks run from  12:00 p.m. on the first day of the Unit Week to 12:00 p.m. on the last day of the Unit Week, subject to the service period as defined in Article I (AA) hereof.

AF.   "Very Substantial Damage":  means loss or damage whereby three-quarters (3/4) or more of the Resort Facility is rendered untenantable, or loss or damage whereby seventy-five (75%) percent or more of the total amount of insurance coverage on the Resort Facility becomes payable.

<u>ARTICLE II</u>

<u>DESCRIPTION OF IMPROVEMENTS AND TIME SHARING PLAN</u>

A.   <u>Description of Resort Facility.</u>

The Resort Facility initially consists of four (4) buildings containing a total of one hundred seventy two (172) Time Share Units, together with certain Common Areas.  The Units and Unit Types are identified on Exhibit "D" attached hereto.  There are four (4) types of

6

Case 6:18-cv-01893-JA-DCI   Document 17-3   Filed 01/23/19   Page 32 of 83 PageID 735

CL 99000162          OR  1564/1405

Unit within the Resort Facility.  Type A is a two bedroom/two bathroom standard Unit.  Type E is a four bedroom/four bathroom grande villa townhouse Unit.  Type G is a three bedroom/three bathroom deluxe Unit, and Type H is a four bedroom/four bathroom grande villa townhouse Unit. The number and types of Units in each building are as follows:

| Building Number | Total Number of Units | Type A | Type E | Type G | Type H |
|---|---|---|---|---|---|
| #5100 | 46 | 10 | 2 | 24 | 10 |
| #5200 | 46 | 10 | 2 | 24 | 10 |
| #5300 | 46 | 10 | 2 | 24 | 10 |
| #5400 | 34 | 10 | 2 | 12 | 10 |

The property upon which the Resort Facility is located is described on Exhibit "A" attached to the Plan.  The Resort Facility consists of the land and the buildings containing Units now or hereafter constructed upon the property, including all improvements thereon (including the Units and the Common Areas and all furniture, furnishings and fixtures therein) and all easements and rights appurtenant thereto intended for use in connection therewith.  Exhibit "A" may be amended from time to time to add additional property upon which additional Units may be constructed.

B.   Description of Common Amenities.

1.    There shall be certain Common Amenities available for use by Owners in connection with the Resort Facility.  The Developer may, but is not obligated to, construct additional facilities on the Common Amenities.  The Common Amenities are not included as part of the Resort Facility, and no Owner shall acquire any ownership interest therein. Title to the Common Amenities is presently vested in the Developer. Title to the Common Amenities shall be retained by the Developer pending the closing of sale of all Time Share Interests in the Resort Facility and any other Member Resort Facility.  The Developer may retain an ownership interest in a portion of the Common Amenities in order to conduct sales and resales at the Resort.  At such time, title to the Common Amenities shall be transferred to the Association.  Pending such conveyance, the Association shall have the obligation to maintain, manage, repair and replace the Common Amenities.  All Owners in the Resort Facility shall have use rights therein in connection with use of the Common Amenities, pending the transfer of same by the Developer to the Association.

7

Case 6:18-cv-01893-JA-DCI   Document 17-3   Filed 02/03/19   Page 38 of 68 PageID 382

CL 99000162          OR 1564/1486

In addition, the Owners at Westgate Vacation Villas (Phases I through XXIV) shall have the right to use the Common Amenities at the Resort Facility. This use of the Common Amenities by Owners in Westgate Vacation Villas is conditioned upon payment of prorata maintenance fees for management and maintenance of the Common Amenities. Such prorata maintenance fee shall be determined by multiplying the total budget for management and maintenance of the Common Amenities by a fraction, the numerator of which shall be the total number of the time share interests in Westgate Vacation Villas (Phases I through XXIV), and the denominator of which shall be the total number of time share interests included in the Resort Facility and Westgate Vacation Villas (Phases I through XXIV). Maintenance fees shall be payable annually or such other time as may be designated by the Board. The Westgate Vacation Villas Owners shall also be subject to special assessment as a condition of use of the Common Amenities and shall be subject to all lien rights created herein.

Notwithstanding anything contained herein to the contrary, all references to the Association's obligation to maintain, manage and repair the Recreational Facilities shall be deemed to include the Common Amenities; provided, however, this provision shall not affect the ownership interest of a Purchaser which is limited to an undivided interest in a building in the Resort Facilty.

2.    The Developer may, however, is not obligated to, add additional properties and improvement(s) to the Common Amenities, in its sole discretion, without the consent of the Association or any Owner. Upon such additional properties and improvement(s) being added to the Common Amenities, such properties and improvement(s) shall be subject to the terms and conditions hereof. Such expansion of the Common Amenities shall be accomplished by the Developer filing in the Public Records in the County in which the Resort Facility is located any notice that the Developer intends to additional properties to the Common Amenities, which notice sets forth the legal description of the properties so added and a description of any improvement(s) located thereon.

3.    The Developer has declared the Resort Facility as a Nonmember Resort Facility pursuant to the Declaration of Covenants, Conditions and Restrictions for Westgate Vacation Villas (Phases I through XXIV). Accordingly, the Owners shall have the right to utilize the Common Amenities in Westgate Vacation Villas, which use is conditioned upon the payment by the Owners of prorata maintenance fees for management and maintenance of the Common Amenities. Such prorata maintenance fee shall be determined by multiplying the total budget for management and maintenance of the Common Amenities by a fraction, the numerator of which shall be the total number of the time share interests in Westgate Vacation Villas (Phases I through XXIV), and the denominator of which shall be the total number of time share interests included in the Resort Facility and Westgate Vacation Villas (Phases I through XXIV). Maintenance fees shall be payable annually or such other time as may be

8

CL 99000162          OR  1564/1487

designated by the Board.  The Owners shall also be subject to special assessment as a condition of use of the Common Amenities and shall be subject to all lien rights created herein.

C.    Time Sharing Plan and Floating Use Plan.

1.    Time Sharing Plan.  Developer shall convey to each Owner by Warranty Deed the ownership in fee simple of an undivided interest in a building in the Resort Facility as a tenant in common with other Owners which interest shall constitute said Owner's Time Share Interest.  One Time Share Interest shall be equal to a fraction, the numerator of which is one (1), and the denominator of which is equal to the number of Time Share Interests in the building in the Resort Facility in which the Time Share Interest is being conveyed.  Notwithstanding the fact that each time share interest has an equal undivided interest in a building in the Resort Facility, the Owners do not necessarily pay an equal share of the operating expenses of the Association.  As set forth in Article IV of the Declaration of Covenants, Conditions and Restrictions attached as Exhibit "3" to this Public Offering Statement, the Board of Directors has the authority to allocate costs among the different types of Units.  The allocation shall be set forth by the Board of Directors as a Note to the Estimated Operating Budget each year.  An Owner may be the Owner of more than one (1) Time Share Interest.  The deed of conveyance by Developer of a Time Share Interest shall designate a Unit which the Owner shall occupy and a Unit Week during which the Owner shall occupy his Unit.  The Unit and Unit Week which is designated for the use of a particular Owner shall be such Owner's Assigned Unit and Assigned Unit Week.  Such Assigned Unit and Assigned Unit Week shall be selected by the Owner.  The Owner shall be entitled to the exclusive use of his Assigned Unit during the Assigned Unit Week and to no other Unit and to the non-exclusive use of the Common Areas.  An Owner shall not have the right to the use of a Unit except during such Owner's Assigned Unit Week, however, this shall not restrict the use by an Owner of the Common Areas at other times of the year, subject to rules and regulations adopted from time to time by the Association.

2.    Floating Use Plan and Floating Use Plan Rules and Regulations.

A.    Floating Use Plan.

a.    Notwithstanding the specific Unit and Unit Week assigned to an Owner, it is the express intent of this Declaration, which intent is consented to by each Owner through acceptance of a conveyance of a Floating Unit Week hereunder, that certain Unit Weeks shall be part of the Floating Use Plan.  Pursuant to the Floating Use Plan all Floating Unit Weeks shall be available for use by all Owners at all times on a "first come, first served" reservation basis in accordance with this

9

CL 99000162                    OR 1564/1488

Declaration and the Floating Use Plan Rules and Regulations, as they may be amended from time to time, an initial copy of which is attached hereto as Exhibit "C".   The purpose of the Floating Use Plan is to enable Floating Unit Week Owners to take advantage of a greater selection of time periods in which to use and enjoy their Floating Unit Weeks by pooling the Floating Unit Weeks and making them available in accordance with this Declaration and the Floating Use Plan Rules and Regulations. The Association shall be the entity responsible for the administration and operation of the Floating Use Plan; however, the Association shall have the power to delegate this responsibility to the Management Company.

The owner of a Floating Unit Week shall be assigned to a specific Unit Week in a specific Unit.   However, owners of Floating Unit Weeks shall not be entitled to possession and use of the specific Unit or the specific Unit Week assigned, but instead, such possession and use rights are released in consideration for receiving the right to request a reservation annually (or biennially, for owners of Biennial Floating Unit Weeks) for a Floating Unit Week within the Floating Use Plan system and during which the Owner may occupy a Unit in accordance with the terms and conditions of the Floating Use Plan and the use restrictions set forth in or promulgated pursuant to the provisions of this Declaration.

b.   <u>Committing Unit Weeks to the Floating Use Plan</u>. A Unit Week is committed to the Floating Use Plan upon the conveyance of the Unit Week as evidenced by the recording of a deed in the Public Records of Osceola County, Florida indicating that the Developer is conveying that Unit Week to the purchaser as a Floating Unit Week.   There are five (5) classes of ownership as follows:

(1)   Fixed Weeks 13, 14, 51 and 52.   It is specifically acknowledged that Weeks 13, 14, 51 and 52 (the "Fixed Weeks") shall not initially be part of the Floating Use Plan.   Owners of Units in the Fixed Weeks shall be entitled to the exclusive use of their regular deeded week.   Owners of Fixed Weeks may elect to participate in the Floating Use Plan in any given year by notifying the Management Company in writing or by fax of their intent.   This notification may occur no earlier than eleven (11) months prior to the commencement of the Unit Week requested, and may occur as late as thirty (30) days prior. Once a Fixed Week Owner has committed his Week to the Floating Use Plan, he may request a Floating Unit Week and be given highest priority based upon availability.   Fixed Week ownership is intended for use during certain special event time periods.   Because calendar dates change from year to year, a specific event may fall outside the Fixed Week period which it was intended to encompass as follows:  For a Saturday check-in, Week 13 is intended to be the week preceding Easter Sunday, and for a Sunday check-in, Week 13 is intended to be the week ending on Easter Sunday.   Week 14 is the following week.   Week 51 is intended to encompass Christmas Day.   When Christmas Day is a check-in day, Week 51 is intended to begin on Christmas Day.   Week 52 is the following week.   In the event

10

CL 99000162          OR  1564/1489

the specific week number does not encompass the specific holiday as set
forth above, the Fixed Week Owners shall automatically have the exclusive
access to the week the event and/or holiday actually occurs that given
year and will relinquish their normal Fixed Week into the Floating Week
pool for said year.

    (2)  All Season Float Four Bedroom (year around
excluding Fixed Weeks, Types E and H).

    (3)  All Season Float Three Bedroom (year around
excluding Fixed Weeks, Type G).

    (4)  All Season Float Two Bedroom (year around
excluding Fixed Weeks, Type A).

    (5)  Value Season Float Four Bedroom (Weeks 1-11; 14-
23; 35-50, Types E and H).

    (6)  Value Season Float Three Bedroom (Weeks 1-11;
14-23; 35-50, Type G).

    (7)  Value Season Float Two Bedroom (Weeks 1-11; 14-
23; 35-50, Type A).

    B.  **Floating Use Plan Rules and Regulations**.  To
implement the Floating Use Plan, the Developer is hereby granted the
exclusive authority to determine and promulgate the initial Floating Use
Plan Rules and Regulations relating to the use, exchange and rental of
all Floating Unit Weeks and the administration of the Floating Use Plan.

    Such Floating Use Plan Rules and Regulations shall provide
for the following:

    (1)  The manner in which an owner of a Floating Unit Week
may request and receive a reservation of a Floating Unit Week for
occupancy each calendar year.

    (2)  Unless otherwise provided in the Floating Use Plan
Rules and Regulations, reservations may only be made for any available
Floating Unit Weeks in the same seasonal and the same unit type category
as the reserving Owner's deeded Floating Unit Week or for any available
Floating Unit Weeks in a lower category as follows:

11

Case 6:18-cv-01893-JA-DCI   Document 16-1   Filed 02/21/18   Page 13 of 65 PageID 168

CL 99000162          OR  1564/1490

|  | All Season Float | Value Season Float | Four Bedroom | Three Bedroom | Two Bedroom |
|---|---|---|---|---|---|
| All Season Float 4 BR | X | X | X | X | X |
| All Season Float 3 BR | X | X |  | X | X |
| All Season Float 2 BR | X | X |  |  |  |
| Value Season Float 4 BR |  | X | X | X | X |
| Value Season Float 3 BR |  | X |  | X | X |
| Value Season Float 2 BR |  | X |  |  | X |

In the event an Owner of a Floating Unit Week reserves a Floating Unit Week in a lower season or lower unit type category than the Owner's deeded Floating Unit Week, thus creating availability in a higher season or unit type category, Owners of deeded weeks in a lower season or unit type category may make reservations into the higher season or unit type category where the availability has been created. Such a reservation can only be made within forty-five (45) days of the commencement of the desired Unit Week.

(3) An Owner of a Floating Unit Week must reserve the occupancy of a Floating Unit Week as provided in the Floating Use Plan Rules and Regulations prior to the commencement of occupancy of a Floating Unit Week each year. All reservations will be processed on a space available, "first-come, first-served" basis, provided that the reservation system may incorporate priorities for processing and confirming reservation requests, which priorities may include, but are not limited to, one or more of the following features:

(i) A priority system for reservations which will give preference to those Owners who own more than one Floating Unit Week;

(ii) Different minimum and maximum time periods or dates for requesting a reservation request;

12

CL 99000162          OR 1564/1491

(iii) A breakage period where use of Floating Unit Weeks not reserved by Owners during the prescribed reservation time period may only be reserved if not previously reserved by the Association for maintenance purposes or by the Developer for rental purposes; and/or

(iv) Such other conditions, restrictions and limitations as the Developer or Association shall deem necessary under the circumstances to assure a manageable and fair system.

C.   Reservation of Floating Unit Weeks for Maintenance Purposes.  The Management Company shall have the right to reserve, at any time, any two (2) Floating Unit Weeks it chooses for each Unit each year (two weeks per Unit annually), in its sole discretion, for maintenance purposes.   Additionally, the Association or the Management Company reserves the right to put Owners in other accommodations in case emergency maintenance is required.   The cost of such alternate accommodations shall be a Common Expense of the Owners.

D.   Reservation Required Prior to Occupancy.  An Owner must reserve the occupancy of a desired Floating Unit Week as provided in the Floating Use Plan Rules and Regulations prior to the commencement of occupancy of his desired Floating Unit Week each year.  In the event the desired occupancy is unavailable, the Owner may request an unreserved alternate Floating Unit Week, if any, subject to the Floating Use Plan Rules and Regulations. if the available Floating Unit Week is not convenient to the Owner's plan or schedule and the Owner is unable to utilize an available Floating Unit Week, the Owner may lose his use of a Floating Unit Week for that year if the Owner does not accept the Floating Unit Week that is available, if any.

E.   Reservation Windows.  The period of time prior to the beginning of each Floating Unit Week in which occupancy must be reserved may be changed by amendment to the Floating Use Plan Rules and Regulations.

F.   Accrual and Carryover.  Unless permitted under the Floating Use Plan Rules and Regulations, there will be no accrual or carryover of unused time from one year to subsequent years.

G.   Biennial Restrictions.  The Owner of a Biennial Unit Week that has been committed to the Floating Use Plan will not be entitled to request and will not be assigned a Biennial Unit Week that is different than the type of Biennial Unit Week purchased.  That is, an Odd Year Biennial Unit Week Owner may request and will be assigned a Floating Unit Week only during calendar years ending in odd numbers, and an Even

13

CL 99000162          OR 1564/1492

Year Biennial Unit Week Owner may request and will be assigned a Floating Unit Week only during calendar years ending in even numbers, unless permitted under the Floating Use Plan.

    H.   **Assessment or Ad Valorem Tax Delinquency.**  An Owner who is delinquent in the payment of any assessment or ad valorem property tax assessment imposed against that Owner's Floating Unit Week shall not be allowed to reserve a Floating Unit Week under the reservation program of the Floating Use Plan, and any previously confirmed Floating Unit Week reservation may be canceled.  If an Owner does not make a reservation or is unable to make a satisfactory reservation, he is not relieved of the obligation to pay all assessments and taxes associated with the ownership of his Unit Weeks.

    E.   **Additional Development.**

      It is the present intent of the Developer to add additional Units (the "Additional Units"), common areas and recreational facilities to the Time Share Plan which are located either adjacent to or contiguous with the Resort Facility (the "Additional Units").  The Additional Units, common areas and recreational facilities may be added to the Plan by an amendment executed by the Developer alone, and no consent of any Unit Owner, mortgagee or the Association shall be required.  The amendment shall contain a legal description of the property to be added to the Resort Facility and shall identify the number of Units being added to the Resort Facility.  The undivided interest attributable to each Unit Week in an additional building shall be equal to a fraction, the numerator of which is one (1) and the denominator of which is the number of Units in the building multiplied by "fifty-two (52).  The Time Share Interest conveyed shall be limited to an undivided interest only in the building in which the Assigned Unit and Assigned Unit Week is located.  The maximum number of Units that will be contained in the Resort Facility cannot be determined at this time.  It is the Developer's present intention to build approximately two thousand five hundred (2,500) Units, however, this shall not be construed as a limitation on the number of Units the Developer may construct.  There shall be no limit on the period of time for the Developer to add Additional Units.

14

Case 6:18-cv-01893-JA-DCI   Document 16-1   Filed 07/23/18   Page 46 of 65 PageID 163

CL 99000162                OR  1564/1493

## ARTICLE III

## ASSOCIATION

### A.   Organization.

The Association is a non-profit Florida corporation, which corporation shall be the governing body for the operation of the Resort Facility.  Neither the officers nor the Directors of the Association shall be required to be members of the Association.  The Board of Directors of the Association, and such officers as the Board may elect or appoint, shall conduct the affairs of the Association in accordance with the Articles and By-Laws, as the same may be amended from time to time. The initial Board shall consist of three (3) members, however, may be increased from time to time in accordance with the provisions of the Articles and By-Laws to include no more than fifteen (15) members.  The Developer reserves the right to appoint members to the Board so long as the Developer is selling Time Share Interests in the Resort Facility. During such period of time, Owners shall not have the right to elect members to the Board.

### B.   Membership.

1.   Qualifications:  Each Owner in the Resort Facility shall be a member of the Association.  The Developer shall be a member with respect to Time Share Interests owned by the Developer.

2.   Transfer of Membership:  The Association membership of each Owner (including the Developer) shall be appurtenant to the Time Share Interests giving rise to such membership and shall not be assigned, transferred, pledged, conveyed or alienated in any way, except upon the transfer of title to said Time Share Interests, and then only to the transferee of title to such Interests.  Any attempt to make a prohibited transfer shall be void.  Any transfer of title to such Time Share Interests shall operate automatically to transfer the membership in the Association to the new Owner thereof.

### C.   Voting.

15

Case 6:18-cv-01893-JA-DCI   Document 16-1   Filed 07/21/18   Page 47 of 68 PageID 516

CL 99000162          OR  1564/1494

Subject to the provisions of the Articles and By-Laws of the Association applicable thereto, each Owner or Owners of a Time Share Interest in the Resort Facility shall be entitled to one (1) vote in the Association with respect to matters on which a vote by the Owners is required or permitted to be taken pursuant to the Articles or By-Laws.

D.   **Expansion of Board of Association - Separate Election.**

At such time as Owners (other than the Developer) are permitted to elect officers and directors of the Association, the Board shall consist of three (3) Directors to be designated by members of the Resort Facility.  All voting, election of Directors and expansion of the Board shall be in accordance with the provisions of the Articles and the By-Laws.

E.   **Duties of the Association.**

1.   **Maintenance and Management of Resort Facility:**  The Association shall be responsible for the maintenance, repair and replacement of all of the Resort Facility.  The Association may enter into an agreement with such firms or companies as it may determine to provide certain services and/or maintenance for and on behalf of the Owners whereby the maintenance and services are provided on a regularly scheduled basis for any maintenance and service as the Association deems advisable and for such period of time and on such basis as it determines.  Such agreement shall be entered into by the Association on behalf of all members of the Association.  The fee for such services shall be deemed a Common Expense and included in the regular maintenance assessment.

2.   **Interior Color Scheme:**  The Association shall determine the interior color scheme, decor and furnishings of each Unit in the Resort Facility, as well as the proper time for redecorating and replacements thereof.  In addition, the Association shall determine the color scheme of the building and all exteriors and the interior color scheme of the Common Areas and shall be responsible for the maintenance thereof.  The Association shall maintain and keep all portions of the properties managed in a condition substantially similar to the architectural design or such change in design as the Developer may determine from time to time, unless the Developer consents in writing to structural changes or improvements.

3.   **Other Utilities:**  The Association shall acquire water, sewer, garbage disposal, electrical, telephone, gas and other necessary utility services for the Resort Facility.

16

Case 6:18-cv-01893-JA-DCI   Document 16-1   Filed 02/25/18   Page 41 of 68 PageID 195

CL 99000162          OR  1564/1495

4.    **Insurance:**  The Association shall obtain, maintain and enforce the policies of insurance as required herein.

5.    **Rules and Regulations:**  The Association shall make, establish, promulgate, amend and repeal Association rules as the Association may from time to time deem advisable, in its sole discretion.

6.    **Taxes and Assessments:**  The Association shall collect all taxes and assessments from its members in accordance with the Act and all applicable laws.

7.    **Enforcement of Restrictions and Rules:**  The Association shall perform such other acts, whether or not expressly authorized by the Plan, as may be reasonably necessary to enforce any of the provisions of the Plan, the Articles, By-Laws or Association rules and regulations.

8.    **Compliance with Act:**  The Association shall perform all duties of a managing entity as required by the Act.  The managing entity shall act in the capacity of a fiduciary to the Owners.  In addition to such other requirements as are set forth in the Act, the Association shall:

a.    Provide, each year, to all Owners an itemized Annual Budget which shall include all receipts and expenditures;

b.    Maintain all books and records concerning the Resort Facility.  All such books and records shall be reasonably available for inspection by any Owner or the authorized agent of any Owner. In addition, the Association shall maintain among its records and provide to the Division upon request a complete list of the names and addresses of all purchasers and owners of time share units in the Time Share Plan.  The managing entity shall update this list no less frequently than quarterly.

c.    Arrange for an annual independent audit to be conducted by a Certified Public Accountant in accordance with the auditing standards as defined by the rules of the Board of Accountancy of the Department of Business and Professional Regulation pursuant to the provisions of Chapter 721.13(3)(e) of all books and records of the Resort Facility.  A copy of the audit shall be forwarded to the Board members.

d.    Make available for inspection by the Division the books and records of the Resort Facility upon request of the Division.

17

CL 99000162                    OR  1564/1496

e.    Schedule the occupancy of Time Share Units in the Resort Facility.

f.    Perform any and all other functions and duties which are necessary and proper to maintain the Resort Facility.

F.    Powers and Authorities of the Association.

In addition to such other powers as may be set forth in the Plan, the Articles, or the By-Laws, the Association shall have all the powers of a non-profit corporation organized under the laws of the State of Florida, subject only to such limitations upon the exercise of such powers as are expressly set forth in the Articles, By-Laws or this Plan. It shall have the power to do any and all lawful things which may be authorized, required or permitted to be done by the Association under this Plan, the Articles and the By-Laws, and to do and perform any and all acts which may be necessary or proper for or incidental to the exercise of any of the express powers of the Association, including, without limitation:

1.    Assessments:  To levy assessments on the Owners of Time Share Interests and to enforce payments of such assessments.

2.    Right of Entry and Enforcement:  To enter upon any portion of the Resort Facility for the purpose of enforcing by peaceful means any other provisions of this Plan or for the purpose of maintaining or repairing any such area if, for any reason whatsoever, maintenance is required thereto.

3.    Easements and Rights-of-Way:  To grant and convey to the Developer or any third party easements and rights-of-way in, on, over or under any of the Common Areas for the purpose of constructing, erecting, operating or maintaining therein, thereon, or thereunder:

a.    Overhead or underground lines, cables, wires, conduits or other devices for the transmission of electricity for lighting, heating, power, telephone or other purposes;

b.    Public sewers, storm water drains, pipes, water systems, sprinkler systems, water, heating and gas lines or pipes; and, similar public or quasi-public improvements or facilities.

4.    Transfer, Dedication and Encumbrance:  To sell, transfer or encumber all or any portion of the Common Areas located in the Resort

18

Case 6:18-cv-01893-JA-DCI   Document 16-1   Filed 01/12/18   Page 18 of 88 PageID 333

CL 99000162          OR  1564/1497

Facility, including the private streets, if any, and any other portion of the property owned by the Association, to a person, firm or entity, whether public or private, and the right of the Association to dedicate or transfer all or any portion of the property owned by the Association to any public agency, authority or Utility for the purposes and subject to such conditions as may be agreed to by the members of the Association. No such sale, transfer, encumbrance or dedication shall be effective unless an instrument signed by the members entitled to cast seventy five (75%) percent of the votes of the members of the Association has been recorded, agreeing to such sale, transfer, encumbrance or dedication, unless written notice of the proposed action is sent to every member not less than thirty (30) days nor more than sixty (60) days in advance. Notwithstanding anything contained herein to the contrary, until the Developer has transferred control of the Association, as provided elsewhere herein, the Association shall be permitted to sell, transfer, encumber or dedicate such portion of the Common Areas located on the Resort Facility as, in its sole discretion, it shall deem appropriate and in the best interests of the development without the consent or vote of the members of the Association.

     5.   Employment of Agents:   To employ the services of any person or corporation as Manager, or other employees, to, as may be directed by the Board, manage, conduct and perform the business, obligations and duties of the Association, and to enter into contracts for such purpose.   Such agent shall have the right to ingress and egress over such portions of the Common Areas as is necessary for the performance of such business, duties and obligations.

     6.   Employment of Professional Advisors:   To employ professional council and advise such persons, firms or corporations such as, but not limited to, landscape architects, recreation experts, planners, lawyers and accountants.

     7.   Create Classes of Service and Make Appropriate Charges: To create, in its sole discretion, various classes of service and to make appropriate charges therefor for the users thereof, including, but not limited to, reasonable admission and other fees for the use of any recreational facilities situated in the Common Areas and to avail itself of any rights granted by law without being required to render such services to those of its members who do not assent to the said charges and to such other rules and regulations as the Board deems proper.   In addition, the Board shall have the right to discontinue any service on nonpayment or to eliminate such services for which there is no demand therefor or adequate funds to maintain the same out of charges.

19

CL 99000162          OR  1564/1498

8.    **Miscellaneous:**  To sue and be sued; pay taxes; make and enter into contracts; and insure, enter into leases or concessions and to pass good and marketable title to the Common Areas; dedicate or transfer all or any part of the Common Areas to a public agency, authority or utility for such purposes and subject to such conditions as may be reasonable; make and execute any and all proper Affidavits for various purposes; compromise any action without leave of Court; insure its own liability for claims against it and against its officers, directors, employees and contractors.

9.    **Three (3) Year Limitation:**  Notwithstanding anything to the contrary herein, the Developer and its agents are precluded from entering into any contract which binds the Association or its Board for a period in excess of three (3) years, unless reasonable cancellation provisions are included in any such contract.

10.   **Personal Liability:**  No member of the Board or any officer of the Association or the Developer or the Manager shall be personally liable to any Owner or to any other party, including the Association, for any damage, loss or prejudice suffered or claimed on account of any act, omission, error or negligence of the Association, the Board, the Manager or any other representative or employee of the Association, the Developer or any officer of the Association, provided that such person, firm or entity has, upon the basis of such information as may be possessed by him, acted in good faith, without willful or intentional misconduct.


<u>ARTICLE IV</u>

<u>ASSESSMENTS FOR COMMON EXPENSES; ESTABLISHMENT OF LIENS</u>

A.    <u>Affirmative Covenant to Pay Expenses.</u>

In order to (1) fulfill the covenants herein contained in the Plan; (2) to preserve the Units and Common Areas for the recreation, safety, welfare and benefit of Owners, their licensees, invitees, guests, family members and lessees; and (3) to provide for improvement, maintenance and preservation of the Units and Common Areas and the services and amenities provided for herein, there is hereby imposed upon the Association and the Owners, the affirmative covenant and obligation to pay the Common Expenses as defined and more particularly set forth in Article VI of the Plan.  The Association, by its Board, shall prepare and adopt in accordance with the By-Laws an annual Budget setting forth the Common Expenses for the operation and management of the Resort Facility and the Common Amenities.  In order for each Owner to pay a fair share of the operating expenses of the Resort Facility, the Board of Directors

20

CL 99000162          OR 1564/1499

will allocate the costs among the different types of Units, by assessing a different maintenance fee to the different types of Units, notwithstanding the fact that each Time Share Interest has an equal share in the ownership in a building in the Resort Facility.  The allocation shall be set forth by the Board of Directors as a Note to the Estimated Operating Budget each year.

The Association shall assess each Owner in the Resort Facility its share of the Common Expenses, which share shall be assessed annually as an Annual Assessment, and the Association shall collect said sums. Annual Assessments shall be payable in advance of the year in which such Annual Assessments apply or upon such other date as may be from time to time determined by the Board.  Notwithstanding the foregoing, each Owner shall be obligated to pay such Special Assessments as shall be levied in addition to the Annual Assessments by the Board against his or her Time Share Interest, either as a result of (a) extraordinary items of expense; (b) nonreoccuring capital expenditures; (c) the failure or refusal of other Owners to pay their Annual or Special Assessments; (d) any sums expended by the Association for the repair or replacement of a Unit or Common Areas damaged by an Owner or its family members or guests; (e) any sums expended by the Association for the removal of any addition or alteration to a Unit or Common Areas made by an Owner in violation of the provisions of the Plan, the Articles, By-Laws and/or Rules and Regulations of the Association; or (f) such other reason or basis determined by the Board in its sole discretion.

B. Lien.

The record Owner(s) of each Time Share Interest in the Resort Facility shall be personally liable, jointly and severally to the Association for the payment of the Annual Assessments or any Special Assessment (hereinafter collectively referred to as "Assessments") levied by the Association against their Time Share Interest and for all costs of collecting such Assessments, including interest, delinquent assessments and attorneys' fees at all trial and appellate levels.  The Assessments, together with interest thereon, and the costs of collection, including reasonable attorneys' fees at all trial and appellate levels as herein provided are hereby declared to be a charge upon the Time Share Interest and shall be a continuing lien upon the Time Share Interest.   Each Assessment against a Time Share Interest, together with such interest thereon at the highest rate allowed by law and the cost of collection thereon, including attorneys' fees through all appeals, shall be the personal obligation of the person, persons or entities owning the Time Share Interest so assessed.   Said lien shall be effective only from and after the date of recordation among the Public Records of Osceola County, Florida, of a written, acknowledged statement by the Association setting forth the amount due to the Association as of the date the statement is signed.  Upon full payment of all sums secured by that lien, the party

21

CL 99000162                    OR  1564/1500

making payment shall be entitled to a recordable satisfaction of the statement of lien.  A purchaser, regardless of how his Time Share Interest is obtained, including a purchaser at a judicial sale, is personally liable for all assessments for common expenses which come due while he is the owner of such interest.  A successor in interest is jointly and severally liable with his predecessor in interest for all unpaid assessments against such predecessor up to the time of transfer of the Time Share Interest to such successor without prejudice to any right a successor in interest may have to recover from his predecessor in interest any amounts assessed against such predecessor and paid by such successor.  Notwithstanding the foregoing, to the extent permitted by applicable law, a Preferred Mortgagee acquiring title to a Time Share Interest as a result of foreclosure of such mortgage or deed in lieu of foreclosure shall not be liable for the share of Common Expenses or other expenses chargeable to the former Owner which became due prior to such acquisition of title unless secured by a claim of lien recorded prior to the recording of the foreclosed mortgage.

Notwithstanding anything contained herein to the contrary, any lien against a Time Share Interest shall encumber only the Assigned Unit during the Assigned Unit Week associated with said Time Share Interest and shall not encumber the property, real or personal of any other Owner.

C.   Owners of Biennial Time Share Interests shall be liable for the payment of the annual assessments either in the amount of one-half (1/2) of the annual assessment for each year, or the total annual assessment during the Owner's Assigned Year.  The determination of the time that payment of an Annual Assessment is due shall be made by the Association.  Special Assessments shall be levied against an Owner of a Biennial Time Share Interest without regard to his Assigned Year.

ARTICLE V

REMEDIES OF ENFORCEMENT

A.   Enforcement of Plan.

1.   The covenants and restrictions herein contained may be enforced by Developer or the Association in any judicial proceeding seeking any relief recognizable at law or in equity, including damages, injunction, and other mandatory relief against any person, persons, firm or entity violating or attempting to violate any covenant or restriction or to enforce any lien created by the Developer pursuant hereto.  The failure either by the Developer or the Association to enforce any covenant or restriction herein contained shall in no event be deemed a waiver of the right to do so thereafter.  The prevailing party in any such litigation shall be entitled to reasonable attorneys' fees and court costs, including costs and fees at all trial and appellate levels.  All such costs incurred by Developer or Association shall be a continuing lien upon the Time Share Interest of the defaulting Owner and such lien

22

Case 6:18-cv-01893-JA-DCI   Document 16-3   Filed 01/23/18   Page 48 of 60 PageID 201

CL 99000162          OR  1564/1501

may be enforced in the manner set forth in paragraph (B) of this Article V.

2.   All rights, remedies or relief of whatsoever nature or kind provided herein in favor of Developer or the Association shall be cumulative and non-exclusive and none shall exclude, jointly or severally, any other right, remedy or relief permitted by law or otherwise available to Developer or the Association.

3.   In addition to any other remedies which Developer or Association may have, in the event an Owner shall be in default of any of the provisions of the Plan, the Articles, the By-Laws or the Rules and Regulations, the Developer and the Association may levy a fine against such Owner which shall continue until such default shall be remedied by the defaulting Owner.  Any such fine shall be a continuing lien on the Time Share Interest of the defaulting Owner and may be enforced in the manner set forth in Paragraph B of this Article V.

B.   <u>Enforcement of Lien Rights and Other Remedies in the Event of Non-Payment of Assessments.</u>

1.   In the event an Owner shall fail to pay any Assessment, then the Association may file an action at law to collect the Assessment plus interest at the highest rate allowed by law, plus court costs and reasonable attorneys' fees and may also file an action in equity to foreclose its lien at any time after the effective date thereof.  The lien may be foreclosed by an action in the name of the Association in like manner as a foreclosure of a mortgage on real property.  The remedies provided herein shall be non-exclusive and cumulative and shall not exclude any other remedy available to the Association by this Plan, law or otherwise.

2.   In addition to the foregoing remedies, the Board in its sole discretion may impose a late charge not to exceed Twenty Five ($25.00) Dollars against an Owner in default.

3.   If the Owner remains in possession of the Unit and a claim of lien is foreclosed, the Owner shall pay a reasonable rental fee for the Unit and the Association is entitled to the appointment of a receiver to collect the rent.

4.   Notwithstanding anything in this Plan to the contrary, in the event any Owner shall fail to pay any Assessment after the same becomes due, then during such period of default, such Owner shall not be entitled to possession of its Assigned Unit in accordance with the

23

Case 6:18-cv-01893-JA-DCI   Document 16-3   Filed 02/23/18   Page 29 of 66 PageID 202

CL 99000162          OR  1564/1502

provisions of Chapter 721, Florida Statutes.  The penalty imposed herein shall in no way operate as a waiver of other rights the Association may have in a court of law or equity to enforce the collection of such unpaid Assessments.

5.   Any person who acquires an interest in a Time Share Interest, except through foreclosure of a mortgage held by a Preferred Mortgagee or by acceptance of a deed in lieu of foreclosure as specifically provided herein, including but not limited to persons acquiring title by operation of law or purchasers at judicial sales, shall not be entitled to occupancy of the Time Share Interest until such time as all unpaid Assessments due and owing by the former Owner have been paid.

C.   Failure of Owner to Vacate.

In the event any Owner of a Time Share Interest fails to vacate his Assigned Unit at the expiration of his Assigned Unit Week or at such earlier time as may be fixed by the Rules and Regulations adopted by the Association from time to time, he shall be deemed a "Holdover Owner".  It shall be the responsibility of the Association to take such steps as may be necessary to remove such Holdover Owner from the Unit and to assist the Owner of a Time Share Interest entitled to occupy a subsequent Assigned Unit Week who may be affected by the Holdover Owner's failure to vacate, to find alternative accommodations during such holdover period.

In addition to such other remedies as may be available to it, the Association shall secure, at its expense, alternate accommodations for any Owner who may not occupy his Assigned Unit during its Assigned Unit Week due to the failure to vacate of any Holdover Owner.  Such accommodations shall be as near in value to the Owner's own Assigned Unit as possible.  The Holdover Owner shall be charged for the loss of such alternative accommodations and any other costs incurred due to his failure to vacate and an administrative fee of Fifty ($50.00) Dollars per day during his period of holding over.  In the event it is necessary that the Association contract for a period greater than the actual period of holding over in order to secure alternative accommodations as set forth above, the entire period shall be the responsibility of the Holdover Owner, although the Fifty ($50.00) Dollar per day administrative fee shall cease upon actual vacating by the Holdover Owner.

The Association shall submit a bill to the Holdover Owner in accordance with this paragraph.  In the event the Holdover Owner fails to pay same within ten (10) days of the date of same, a lien shall be filed

24

CL 99000162          OR  1564/1503

against said Holdover Owner's Time Share Interest in accordance with the provisions hereof.

The foregoing provisions shall not abridge the Association's right to take such other action as is provided by law or equity.

## ARTICLE VI

### GUARANTEE OF ASSESSMENTS

Developer may guarantee the Common Expenses of the Association as may be permitted by law and, during any such period of guarantee, the Developer shall not be required to pay any assessments levied against Developer owned Unit Weeks, provided, however, during such period of the Developer's guarantee, Developer shall be obligated to pay for any amount required to pay the Common Expenses not receivable from Owners of Time Share Interests other than Developer.

## ARTICLE VII

### COMMON EXPENSES

The following expenses are declared to be Common Expenses which the Owners are obligated to pay as provided herein.

A.    Maintenance Fees.  All expenses for the repair and upkeep of a Unit for normal wear and tear, repair and replacement of furniture, fixtures, appliances, carpeting and utilities.

B.    Utility Charges.  All charges levied for utilities providing services for any portion of the Resort Facility, whether they are supplied by a private or public firm.  It is contemplated that this obligation will include all charges for water, gas, sprinkler systems, sprinkler pumps, telephone, sewer, sewage pumps and any other type of utility or any other type of service charge.

C.    Liability Insurance.  The premiums on the policy or policies of insurance as described in Article IX of this Plan.

D.    Fire, Windstorm and Other Casualty Insurance.  The premiums for insurance as described in Article X of this Plan.

25

CL 99000162          OR 1564/1504

E.    **Destruction of Buildings or Improvements.**  Any sums necessary to repair or replace, construct or reconstruct damages caused by the destruction of any portion of the Resort Facility by fire, windstorm or other casualty regardless of whether or not the same is covered in whole or in part by insurance.  In the event insurance money shall be payable, such insurance money shall be paid in accordance with the provisions of Article X hereof.

F.    **Repair, Replacement and Maintenance.**  All expenses necessary to keep and maintain, repair and replace any portion of the Resort Facility, including, but not limited to, personal property, furniture, fixtures and equipment, in a manner consistent with the development of the Resort Facility and in accordance with the covenants and restrictions contained herein and in conformity with all orders, ordinances, rulings and regulations of any and all federal, state and city governments having jurisdiction thereover, as well as the statutes and laws of the State of Florida and the United States.

G.    **Operational Expenses.**   The costs of administration and operation of the Association, including any employees and managing entity or entities necessary to carry on the obligations and covenants of the Association.

H.    **Indemnification.**  The Association covenants and agrees that it will indemnify and save harmless Developer from and against any and all claims, suits, actions, damages and/or causes of action arising from any personal injury, loss of life, and/or damage to property, sustained on the Resort Facility thereto from and against all costs, counsel fees, expenses and liabilities incurred in and about any such claim, the investigation thereof or the defense of any action or proceeding brought thereon and from and against any orders, judgments and/or decrees which may be entered thereon.  Including in the foregoing provisions of indemnification are any expense that Developer may be compelled to incur in bringing suit for the purpose of enforcing rights hereunder or for the purpose of compelling the specific enforcement of the provisions, conditions and covenants contained in the Declaration to be kept and performed by the Association and its members.

I.    **Reserve Funds.**  The cost to establish an adequate reserve fund for replacement and/or capital refurbishment and/or capital improvements of all or any portion of the Resort Facility determined proper and sufficient by the Board.   Each Owner acknowledges, understands and consents that such reserve funds, if any, are the exclusive property of the Association as a whole and that no Owner shall have any interest, claim or right to any such reserves.

26

Case 6:18-cv-01893-JA-DCI   Document 16-3   Filed 02/03/19   Page 28 of 66 PageID 205

CL 97000162          OR  1564/1505

J.    Fees to Westgate Vacation Village Owners Association, Inc.  The Association's pro-rata share of maintenance of the Common Amenities at Westgate Vacation Villas (Phases I through XXIV) pursuant to the status of the Resort Facility as a Nonmember Resort thereunder.

K.    Miscellaneous Expenses.   The cost of all items of expenses pertaining to or for the benefit of the Resort Facility and any improvements now or hereafter located thereon or any part thereof not herein specifically enumerated.

L.    Taxes.   If the Board so determines, the Board may include as Common Expenses, any and all taxes levied or assessed at any and all times by any and all taxing authorities, including all taxes, charges, assessments and impositions and liens for public improvements, special charges and assessments in water drainage districts and in general all taxes and tax liens which may be assessed against the Resort Facility and the Common Amenities and against any and all personal property and improvements which are now or which may hereinafter be placed thereon, including any interest, penalties or other charges which may be included thereon.   Under current law, the Association shall collect and remit the taxes and Special Assessments due on the Resort Facility.   If the law is changed and the Association is not required to collect the taxes, then the Association shall not be obligated to include taxes as part of the Common Expenses and collect Assessments therefor.

## ARTICLE VIII

### MANAGEMENT OF RESORT FACILITY

The Association may, however, shall not be obligated to, enter into a management agreement with a separate management firm and/or a Manager (including Developer or its affiliate(s)) as the Board may determine in its sole discretion whereby it contracts for management services which are required to discharge its duties under this Plan and for the management, operation and maintenance of the Resort Facility.   Further, the Association may, in the sole discretion, employ a Manager.  All costs associated with such management shall be assessed as a Common Expense against the Owners.

27

CL 99000162          OR  1564/1506

## ARTICLE IX

### LIABILITY INSURANCE

The Board shall obtain liability insurance with such coverage and in such amounts as it may determine from time to time for the purpose of providing liability insurance coverage for the Resort Facility. Premiums for such insurance shall be part of the Common Expenses. Such insurance shall also include public liability, workmen's compensation and hired automobile coverage. All liability insurance shall contain a cross liability endorsement to cover liabilities of the Owners as a group to each Owner.

## ARTICLE X

### CASUALTY INSURANCE AND DESTRUCTION OF IMPROVEMENTS

A.    The Association shall obtain casualty insurance with such coverage and in such amounts as it may determine from time to time for the purpose of providing casualty insurance coverage for the Resort Facility, including fire and extended coverage insurance, vandalism and malicious mischief insurance and flood insurance sponsored by the federal government, all of which insurance shall insure all of the insurable improvements on and within the Resort Facility, including personal property owned by the Association, in and for the interest of the Association, all Owners and Preferred Mortgagees, as their interest may appear, in a company acceptable to the standards set by the Board in an amount equal to the maximum insurable replacement value as determined annually by the Board. The premiums for such coverage and other expenses in connection with such insurance shall be paid by the Association and charged to Owners as part of the Common Expenses. The company or companies with which the Association shall place its insurance coverage, as provided in this Plan, and the insurance agent or agents placing such insurance must be authorized to do business in the State of Florida with a place of business in Osceola County, Florida. The Preferred Mortgagee holding the highest dollar indebtedness encumbering Time Share Interest shall have the right, for so long as it holds such highest dollar indebtedness, to approve: the form of such insurance policies, the amounts thereof, the company or companies who shall be the insurers under such policies and the insurance agent or agents, and the designation of an "Insurance Trustee" (as hereinafter defined) and a successor "Insurance Trustee", which consent will not be unreasonably delayed or withheld. The Association shall have the right to designate an insurance trustee (the "Insurance Trustee") to act as an insurance trustee in the manner provided in this Plan, which Insurance Trustee shall be a

28

Case 6:18-cv-01893-JA-DCI   Document 16-1   Filed 12/26/18   Page 59 of 68 PageID 203

CL 99000162          OR 1564/1507

commercial bank or trust company which is authorized to do business in the State of Florida and which has its principal office in Osceola County, Florida, and thereafter, at any time and from time to time, the Association shall have the right to change the Insurance Trustee to another such bank or trust company.

B.    All policies of insurance purchased by the Association shall be deposited with the Insurance Trustee upon its written acknowledgment that the policies and any proceeds thereof will be held in accordance with the terms hereof.  Said policies shall provide that all insurance proceeds payable on account of loss or damage shall be payable to the Insurance Trustee, and the Insurance Trustee may deduct from the insurance proceeds collected a reasonable fee for its services as Insurance Trustee.  The Board is hereby irrevocably appointed agent for each Owner to adjust all claims arising under insurance policies purchased by the Association in which Owners have or may have an interest.  The Insurance Trustee shall not be liable in any manner for the payment of any premiums on policies, the renewal of policies, the sufficiency of the coverage of any such policies or any failure to collect any insurance proceeds under any policies.

C.    In the event of any damage to the Resort Facility, no Preferred Mortgagee shall have any right to participate in the determination of whether the Resort Facility is to be rebuilt; nor shall any Preferred Mortgagee have the right to apply insurance proceeds received by the Insurance Trustee to the repayment of its loan, unless such proceeds are distributed to Owners and/or their respective Preferred Mortgagees.

D.    The duty of the Insurance Trustee shall be to receive any and all proceeds from the insurance policies held by it as such Insurance Trustee and to hold such proceeds in trust for the Association, Owners and Preferred Mortgagees under the following terms:

1.    Loss Less Than "Very Substantial":  Where a loss or damage occurs to any Unit or Units or to the Common Areas, but said loss is less than "very substantial" (as hereinafter defined) it shall be obligatory upon the Association to repair or restore the damage caused by said loss. Where such loss or damage is less than "very substantial":

(a)    The Board shall promptly obtain reliable and detailed estimates of the cost of repairing and restoration.

(b)    If the damage or loss is limited to the Common Areas with no or inconsequential damage or loss to any individual Unit, and if such damage or loss to the Common Areas is

29

CL 99000162          OR  1564/1508

less than $3,000.00, the insurance proceeds shall be
endorsed by the Insurance Trustee over to the Association,
and the Association shall promptly contract for the repair
and restoration of the damage.

(c)   Subject to the provisions of subparagraph (f) hereinafter,
if the damage or loss involves any individual Unit as well
as the Common Areas, or if the damage is limited to the
Common Areas alone, but is in excess of $3,000.00, the
insurance proceeds shall be disbursed by the Insurance
Trustee for the repair and restoration of the property
upon the written direction and approval of the
Association; provided, however, that upon the request of
the Preferred Mortgagee, having the highest dollar
indebtedness on Units in the Resort Facility, the written
approval shall also be required of such Preferred
Mortgagee.   Should written approval be required as
aforesaid, it shall be said Preferred Mortgagee's duty to
give written notice thereof to the Insurance Trustee.  The
Insurance Trustee may rely upon the certificate of the
Association and the aforesaid Preferred Mortgagee, if said
Preferred Mortgagee's written approval is required, as to
the payee and the amount to be paid from said proceeds.
All payees shall deliver paid bills and waivers of
mechanics' liens to the Insurance Trustee, and execute any
affidavit required by law or by the Association, the
aforesaid Preferred Mortgagee, or the Insurance Trustee,
and deliver same to the Insurance Trustee.   In addition to
the foregoing, the Preferred Mortgagee whose approval may
be required, as aforesaid, shall have the right to require
the Association to obtain a completion, performance, and
payment bond in an amount and with a bonding company
authorized to do business in the State of Florida which is
acceptable to said Preferred Mortgagee.

(d)   Subject to the foregoing, the Board shall have the right
and obligation to negotiate and contract for the repair
and restoration of the premises.

(e)   If the net proceeds of the insurance are insufficient to
pay for the estimated cost of restoration and repair to
any Unit or Units or to the Common Areas (or for the
actual cost thereof, if the work has actually been done),
the Association shall promptly, upon determination of the
of the deficiency, levy a uniform Special Assessment

30

CL 99000162          OR 1564/1509

against all Owners for the deficiency.  The Special Assessment shall be delivered by the Association to the Insurance Trustee and added, by said Trustee, to the proceeds available for the repair and restoration of the Resort Facility.

(f)  In the event the insurance proceeds are sufficient to pay for the cost of restoration and repair, or in the event the insurance proceeds are insufficient but additional funds are raised by Special Assessment within one hundred twenty (120) days after the casualty, so that sufficient funds are on hand to fully pay for such restoration and repair, then no Mortgagees shall have the right to require the application of insurance proceeds as to the payment of its loan; provided, however, this provision may be waived by the Board in favor of any Preferred Mortgagee upon request therefor at any time.  To the extent that any insurance proceeds are required to be paid over to such Preferred Mortgagee, the Owner shall be obliged to replenish the funds so paid over, and said Owner and his Time Share Interest shall be subject to Special Assessment for such sum.

2.  "Very Substantial Damage": As used in this Plan, the term "very substantial" damage shall mean loss or damage whereby three-quarters (3/4) or more of the Resort Facility is rendered untenantable, or loss or damage whereby seventy-five (75%) percent or more of the total amount of insurance coverage on the Resort Facility becomes payable. Should such "very substantial" damage occur, then:

(a)  The Board shall obtain detailed estimates or bids for the cost of rebuilding and reconstruction of such damaged property for the purpose of determining whether such insurance proceeds are sufficient to pay for the same.

(b)  In the event the insurance proceeds are sufficient to rebuild and reconstruct all of such damaged improvements or if the insurance proceeds together with the funds described in subparagraph 3(c) below are sufficient for such purpose, then such damaged improvements shall be completely repaired and restored. The Board shall negotiate for the repair and restoration of such damaged improvements, and the Association shall negotiate and enter into a construction contract with a contractor to do the work on a fixed price basis or on any other reasonable

31

Case 6:18-cv-01893-JA-DCI   Document 16-4   Filed 12/13/18   Page 55 of 66 PageID 216

CL 99000162          OR 1564/1510

terms acceptable to the Board, which contractor shall post a performance and payment bond with respect to such work. The Insurance Trustee shall disburse the insurance proceeds and other applicable funds held in trust in accordance with provision for progress payments to be contained in such construction contract; provided, however, prior to any payment of such funds, the payees of such funds shall deliver to the Insurance Trustee any paid bills, waivers of liens under any lien laws and executed affidavits required by law, the Association or any respective Preferred Mortgagees.

(c)  In the event the insurance proceeds are insufficient to repair and replace all of the damaged improvements within the Common Areas and any Unit or Units, the Board shall hold a special meeting to determine a Special Assessment against all of the Owners to obtain any necessary funds to repair and to restore such damaged improvements.  Such Special Assessment shall be uniform as to all Time Share Interests.  Upon the determination by the Board of the amount of such Special Assessment, the Board shall immediately levy such Special Assessment against an Owner's Time Share Interest, setting forth the date or dates of payment of the same, and any and all funds received from the Owners pursuant to such Special Assessment shall be delivered to the Insurance Trustee and disbursed as provided in subparagraph 3(b) immediately preceding.  In the event three-fourths (3/4) of the Owners advise the Board in writing on or before the date for the first payment thereof that they are opposed to a Special Assessment, then the Insurance Trustee shall divide the net insurance proceeds equally and shall promptly pay each share of such proceeds to the Owners and Preferred Mortgagees of record as their interests may appear (an "Insurance Proceeds Distribution").  In making such distribution to the Owners and the Preferred Mortgagees, the Insurance Trustee may rely upon a certificate of an abstract company as to the names of the then Owners and their respective Preferred Mortgagees.

3.  In the event any dispute shall arise as to whether or not "very substantial" damage has occurred, it is agreed that such a finding made by the Board shall be binding upon all Owners.

32

CL 99000162          OR  1564/1511

4.    The Insurance Trustee may rely upon a certificate of the Association, certifying as to whether or not the damaged property is to be repaired and/or restored.  Upon request of the Insurance Trustee, the Association shall deliver such certificate.

5.    In the event that after the completion of and payment for the repair and reconstruction of the damage to the Resort Facility, and after the payment of the Insurance Trustee's fee with respect thereto, any excess insurance proceeds remain in the hands of the Insurance Trustee, then such excess shall be disbursed in the manner of the Insurance Proceeds Distribution.  However, in the event such repairs and replacements were paid for by any Special Assessment as well as by the insurance proceeds, then it shall be presumed that the monies disbursed in payment of any repair, replacement or reconstruction were first disbursed from insurance proceeds and any remaining funds held by the Insurance Trustee shall be distributed to the Owners in proportion to their contributions by way of Special Assessment.

6.    In the event the Insurance Trustee has on hand, within ninety (90) days after any casualty or loss, insurance proceeds and, if necessary, funds from any Special Assessment sufficient to pay fully for any required restoration and repair with respect to such casualty or loss, then no Preferred Mortgagee shall have the right to require the application of any insurance proceeds or Special Assessment to the payment of its loan.  Any provision contained herein for the benefit of any Preferred Mortgagee may be enforced by a Preferred Mortgagee.

7.    Any repair, rebuilding or reconstruction of damaged property shall be substantially in accordance with the architectural plans and specifications for (a) the originally constructed Resort Facility, (b) reconstructed Resort Facility, or (c) new plans and specifications approved by the Board; provided, however, any material or substantial change in new plans and specifications approved by the Board from the plans and specifications of previously constructed property shall require approval by the Preferred Mortgagee holding the highest dollar indebtedness encumbering Units in the Resort Facility.

B.    Notwithstanding anything contained herein to the contrary, in the event a loss occurs which is determined to have been attributable to a particular Owner of a Time Share Interest and such loss causes damage to the Common Areas and/or other Units within the Resort Facility, then the Owner of the Time Share Interest to which the loss is attributable shall be assessed the entire expense of the insured's policy deductible, if any.  In the event a loss occurs to the Common Areas and/or more than one Unit within the Resort Facility and such loss cannot be determined to

33

CL 99000162          OR  1564/1512

have emanated from any particular Owner, then all Owners within the Resort Facility, shall equally bear the expense of the insured's policy deductible, if any.

## ARTICLE XI

## CONDEMNATION

A.   Deposit of Awards with Insurance Trustee.

The taking of the Resort Facility by condemnation shall be deemed to be a casualty and the awards for that taking shall be deemed to be proceeds from insurance on account of the casualty and shall be deposited with the Insurance Trustee. Even though awards may be payable to Owners, in the event of failure to do so, in the discretion of the Board, a Special Assessment shall be made against a defaulting Owner in the amount of his award, or the amount of that award shall be set off against the sums hereafter made payable to that Owner.

B.   Determination Whether to Continue Resort Facility.

Whether the Resort Facility will be continued after condemnation will be determined in the manner provided for determining whether damaged property will be reconstructed and repaired after casualty. For this purpose, the taking by condemnation shall be deemed to be a casualty.

C.   Disbursement of Funds.

If the Resort Facility is terminated after condemnation, the proceeds of the awards and Special Assessments will be deemed to be common property of the Owners and shall be owned and distributed in the manner of the Insurance Proceeds Distribution. If the Resort Facility is not terminated after condemnation, the size of the Resort Facility will be reduced, the Owners of condemned Units will be made whole and the property damaged by the taking will be made useable in the manner provided below. The proceeds of the awards and Special Assessments shall be used for these purposes and shall be disbursed in the manner of the Insurance Proceeds Distribution.

D.   Unit Reduced But Tenantable.

If the taking reduces the size of a Unit and the remaining portion of the Unit can be made tenantable, the award for taking of a

34

CL 99000162          OR 1564/1513

portion of the Unit shall be used for the following purposes in the order stated and the following changes shall be effected in the Resort Facility.

1.   Restoration of Unit.

The Unit shall be made tenantable.  If the cost of the restoration exceeds the amount of the award, the additional funds required shall be assessed against Owners of the Unit Weeks in the Unit.

2.   Distribution of Surplus.

The balance of the award, if any, shall be distributed to the Owners of Unit Weeks in the Unit and to each mortgagees of Unit Weeks in the Unit, the remittance being made payable jointly to the Owners and mortgagees.

B.   Unit Made Untenantable.

If the taking is of the entire Unit or so reduces the size of a Unit that it cannot be made tenantable, the award for the taking of the Unit shall be used for the following purposes in the order stated and the following changes shall be effected in the Resort Facility.

1.   Payment of Award.  The award shall be paid first to all Preferred Mortgagees in an amount sufficient to pay off their mortgages due from those Units which are not tenantable; and then jointly to the Owners and mortgagees of Unit Weeks in the Units not tenantable in an amount equal to the market value of the Unit immediately prior to the taking and with credit being given for payments previously reserved for Preferred Mortgagees; and the balance, if any, to repairing and replacing the Common Areas.

2.   Addition to Common Areas.  The remaining portion of the Unit, if any, shall become part of the Common Area and shall be placed in condition for use by all of Unit Owners in the manner approved by the Board provided that if the cost of the work shall exceed the balance of the fund from the award for the taking, the work shall be approved in the manner elsewhere required for further improvements of the Common Areas.

3.   Adjustment of Time Share Interest.  The Time Share Interest of each Owner in the Units and Common Areas that continue as part of the Resort Facility shall be adjusted to equally distribute the Time Share Interests among the reduced number of Owners.

35

Case 6:18-cv-01893-JA-DCI   Document 16-3   Filed 02/25/18   Page 61 of 66 PageID 236

CL 99000162           OR  1564/1514

4.    **Special Assessments.**  If the amount of the award for the taking is not sufficient to pay the market value of the condemned Unit to the Owner and to condition the remaining portion of the Unit for use as a part of the Common Areas, the additional funds required for those purposes shall be raised by Special Assessments against all of the Owners who will continue as Owners of Units after the changes in the Resort Facility affected by the taking.  The Special Assessments shall be made in proportion to the Time Share Interest of those Owners in the Resort Facility after the changes affected by the taking.

5.    **Arbitration.**  If the market value of a Unit prior to the taking cannot be determined by agreement between the Owner and mortgagees of Unit Weeks in the Unit and the Association within thirty (30) days after notice by either party, the value shall be determined by arbitration in accordance with the existing rules of the American Arbitration Association, except that the arbitrators shall be two (2) appraisers appointed by the American Arbitration Association who shall base their determination upon an average of their appraisals of the Unit; and a judgment of specific performance upon the decision rendered by the arbitrators may be entered in any court of competent jurisdiction.  The cost of arbitration proceedings shall be assessed equally against all Owners of Unit Weeks in the affected Units.

F.    <u>Taking of Common Areas.</u>

Awards for the taking of Common Areas shall be used to make the remaining portion of the Common Areas useable in the manner approved by the Board; provided, that if the cost of the work shall exceed the balance of the funds from the awards for the taking, the work shall be approved in the manner elsewhere required for further improvement of the Common Areas.  The balance of the awards for the taking of Common Areas, if any, shall be distributed equally to the Owners.  If there is a mortgage of a Unit, the distribution shall be paid jointly to the Owner and the mortgagees of the Unit.

G.    <u>Amendment of Plan.</u>

The changes in Units, in the Common Areas and in the Time Share Interest of each Owner shall be evidenced by an amendment of this Plan that need be approved by fifty-one (51%) percent of the total membership vote or Units whose Owner's Time Share Interest are affected by such condemnation.

36

CL 99000162          OR  1564/1515

## ARTICLE XII

### GRANT OF EASEMENTS AND RESERVATION OF EASEMENTS AND RIGHTS

A.   Perpetual Non-Exclusive Easement to Common Areas, Common Amenities and Public Ways.

The driveways, walks and other rights-of-way in the Resort Facility and in the Common Amenities shall be and the same are hereby declared reserved to be subject to a perpetual non-exclusive easement over and across same for ingress and egress to and from the Common Areas, Common Amenities, the Resort Facility and publicly dedicated ways in favor of Developer, the Association, the Managing Entity, the Owners and all of their family members, guests, licensees, lessees and invitees.

B.   Easements and Cross-Easements on Common Areas.

1.   Developer hereby grants an easement or easements on, upon, across, through and under the Common Areas and/or the Common Amenities (which easement may include reasonable rights of access for persons and equipment necessary to accomplish such purposes) to provide utility services, including, without limitation, power, electric, light, telephone, cable television, gas, water, sewer and drainage and any other utility or service upon or for the benefit of any part of the resort and facility, and to provide for the repair and maintenance of the equipment required to provide such utility services; provided, however, no such easement will be granted with respect to any portion of the Resort Facility whereupon a building or an improvement exists.

2.   Developer reserves the right to grant such easements over and upon the Common Areas and/or Common Amenities in favor of Developer, the Association, the Managing Entity, and the Owners and all of their family members, guests, lessees, licensees and invitees and appropriate utility and other service corporations or companies and governmental entities for ingress and egress and to provide power, electric, sewer and sewage pumps, water, sprinkler system, sprinkler pumps and other utility services and lighting facilities, irrigation, drainage, television transmission facilities, security service and facilities in connection therewith and access to walks and publicly dedicated streets and the like and to provide for the repair and maintenance of the equipment necessary to provide such services and access to streets and roadways serving the Resort Facility which are beyond the boundaries thereof and the like as it deems to be in the best interests and necessary and proper for the Resort Facility.

37

CL 99000162            OR  1564/1516

### C.  Easement for Encroachments.

All of the Resort Facility shall be subject to easements for encroachments, which now or hereafter exist, caused by settlement or movement of any improvements upon the Resort Facility or improvements contiguous thereto or caused by minor inaccuracies in building or rebuilding of such improvements.   The above easements shall continue until such encroachments no longer exist.

### D.  Reservation of Easement by Developer.

Developer reserves and shall have the right to enter into and transact in the Resort Facility, any Member Resort Facility and the Common Amenities any business necessary to consummate the sale or lease of Units or real property in any Member Resort Facility or the construction or repair, maintenance or reconstruction of improvements in Resort Facility, including the right to maintain models and a sales office, place signs, employ sales personnel, including the right to carry on construction or maintenance activities.   The Developer shall also have the right to transact any business necessary to consummate the sale or lease of other properties, whether real or personal, and whether or not affiliated with the Resort Facility or any Member Resort Facility, in any fashion.   The Developer further reserves the right to conduct an exclusive on-site resale program for Owners of Time Share Interests in the Resort Facility and any Member Resort Facility.   The provisions hereof may not be suspended, superseded or modified in any manner and any amendment to the Declaration in writing by the Developer.   The rights of use and transaction of business set forth herein and any other rights reserved in the Declaration may be assigned in writing by the Developer in whole or in part.   All rights reserved hereunder by the Developer shall be exclusive to the Developer and its assigns.   Notwithstanding the provisions of Article II(B) hereof, the Developer may retain an ownership interest in a portion of the Common Amenities in order to exercise its rights hereunder.

### E.  Easement Over Retained Land.

The Developer hereby grants to each Owner of a Time Share Interest in the Resort Facility, each Member Resort Facility and each Non- Member Resort Facility a non-exclusive easement for ingress and egress over retained lands of the Developer which are located either adjacent to or contiguous with the Resort Facility, the Common Amenities, any Member Resort Facility or any Non-Member Resort Facility for the purpose of pedestrian ingress and egress over and from the Resort Facility, Common Amenities, any Member Resort Facility or any Non-Member Resort Facility.

38

Case 6:18-cv-01893-JA-DCI   Document 16-3   Filed 02/25/18   Page 60 of 68 PageID 233

CL 99000162          OR  1564/1517

This easement shall run in favor of each Owner, their guests, licensees, and invitees, and the Developer, its successors or assigns.  Such easement shall apply only with respect to unimproved portions of the retained land and shall not apply with respect to any improved portions of the retained land which are not included either as part of the Resort Facility, Common Amenities, any Member Resort Facility or any Non-Member Resort Facility.

<u>ARTICLE XIII</u>

<u>LAND USE COVENANTS</u>

In consideration of the benefits hereinafter contained and the payment of the Common Expenses referred to herein, Developer does hereby declare that the Units and the Common Areas shall be used, transferred, demised, sold, conveyed and occupied subject to the terms of the Plan as follows:

A.   <u>Occupancy and Use Restrictions:</u>

1.   No Owner may occupy his Unit or permit another to occupy it unless he has provided notice to the Association at least fourteen (14) days in advance of the commencement of the Unit Week of his intention to occupy the Unit or to allow occupancy of his Unit by another person.

2.   The Units shall be for transient resort occupancy only. No trade, business, profession or other type of commercial activity may be conducted in any Unit except for any Units which are used by Developer for models, sales offices, construction offices, storage or related uses. Each Owner shall have the exclusive right to use and occupy his Assigned Unit during the Assigned Unit Week assigned to such Owner subject to the provisions of the Plan.   Without limiting the generality of the foregoing, no Owner or any other person or entity (other than the Developer or its designees) may advertise in any way in the Resort Facility or in any right-of-way adjacent to the Resort Facility. Included within the term "advertising" shall be for sale signs, displays of any kind, picketing and verbal communication regarding the sale or resale of Units or any commercial activity.   The provisions of this paragraph may be enforced by either the Developer or the Association by a suit for damages or injunctive relief and, in addition, the Developer shall be entitled to a penalty of One Thousand ($1,000.00) Dollars per day for violation of this paragraph, it being expressly agreed that the

39

Case 6:18-cv-01893-JA-DCI   Document 16-3   Filed 02/11/18   Page 85 of 88 PageID 218

CL 99000162          OR  1564/1518

damages associated with a violation of this paragraph cannot be accurately determined.

3.    An Owner shall not keep a pet in his Unit unless specifically permitted by the Rules and Regulations which may be promulgated by the Association from time to time, nor shall an Owner keep any other animals, livestock or poultry in his Unit, nor may any of the same be raised, bred or kept upon the Common Areas or any portion of the Resort Facility.

4.    An Owner shall not permit or suffer anything to be done or kept in its Unit which will increase the insurance rates on its Unit or the Common Areas which will obstruct or interfere with the rights of other Owners or the Association or the Managing Entity.

5.    No Owner shall annoy other Owners by unreasonable noises or otherwise and no Owner shall commit or permit to be committed any nuisance or immoral or illegal act in its Unit or on the Common Areas.

6.    In the event of damage to or destruction of any Unit, the furnishings in any Unit or the Common Area caused by an Owner or the family members, guests, invitees, lessees or licensees of an Owner, such Owner shall be liable for the cost of necessary repairs and reconstruction to restore the Unit, furnishings and/or Common Area to its original condition.  The Association may bring an action against the Owner to recover the costs of the damage or destruction, but shall not have a lien right against the Owner.

7.    No Owner (with the exception of Developer, for so long as Developer is an Owner) shall display any sign, advertisement or notice of any type on the exterior of its Unit, the Common Areas or at any window or other part of its Unit or on any personal property located therein; no Owner shall erect any exterior antennae or aerials upon its Unit or the Common Areas; and no Owner shall cause anything to project out of any window, door, porch or balcony except as may be approved in writing by the Association (except as installed as of the date the Plan is recorded or except as thereafter installed by Developer.)  See paragraph 1 above for additional information regarding commercial activities.

8.    An Owner (excluding Developer, for so long as Developer is an Owner) shall not be permitted to keep any boat, trailer, truck, camper, van in excess of twenty (20) feet long, recreational vehicle or other vehicle which is not a private passenger car on any portion of the Resort Facility and any such vehicle shall be removed at the expense of the Owner responsible therefor.  The use of parking spaces may be further regulated and limited by the Rules and Regulations promulgated by the Association.

40

CL 99000162          QR 1564/1519

9.   No clothesline or other similar device shall be allowed on any portion of the Resort Facility and no clothes, sheets, blankets, laundry, rugs or any kind of article shall be dried, aired, beaten or dusted by extending same from the windows, doors, porches or balconies of a Unit.

10.   Each Owner shall keep its Unit in a good state of preservation and cleanliness and shall not sweep or throw or permit to be swept or thrown therefrom or from the doors, windows, porch or balcony thereof any dirt or other substances.

11.   Waterclosets and other water apparatus on the Resort Facility shall not be used for any purposes other than those for which they were constructed. An Owner shall pay for any damage to a Unit, its contents and/or the Common Areas because of the misuse of waterclosets or other apparatus in its Unit. Liability for any damage to a Unit caused by the moving or carrying of any article on the Resort Facility shall be borne by the Owner responsible or the presence of such article. An Owner shall be liable for the expense of any maintenance, repair or replacement of any real or personal property rendered necessary by his act, neglect or carelessness, or by that of any member of his family, or his or their guests, employees, agents, licensees, or lessees. Such liability shall include any increase in fire insurance rates occasioned by use, misuse, occupancy or abandonment of a Unit or the Common Areas and shall also include the cost of repairing broken windows. An Owner shall also be liable for any personal injuries caused by his negligent acts or those of any member of his family, or his or their guests, employees, agents, licensees or lessees. Nothing herein contained, however, shall be construed so as to modify any waiver by insurance companies of rights of subrogation.

12.   No Owner shall use or permit to be brought into any Unit, porch or balcony any inflammable oils or fluids such as gasoline, kerosene, naphtha, benzine or other explosives or articles deemed extra hazardous to life, limb or property.

13.   The Association will retain a passkey to each Unit. No Owner shall alter any lock or install a new lock on any door leading into its Unit without the prior written consent of the Association. If such consent is given, the Owner shall provide the Association with a key for the use of the Association. In the event the Association is not provided with a key to the Unit, the Owner shall pay the cost incurred by the Association in gaining entrance to its Unit.

41

Case 6:18-cv-01893-JA-DCI   Document 16-1   Filed 02/05/18   Page 95 of 86 PageID 226

CL 99000162          OR 1564/1520

14.  No Owner shall cook or barbecue on any porch or balcony. Only lawn furniture is permitted on porches and balconies. the hanging of articles of any type on the porch or balcony railings is not permitted.

15.  An Owner may not make or cause to be made any structural modifications to its Unit (except those modifications which exist as of the date the Plan is recorded or as made by Developer) without the Association's prior written consent, which consent may be unreasonably withheld.

B.    Private Use:  The Units and the Common Areas are not for the use and enjoyment of the public, but are expressly reserved for the private use and enjoyment of the Developer, the Association, the Managing Entity, the Owners, guests, invitees and lessees in accordance with the Plan.

C.    Rules and Regulations:  The Association shall impose rules and regulations regulating the use and enjoyment of the Units and the Common Areas.  The rules and regulations so promulgated shall in all respects be consistent with the use covenants set forth in the Declaration and with the architectural and beautification concept presently existing.  The Association may modify, alter, amend and rescind such rules and regulations, provided such modifications, alterations, amendments and rescissions are consistent with the use covenants set forth herein.

## ARTICLE XIV

### PROVISIONS FOR ALTERATIONS OF UNITS BY DEVELOPER

A.    Developer reserves the right to alter the interior design and arrangement of all Units (which alterations made by Developer to Units it owns are hereinafter referred to as the "Alterations").

B.    An amendment of the Plan to evidence such Alterations shall be filed by Developer in accordance with the provisions of this paragraph B. Such amendment ("Developer's Amendment") need be signed and acknowledged only by Developer and shall not require approval of the Association, other Owners or lienors or mortgagees of the amendment of the Plan.  This amendment shall adjust the Time Share Interest and the voting rights attributable to the Time Share Interest being affected by the Alterations and may be made as a Developer's Amendment as long as Developer owns the Time Share Interests attributable to the Units being adjusted.

42

Case 6:18-cv-01893-JA-DCI   Document 16-3   Filed 12/03/18   Page 88 of 88 PageID 221

CL 99000162          OR 1564/1521

## ARTICLE XV

### AMENDMENTS TO THE PLAN

A.    So long as the Developer has a right to appoint all officers and directors of the Board, as provided for herein, any Amendments may be made by the Developer alone, which Amendment shall be signed by the Developer and need not be joined in by any other party, provided, however, that such Amendment shall not materially and adversely affect any Owner's property rights.

B.    Except for a Developer's Amendment, as provided for herein, the Plan may be amended only by the consent of a majority of all Owners of the Resort Facility.    Except for an Amendment made by the Developer, pursuant to the terms hereof, no Amendment of the Plan shall change the configuration or size of any Unit in any material fashion or materially alter or modify the appurtenances to such Unit, unless all of the record Owners of the Time Share Interest effecting such Unit and all of the Preferred Mortgagees of record holding Mortgages on said Time Share Interest shall consent in writing thereto.    Any such amendment shall be voted on at a special meeting of the affected Owners and their consent thereto shall be evidenced by a certificate joined in and executed by such Owners and all affected Preferred Mortgagees and recorded in the same manner as an amendment provided in paragraph A of this Article XV.

## ARTICLE XVI

### TRANSFER OF ASSOCIATION CONTROL

The Developer reserves the right to appoint all members of the Board of Directors until such time as the Developer is no longer offering Time Share Interests for sale in the Resort Facility.    At that time, Owners, other than the Developer, shall be entitled to elect a majority of the Board.    Notwithstanding anything contained herein to the contrary, the Developer may, in its sole discretion, relinquish control of the Association to Owners, other than the Developer, prior to the required turnover date.

43

Case 6:18-cv-01893-JA-DCI   Document 16-3   Filed 02/03/18   Page 69 of 88 PageID 228

CL 99000162          OR  1564/1522

## ARTICLE XVII

### TERMINATION

A.    This Plan may be terminated by the affirmative written consent of eighty (80%) percent of the Owners and the written consent of all Preferred Mortgagees encumbering Time Share Interests in the Resort Facility; provided, however, that the Board consents to such termination by a vote of three-fourths (3/4) of the entire Board taken at a special meeting called for that purpose.

B.    In the event of the termination of this Time Sharing Plan, the Resort Facility shall be deemed removed from the provisions of the Act and shall be owned in common by the Owners pro rata in accordance with their Time Share Interest as provided in this Plan.  Any and all lien rights provided for in this Time Sharing Plan or elsewhere shall continue to run with the real property designated herein as the Resort Facility and shall encumber the respective undivided shares of the Owners thereof as tenants in common.  Each Owner shall continue to be responsible for his pro rata share of Common Expenses.

## ARTICLE XVIII

### PARTITION

No Owner or any other person or entity acquiring any right, title or interest in a Time Share Interest shall seek or obtain through any legal procedures, judicial partition of the Resort Facility or sale of the Resort Facility in lieu of partition.

## ARTICLE XIX

### RIGHTS RESERVED UNTO PREFERRED MORTGAGEES

A.    So long as any Preferred Mortgagee shall hold any mortgage upon any Time Share Interest or shall be the Owner of any Time Share Interest, such Preferred Mortgagee shall have the following rights:

1.    To be entitled to be furnished with at least one (1) copy of the Annual Financial Statement and Report of the Association, prepared by a Certified Public Accountant designated by the Association, including a detailed statement of annual carrying charges or income collected and operating expenses; such Financial Statements and Report to be furnished,

44

CL 99000162          OR 1564/1523

upon written demand, within ninety (90) days following the end of each calendar year.

2. To be given notice by the Association of the calling of any meeting of the membership to be held for the purpose of considering any proposed amendment to this Plan, the Articles or the By-Laws, which notice shall state the nature of the amendment being proposed.

3. To be given notice of default by any Owner of a Time Share Interest encumbered by a mortgage held by any Preferred Mortgagee, such notice to be given in writing and sent to the principal office of such Preferred Mortgagee or to the place which it may designate in writing to the Association.

B. Whenever any Preferred Mortgagee desires to be subject to the provisions of this Article, such Preferred Mortgagee shall serve written notice of such fact upon the Association by registered or certified mail, addressed to the Association and sent to its address stated herein, with a copy by registered or certified mail addressed to the Preferred Mortgagee having the highest dollar indebtedness on Time Share Interests in the Resort Facility, which written notices shall identify the Time Share Interest upon which any such Preferred Mortgagee holds any mortgage or mortgages or otherwise sufficiently identifies the Time Share Interest and the mortgage or mortgages held by such Preferred Mortgagee, and such notice shall designate the place to which notices are to be given by the Association to such Preferred Mortgagee.

C. Should the Association fail to pay any premium for insurance required to be placed on the Resort Facility, or should the Association fail to comply with other insurance requirements imposed by the Preferred Mortgagee owning and holding the highest dollar indebtedness against Time Share Interests in the Resort Facility, then said Preferred Mortgagee shall have the right, at its option, to order and advance such sums as are required to maintain or procure such insurance and to the extent of the monies so advanced, plus interest thereon, at the highest rate allowed by law, said Preferred Mortgagee shall be subrogated to the lien rights of the Association against individual Time Share Interests for the payment of such items of Common Expense.

D. If two (2) or more Preferred Mortgagees hold any mortgage upon a Time Share Interest, the exercise of the rights above described or the manner of exercising such rights shall vest in the Preferred Mortgagee holding the highest dollar indebtedness against the Time Share Interest in the Resort Facility and the decision of such Preferred Mortgagee shall be controlling.

45

CL 99000162          OR  1564/1524

E.   The rights of any Preferred Mortgagee as set forth herein shall apply only with respect to the Assigned Unit during the Assigned Unit Week of the Time Share Interest encumbered by such mortgage and shall not affect any other Assigned Unit or Assigned Unit Week notwithstanding anything contained herein to the contrary.

F.   Any rights reserved hereunder shall be in addition to any rights of a Preferred Mortgagee created in the mortgage transaction entered into between an Owner and a Preferred Mortgagee.

<u>ARTICLE XX</u>

<u>RESALES</u>

Each Owner hereby grants to CFI Realty, Inc. or other licensed real estate broker designated by the Developer ("Broker") the exclusive right, but not the obligation, to act as Owner's exclusive sales agent in the event Owner desires to resell his Time Share Interest.  If Broker has not waived its right in writing to act as exclusive sales agent for Owner, then Broker shall be entitled to a brokerage commission equal to the then prevailing rate for broker's commissions for time share resales in Osceola County, as determined by Broker from time to time.  In the event of a resale of the Time Share Interest, Developer or Broker shall have the right to enforce this provision by injunctive proceedings in addition to any other remedies available to it, it being expressly agreed to by the parties that Developer or Broker has no adequate remedy at law for a breach of this provision.  Notwithstanding anything contained herein to the contrary, Developer or Broker shall have no obligation to act as Owner's exclusive sales agent, and Developer and Broker shall have the right to exercise its rights hereunder in its sole and absolute discretion.  Nothing contained herein shall be deemed to be a warranty or representation by either the Developer or Broker that Developer or Broker currently operates a program pursuant to which it conducts resales or will conduct such a program in the future.  Further, there is no assurance that Owner will be able to resell his Unit on terms acceptable to Owner whether or not Broker is acting as Owner's sales agent.  This provision may not be amended without the consent of the Developer. Without limiting the generality of the Developer's right to amend as contained in Article IX hereof, the Developer specifically reserves the right to amend this paragraph in order to set forth such additional terms and conditions as may be necessary to carry out the purposes hereof.

46

CL 99000162         OR  1564/1525

## ARTICLE XXI

### RIGHT OF FIRST REFUSAL

In the event any Owner wishes to sell or transfer his Time Share Interest, the Developer or its assignee shall have the option to purchase said Time Share Interest, upon the same conditions as are offered by the Owner to a third person.  Any attempt to sell said Time Share Interest without waiver of the right of first refusal by the Developer shall be wholly null and void, and shall confer no title or interest whatsoever upon any purchaser; provided however, any deed may be validated by subsequent approval by the Developer in the event of a sale without prior approval as herein provided.

Should an Owner wish to sell or transfer his Time Share Interest, he shall deliver to the Developer a written notice containing a copy of the executed purchase agreement between buyer and seller, which agreement shall be executed subject to the Developer's waiver of its right of first refusal and consent to the sale or transfer.  The Owner shall also submit to the Developer, within five (5) days from receipt of any request by the Developer, any supplemental information as may be required by the Developer.

The Developer, within ten (10) days after receiving such notice and such supplemental information as is required by the Developer, shall either consent to the transaction specified in said notice, or by written notice to be delivered to the Owner's last known address (or mailed to the place designated by the Owner in his notice), designate the Developer, or one or more persons, who are willing to purchase upon the same terms as those specified in the Owner's notice.

The Developer or his stated designee shall have fourteen (14) days from the date of the notice sent by the Developer within which to make a binding offer to purchase upon the same terms and conditions specified in the Owner's notice, and the Owner shall close the transaction in accordance with the contract.  Failure of the Developer to designate such person(s) or failure of such person(s) to make such binding offer within the said fourteen (14) day period, shall be deemed consent by the Developer to the transaction specified in the Owner's notice, and the Owner shall be free to make or accept the offer specified in his notice, and sell said interest pursuant thereto to the prospective purchaser named therein in accordance with the agreement submitted to the Developer.

In the event the sale or transfer to a third party is approved by the Developer but is not ultimately consummated, the Owner may not sell

47

CL 99000162          OR  1564/1526

or transfer his Time Share Interest without further complying with the terms and conditions of this section.

The consent of the Developer shall be in proper recordable form and shall be delivered to the Owner.  Should the Developer fail to act, as herein set forth, and within the time provided herein, the Developer shall, nevertheless, thereafter prepare and deliver its written approval in proper recordable form, as aforesaid, and no conveyance of title or interest whatsoever shall be deemed valid without the consent of the Developer as herein set forth.

This provision may not be amended without the consent of the Developer.  Without limiting the generality of the Developer's right to amend as contained in Article IX hereof, the Developer specifically reserves the right to amend this paragraph in order to set forth such additional terms and conditions as may be necessary to carry out the purposes hereof.

### ARTICLE XXII

### GENERAL PROVISIONS

A.   **Duration**.  All of the covenants, agreements and restrictions covering the Resort Facility, including the land use covenants and affirmative covenants to pay Common Expenses shall run with and bind the Land encumbered hereby and shall inure to the benefit of and be binding upon Developer, the Association and its members, their respective legal representatives, heirs, successors and assigns for a term of thirty (30) years from the date the Plan is recorded, after which time said covenant shall be automatically extended for successive periods of ten (10) years unless after said thirty (30) year term an instrument signed by two-thirds (2/3) of the Owners is recorded agreeing to terminate said covenants and restrictions.  No such instrument shall be effective, however, unless made and recorded among the Public Records of Osceola County, Florida, one (1) year in advance of the effective date of such termination.

B.   **Plan of Ownership**.  Developer, the Association and the Owners and their grantees, successors or assigns by acceptance of their instrument of conveyance of a Time Share Interest all acknowledge that the Resort Facility has been developed under a common plan as set forth in Article II herein.  Such parties further acknowledge that the easement rights, use covenants and obligations to pay Common Expenses are an integral part of the common plan of development and are required to provide access to and from the various portions of the Resort Facility

48

Case 6:18-cv-01893-JA-DCI   Document 18-1   Filed 01/23/18   Page 50 of 66 PageID 310

CL 99000162          OR  1564/1527

and publicly dedicated rights-of-way as well as the operation and maintenance of the Resort Facility.

C.   <u>Compliance with Regulations of Public Bodies</u>.  The Association shall, as a Common Expense, perform such acts and do such things as shall be lawfully required by any public body having jurisdiction over the same in order to comply with sanitary requirements, fire hazard requirements, zoning requirements, set-back requirements, drainage requirements and other similar requirements designed to protect the public.

D.   <u>Lawful Use of Land</u>.  The Association covenants and agrees that it will conform to and observe all ordinances, rules, laws and regulations of Osceola County, State of Florida, and the United States of America and all public authorities and boards of officers relating to the Common Areas or improvements upon the same or use thereof and will not during such time permit the same to be used for any illegal or immoral purpose, business or occupation.

E.   <u>Fiduciary Obligation of Association</u>.   The officers and directors of the Association have a fiduciary relationship to the Owners and are obligated to fulfill the duties and functions set forth herein and to pursue with due diligence the remedies provided pursuant to the Plan and to enforce the covenants and restrictions herein contained.

F.   <u>Severability</u>.  Invalidation of any one of these covenants or restrictions or any of the terms and conditions herein contained or the reduction in time by reason of any rule against perpetuity shall in no way affect any other provision which shall remain in full force and effect for such period of time as may be permitted by law.

IN WITNESS WHEREOF, this Plan has been executed by Developer, this 4th day of January , 1999.

49

CL 99000162          OR  1564/1528

Signed Sealed and Delivered
in the Presence of:

WESTGATE VACATION VILLAS, LTD., a Florida
limited partnership
7450 Sandlake Commons Boulevard
Orlando, Florida  32819

BY:  WESTGATE  VACATION  VILLAS,  INC.,
General Partner

Print Name: PATRICIA A. COHAN

Print Name: MICHAEL E. MARDER

BY:
        DAVID A. SIEGEL, President

(Corporate Seal)

The WESTGATE TOWN CENTER OWNERS ASSOCIATION, INC., hereby consents to
the terms and provisions contained in the Plan.

WESTGATE TOWN CENTER OWNERS ASSOCIATION, INC.
7450 Sandlake Commons Boulevard
Orlando, Florida  32819

Print Name: PATRICIA A. COHAN

Print Name: MICHAEL E. MARDER

BY:
        DAVID A. SIEGEL, President

(Corporate Seal)

STATE OF FLORIDA    )
                    )  ss.
COUNTY OF OSCEOLA   )

The foregoing instrument was acknowledged before me this 4th day of
January        , 199 9, by DAVID A. SIEGEL, as President of WESTGATE
VACATION VILLAS, INC., a Florida corporation, as General Partner of
WESTGATE VACATION VILLAS, LTD., a Florida limited partnership, on behalf
of the partnership.  He is personally known to me or has produced
_____ as a type of identification.

Print Name: PATRICIA A. COHAN
Notary Public, State of: Florida
Serial Number, if any: CC 426858

My commission expires:
        3|3|99

Official Seal
PATRICIA A. COHAN
Notary Public, State of Florida
My comm. expires March 31, 1999
Comm. No. CC 426858

50

Case 6:18-cv-01893-JA-DCI Document 16-3 Filed 02/08/19 Page 52 of 88 PageID 229

CL 99000162     OR 1564/1529

STATE OF FLORIDA     )
                       )   SS.
COUNTY OF OSCEOLA    )

The foregoing instrument was acknowledged before me this 4th day of January , 199 9 , by DAVID A. SIEGEL, as President of WESTGATE TOWN CENTER OWNERS ASSOCIATION, INC., a Florida corporation not-for-for-profit, on behalf of the corporation. He is personally known to me ~~or~~ ~~has produced _____ as a type of identification~~ and who did/did not take an oath.

*Patricia A Cohan*

Print Name:   PATRICIA A. COHAN
Notary Public, State of: Florida
Serial Number, if any: CC 426858

My commission expires:
3/3, /99



Official Seal
PATRICIA A. COHAN
Notary Public, State of Florida
My comm. expires March 31, 1999
Comm. No. CC 436858

Case 6:18-cv-01893-JA-DCI   Document 16-1   Filed 07/01/18   Page 32 of 68 PageID 288

CL 99000162          OR   1564/1530

## EXHIBIT "A"

## LEGAL DESCRIPTION OF RESORT FACILITY



Case 6:18-cv-01893-JA-DCI   Document 16-3   Filed 12/23/18   Page 58 of 68 PageID 281

CL 99000162            OR   1564/1531

**LEGAL DESCRIPTION FOR BUILDING 5100:**

COMMENCE AT THE NORTHEAST CORNER OF LOT 8, BLOCK "A" OF THE FLORIDA
FRUIT & TRUCKLAND COMPANY'S SUBDIVISION OF SECTION 10, TOWNSHIP 25
SOUTH, RANGE 27 EAST, AS RECORDED IN PLAT BOOK "B", PAGE 68 OF THE
PUBLIC RECORDS OF OSCEOLA COUNTY, FLORIDA; THENCE RUN SOUTH
00°02'52" EAST ALONG THE EAST LINE OF SAID LOT 8, A DISTANCE OF
988.07 FEET TO A POINT; THENCE RUN SOUTH 89°57'08" WEST, A DISTANCE
OF 211.17 FEET TO THE POINT OF BEGINNING; THENCE CONTINUE SOUTH
89°57'08" WEST, A DISTANCE OF 78.73 FEET TO A POINT; THENCE RUN
NORTH, A DISTANCE OF 123.86 FEET TO A POINT; THENCE RUN NORTH
44°57'08" EAST, A DISTANCE OF 119.15 FEET TO A POINT; THENCE RUN
NORTH 89°57'08" EAST, A DISTANCE OF 190.34 FEET TO A POINT; THENCE
RUN SOUTH 00°00'58" EAST, A DISTANCE OF 78.67 FEET TO A POINT;
THENCE RUN SOUTH 89°57'08" WEST, A DISTANCE OF 160.64 FEET TO A
POINT; THENCE RUN SOUTH 44°57'09" WEST, A DISTANCE OF 64.04 FEET TO
A POINT; THENCE RUN SOUTH 00°02'52" EAST, A DISTANCE OF 84.16 FEET
TO THE POINT OF BEGINNING.

**LEGAL DESCRIPTION FOR BUILDING 5200:**

COMMENCE AT THE NORTHEAST CORNER OF LOT 8, BLOCK "A" OF THE FLORIDA
FRUIT & TRUCKLAND COMPANY'S SUBDIVISION OF SECTION 10, TOWNSHIP 25
SOUTH, RANGE 27 EAST, AS RECORDED IN PLAT BOOK "B", PAGE 68 OF THE
PUBLIC RECORDS OF OSCEOLA COUNTY, FLORIDA; THENCE RUN SOUTH
00°02'52" EAST ALONG THE EAST LINE OF SAID LOT 8, A DISTANCE OF
988.07 FEET TO A POINT; THENCE RUN SOUTH 89°57'08" WEST, A DISTANCE
OF 289.90 FEET TO A POINT;  THENCE RUN NORTH, A DISTANCE OF 199.73
FEET TO A POINT; THENCE RUN NORTH 58°09'02" EAST, A DISTANCE OF
33.48 FEET TO A POINT; THENCE RUN NORTH 30°36'36" EAST, A DISTANCE
OF 62.96 FEET TO A POINT; THENCE RUN NORTH 09°11'01" EAST, A
DISTANCE OF 65.88 FEET TO A POINT; THENCE RUN NORTH 00°46'58" EAST,
A DISTANCE OF 43.21 FEET TO THE POINT OF BEGINNING; THENCE RUN
NORTH 04°40'00" EAST, A DISTANCE OF 72.86 FEET TO A POINT; THENCE
RUN NORTH, A DISTANCE OF 110.27 FEET TO A POINT; THENCE RUN SOUTH
87°47'08" EAST, A DISTANCE OF 83.48 FEET TO A POINT; THENCE RUN
SOUTH 00°02'52" EAST, A DISTANCE OF 152.29 FEET TO A POINT; THENCE
RUN SOUTH 45°02'53" EAST, A DISTANCE OF 64.04 FEET TO A POINT;
THENCE RUN NORTH 89°57'08" EAST, A DISTANCE OF 68.10 FEET TO A
POINT; THENCE RUN SOUTH 00°00'58" EAST, A DISTANCE OF 78.67 FEET TO
A POINT; THENCE RUN SOUTH 89°57'08" WEST, A DISTANCE OF 107.71 FEET
TO A POINT; THENCE RUN NORTH 44°35'25" WEST, A DISTANCE OF 135.60
FEET TO THE POINT OF BEGINNING.

**LEGAL DESCRIPTION FOR BUILDING 5300:**

COMMENCE AT THE NORTHEAST CORNER OF LOT 9, BLOCK "A" OF THE FLORIDA
FRUIT & TRUCKLAND COMPANY'S SUBDIVISION OF SECTION 10, TOWNSHIP 25
SOUTH, RANGE 27 EAST, AS RECORDED IN PLAT BOOK "B", PAGE 68 OF THE
PUBLIC RECORDS OF OSCEOLA COUNTY, FLORIDA; THENCE RUN SOUTH
00°02'52" EAST ALONG THE EAST LINE OF SAID LOT 8, A DISTANCE OF
108.48 FEET; THENCE RUN SOUTH 89°57'08" WEST, A DISTANCE OF 16.84
FEET TO THE POINT OF BEGINNING; THENCE CONTINUE SOUTH 89°57'08"
WEST, A DISTANCE OF 118.54 FEET TO A POINT; THENCE RUN SOUTH
44°57'08" WEST, A DISTANCE OF 141.13 FEET TO A POINT; THENCE RUN
SOUTH 00°02'52" EAST, A DISTANCE OF 170.45 FEET TO A POINT; THENCE
RUN NORTH 89°57'08" EAST, A DISTANCE OF 94.17 FEET TO A POINT;
THENCE RUN NORTH 00°02'52" WEST, A DISTANCE OF 155.29 FEET TO A
POINT; THENCE RUN NORTH 44°57'08" EAST, A DISTANCE OF 64.04 FEET TO
A POINT; THENCE RUN NORTH 89°57'08" EAST, A DISTANCE OF 78.84 FEET
TO A POINT; THENCE RUN NORTH 00°00'58" WEST, A DISTANCE OF 78.67
FEET TO THE POINT OF BEGINNING. .

Case 6:18-cv-01893-JA-DCI   Document 16-1   Filed 02/01/18   Page 59 of 68 PageID 262

CL 99000162          OR 1564/1532

**LEGAL DESCRIPTION FOR BUILDING 5400:**

COMMENCE AT THE NORTHEAST CORNER OF LOT 8, BLOCK "A" OF THE FLORIDA FRUIT & TRUCKLAND COMPANY'S SUBDIVISION OF SECTION 10, TOWNSHIP 25 SOUTH, RANGE 27 EAST, AS RECORDED IN PLAT BOOK "B", PAGE 68 OF THE PUBLIC RECORDS OF OSCEOLA COUNTY, FLORIDA; THENCE RUN SOUTH 00°02'52" EAST ALONG THE EAST LINE OF SAID LOT 8, A DISTANCE OF 50.00 FEET TO A POINT; THENCE RUN SOUTH 89°36'04" WEST, A DISTANCE OF 462.93 FEET TO A POINT; THENCE RUN SOUTH 77°25'32" WEST, A DISTANCE OF 76.32 FEET TO A POINT; THENCE RUN SOUTH, A DISTANCE OF 40.08 FEET TO THE POINT OF BEGINNING; THENCE CONTINUE SOUTH, A DISTANCE OF 78.67 FEET TO A POINT; THENCE RUN NORTH 89°57'08" EAST, A DISTANCE OF 186.57 FEET TO A POINT; THENCE RUN SOUTH 45°02'52" EAST, A DISTANCE OF 64.82 FEET TO A POINT; THENCE RUN NORTH 89°57'08" EAST, A DISTANCE OF 22.68 FEET TO A POINT; THENCE RUN NORTH 44°57'08" EAST, A DISTANCE OF 71.51 FEET TO A POINT; THENCE RUN NORTH 47°05'46" WEST, A DISTANCE OF 108.51 FEET TO A POINT; THENCE RUN SOUTH 89°57'08" WEST, A DISTANCE OF 196.17 FEET TO THE POINT OF BEGINNING.



Case 6:18-cv-01893-JA-DCI   Document 16-1   Filed 02/03/18   Page 80 of 88 PageID 269

CL 99000162          OR   1564/1533

EXHIBIT "B"

LEGAL DESCRIPTION OF COMMON AMENITIES



CL 99000162          OR  1564/1534

**LEGAL DESCRIPTION FOR COMMON AREA AND PARKING FOR BUILDINGS 5100, 5200, 5300 AND 5400:**

COMMENCE AT THE NORTHEAST CORNER OF LOT 8, BLOCK "A" OF THE FLORIDA FRUIT & TRUCKLAND COMPANY'S SUBDIVISION OF SECTION 10, TOWNSHIP 25 SOUTH, RANGE 27 EAST, AS RECORDED IN PLAT BOOK "B", PAGE 68 OF THE PUBLIC RECORDS OF OSCEOLA COUNTY, FLORIDA; THENCE RUN SOUTH 00°02'52" EAST ALONG THE EAST LINE OF SAID LOT 8, A DISTANCE OF 50.00 FEET TO THE POINT OF BEGINNING; THENCE CONTINUE SOUTH 00°02'52" EAST, A DISTANCE OF 938.07 FEET TO A POINT; THENCE RUN SOUTH 89°57'08" WEST, A DISTANCE OF 289.90 FEET TO A POINT; THENCE RUN NORTH, A DISTANCE OF 199.73 FEET TO A POINT; THENCE RUN NORTH 58°09'02" EAST, A DISTANCE OF 33.48 FEET TO A POINT; THENCE RUN NORTH 30°36'36" EAST, A DISTANCE OF 62.96 FEET TO A POINT; THENCE RUN NORTH 09°11'01" EAST, A DISTANCE OF 65.88 FEET TO A POINT; THENCE RUN NORTH 00°46'28" EAST, A DISTANCE OF 43.21 FEET TO A POINT; THENCE RUN NORTH 04°40'00" EAST, A DISTANCE OF 72.86 FEET TO A POINT; THENCE RUN NORTH, A DISTANCE OF 110.27 FEET TO A POINT; THENCE RUN NORTH 87°47'08" WEST, A DISTANCE OF 26.42 FEET TO A POINT; THENCE RUN NORTH 51°21'32" WEST, A DISTANCE OF 182.29 FEET TO A POINT; THENCE RUN NORTH 70°42'07" WEST, A DISTANCE OF 40.63 FEET TO A POINT; THENCE RUN SOUTH 89°57'08" WEST, A DISTANCE OF 119.20 FEET TO A POINT; THENCE RUN NORTH, A DISTANCE OF 227.75 FEET TO A POINT; THENCE RUN NORTH 77°25'22" EAST, A DISTANCE OF 76.32 FEET TO A POINT; THENCE RUN NORTH 89°36'04" EAST, A DISTANCE OF 462.93 FEET TO THE POINT OF BEGINNING.

LESS AND EXCEPT THE FOLLOWING DESCRIBED BUILDING PARCELS:

**BUILDING 5100:**

COMMENCE AT THE NORTHEAST CORNER OF LOT 8, BLOCK "A" OF THE FLORIDA FRUIT & TRUCKLAND COMPANY'S SUBDIVISION OF SECTION 10, TOWNSHIP 25 SOUTH, RANGE 27 EAST, AS RECORDED IN PLAT BOOK "B", PAGE 68 OF THE PUBLIC RECORDS OF OSCEOLA COUNTY, FLORIDA; THENCE RUN SOUTH 00°02'52" EAST ALONG THE EAST LINE OF SAID LOT 8, A DISTANCE OF 988.07 FEET TO A POINT; THENCE RUN SOUTH 89°57'08" WEST, A DISTANCE OF 211.17 FEET TO THE POINT OF BEGINNING; THENCE CONTINUE SOUTH 89°57'08" WEST, A DISTANCE OF 78.73 FEET TO A POINT; THENCE RUN NORTH 44°57'08" EAST, A DISTANCE OF 119.15 FEET TO A POINT; THENCE RUN NORTH 89°57'08" EAST, A DISTANCE OF 190.34 FEET TO A POINT; THENCE RUN SOUTH 00°00'58" EAST, A DISTANCE OF 78.67 FEET TO A POINT; THENCE RUN SOUTH 89°57'08" WEST, A DISTANCE OF 150.64 FEET TO A POINT; THENCE RUN SOUTH 44°57'09" WEST, A DISTANCE OF 64.04 FEET TO A POINT; THENCE RUN SOUTH 00°02'52" EAST, A DISTANCE OF 84.16 FEET TO THE POINT OF BEGINNING.

**BUILDING 5200:**

COMMENCE AT THE NORTHEAST CORNER OF LOT 8, BLOCK "A" OF THE FLORIDA FRUIT & TRUCKLAND COMPANY'S SUBDIVISION OF SECTION 10, TOWNSHIP 25 SOUTH, RANGE 27 EAST, AS RECORDED IN PLAT BOOK "B", PAGE 68 OF THE PUBLIC RECORDS OF OSCEOLA COUNTY, FLORIDA; THENCE RUN SOUTH 00°02'52" EAST ALONG THE EAST LINE OF SAID LOT 8, A DISTANCE OF 988.07 FEET TO A POINT; THENCE RUN SOUTH 89°57'08" WEST, A DISTANCE OF 289.90 FEET TO A POINT; THENCE RUN NORTH, A DISTANCE OF 199.73 FEET TO A POINT; THENCE RUN NORTH 58°09'02" EAST, A DISTANCE OF 33.48 FEET TO A POINT; THENCE RUN NORTH 30°36'36" EAST, A DISTANCE OF 62.96 FEET TO A POINT; THENCE RUN NORTH 09°11'01" EAST, A DISTANCE OF 65.88 FEET TO A POINT; THENCE RUN NORTH 00°46'28" EAST, A DISTANCE OF 43.21 FEET TO THE POINT OF BEGINNING; THENCE RUN NORTH 04°40'00" EAST, A DISTANCE OF 72.86 FEET TO A POINT; THENCE RUN NORTH, A DISTANCE OF 110.27 FEET TO A POINT; THENCE RUN NORTH 87°47'08" EAST, A DISTANCE OF 83.48 FEET TO A POINT; THENCE RUN SOUTH 00°02'52" EAST, A DISTANCE OF 152.29 FEET TO A POINT; THENCE RUN SOUTH 45°02'51" EAST, A DISTANCE OF 64.04 FEET TO A POINT; THENCE RUN NORTH 89°57'08" EAST, A DISTANCE OF 65.10 FEET TO A POINT; THENCE RUN SOUTH 00°00'58" EAST, A DISTANCE OF 78.67 FEET TO A POINT; THENCE RUN SOUTH 89°57'08" WEST, A DISTANCE OF 107.71 FEET TO A POINT; THENCE RUN NORTH 44°35'25" WEST, A DISTANCE OF 135.60 FEET TO THE POINT OF BEGINNING.

Case 6:18-cv-01893-JA-DCI   Document 16-1   Filed 01/24/18   Page 68 of 86 PageID 202

CL 99000162                    OR  1564/1535

**BUILDING 5300:**

COMMENCE AT THE NORTHEAST CORNER OF LOT 8, BLOCK "A" OF THE FLORIDA FRUIT & TRUCKLAND COMPANY'S SUBDIVISION OF SECTION 10, TOWNSHIP 25 SOUTH, RANGE 27 EAST, AS RECORDED IN PLAT BOOK "B", PAGE 68 OF THE PUBLIC RECORDS OF OSCEOLA COUNTY, FLORIDA; THENCE RUN SOUTH 00°02'52" EAST ALONG THE EAST LINE OF SAID LOT 8, A DISTANCE OF 108.48 FEET; THENCE RUN SOUTH 89°57'08" WEST, A DISTANCE OF 16.84 FEET TO THE POINT OF BEGINNING; THENCE CONTINUE SOUTH 89°57'08" WEST, A DISTANCE OF 118.54 FEET TO A POINT; THENCE RUN SOUTH 44°57'08" WEST, A DISTANCE OF 141.13 FEET TO A POINT; THENCE RUN SOUTH 00°02'52" EAST, A DISTANCE OF 179.45 FEET TO A POINT; THENCE RUN NORTH 89°57'08" EAST, A DISTANCE OF 94.17 FEET TO A POINT; THENCE RUN NORTH 00°02'52" WEST, A DISTANCE OF 155.29 FEET TO A POINT; THENCE RUN NORTH 44°57'08" EAST, A DISTANCE OF 64.04 FEET TO A POINT; THENCE RUN NORTH 89°57'08" EAST, A DISTANCE OF 78.84 FEET TO A POINT; THENCE RUN NORTH 00°00' 58" WEST, A DISTANCE OF 78.67 FEET TO THE POINT OF BEGINNING.

**BUILDING 5400:**

COMMENCE AT THE NORTHEAST CORNER OF LOT 8, BLOCK "A" OF THE FLORIDA FRUIT & TRUCKLAND COMPANY'S SUBDIVISION OF SECTION 10, TOWNSHIP 25 SOUTH, RANGE 27 EAST, AS RECORDED IN PLAT BOOK "B", PAGE 68 OF THE PUBLIC RECORDS OF OSCEOLA COUNTY, FLORIDA; THENCE RUN SOUTH 00°02'52" EAST ALONG THE EAST LINE OF SAID LOT 8, A DISTANCE OF 50.00 FEET TO A POINT; THENCE RUN SOUTH 89°36'04" WEST, A DISTANCE OF 462.93 FEET TO A POINT; THENCE RUN SOUTH 77°25'22" WEST, A DISTANCE OF 76.32 FEET TO A POINT; THENCE RUN SOUTH, A DISTANCE OF 40.08 FEET TO THE POINT OF BEGINNING; THENCE CONTINUE SOUTH, A DISTANCE OF 78.67 FEET TO A POINT; THENCE RUN NORTH 89°57'08" EAST, A DISTANCE OF 156.57 FEET TO A POINT; THENCE RUN SOUTH 45°02'52" EAST, A DISTANCE OF 64.82 FEET TO A POINT; THENCE RUN NORTH 89°57'08" EAST, A DISTANCE OF 22.88 FEET TO A POINT; THENCE RUN NORTH 44°57'08" EAST, A DISTANCE OF 71.51 FEET TO A POINT; THENCE RUN NORTH 47°05'46" WEST, A DISTANCE OF 108.51 FEET TO A POINT; THENCE RUN SOUTH 89°57'08" WEST, A DISTANCE OF 196.17 FEET TO THE POINT OF BEGINNING.

**EASEMENT PROPERTY**

BEGIN AT THE SOUTHWEST CORNER OF LOT 10, BLOCK "A" OF THE FLORIDA FRUIT AND TRUCKLAND COMPANY'S SUBDIVISION OF SECTION 10, TOWNSHIP 25 SOUTH, RANGE 27 EAST, AS RECORDED IN PLAT BOOK "B", PAGE 68 OF THE PUBLIC RECORDS OF OSCEOLA COUNTY, FLORIDA; THENCE RUN NORTH 89°33'10" EAST ALONG THE SOUTH LINE OF SAID LOT 10 AND LOT 8, BLOCK "A", A DISTANCE OF 978.26 FEET TO THE SOUTHEAST CORNER OF SAID LOT 8, BLOCK "A"; THENCE RUN NORTH 00°02'52" WEST ALONG THE EAST LINE OF SAID LOT 8, BLOCK "A", A DISTANCE OF 1456.92 FEET TO THE POINT OF BEGINNING; THENCE RUN SOUTH 89°36'04" WEST, A DISTANCE OF 60.00 FEET TO A POINT; THENCE RUN NORTH 00°02'52" WEST, PARALLEL WITH THE EAST LINE OF SAID LOT 8, BLOCK "A", A DISTANCE OF 50.00 FEET, MORE OR LESS, TO A POINT ON THE SOUTHERLY RIGHT OF WAY LINE OF FUNIE STEED ROAD; THENCE RUN NORTH 89°36'04" EAST ALONG SAID SOUTHERLY RIGHT OF WAY LINE, 60.00 FEET TO A POINT ON THE EAST LINE OF SAID LOT 8, BLOCK "A"; THENCE RUN SOUTH 00°02'52" EAST ALONG THE EAST LINE OF SAID LOT 8, BLOCK "A", 50.00 FEET, MORE OR LESS, TO THE POINT OF BEGINNING.

Case 6:18-cv-01893-JA-DCI   Document 16-1   Filed 02/03/19   Page 69 of 88 PageID 258

CL 99000162          OR  1564/1536

EXHIBIT "C"

### FLOATING USE PLAN RULES AND REGULATIONS FOR WESTGATE TOWN CENTER

These Floating Use Plan Rules and Regulations (the "Rules and Regulations") are promulgated pursuant to the Declaration of Covenants, Conditions and Restrictions ("Declaration") and shall govern the manner for making reservations for Floating Unit Weeks committed to the Floating Use Plan. These Rules and Regulations shall be binding upon all Owners, their guests, invitees, lessees, licensees and designees.

1.   **Definitions.**  All terms used in these Rules and Regulations shall have the same meaning given to them in the Declaration.

2.   **Classes of Ownership.**  As described in the Declaration, there are seven (7) classes of owners:  (a)  Fixed Weeks 13, 14, 51 and 52; (b) All Season Float Four Bedroom (year around excluding Fixed Weeks, Types E and H); (c)  All Season Float Three Bedroom (year around excluding Fixed Weeks, Type G); (d) All Season Float Two Bedroom (year around excluding Fixed Weeks, Type A); (e) Value Season Float Four Bedroom (Weeks 1-11; 14-23; 35-50, Types E and H); (f) Value Season Float Three Bedroom (Weeks 1-11; 14-23; 35-50, Type G); and (g) Value Season Float Two Bedroom (Weeks 1-11; 14-23; 35-50, Type A).

3.   **Managing Entity.**  Pursuant to the Declaration, the Association has the responsibility for the management and operation of the Floating Use Plan.  Pursuant to the Management Contract with CFI Resorts Management, Inc., a Florida corporation (the "Management Company"), the Association has delegated its responsibilities to the Management Company.

4.   **Designation of Principal Contact.**  For Floating Unit Weeks that are owned by more than one owner, the owners shall designate a "Principal Contact" from time to time by notifying the Management Company of same through a writing executed by all the Owners or by an authorized representative of the business entity.  The Principal Contact shall be the designated individual with whom the Management Company shall deal with respect to making reservations, sending confirmations, and providing other services. Owners may be charged an administrative fee not to exceed $25.00 each time there is a request to change a Principal Contact designation.

5.   **Reservation Requests.**

a.   **First Come, First Served.**  Reservation requests for a particular Floating Unit Week will be taken on a first-come, first served basis within each calendar year within the appropriate scheduling window. Reservations may only be made for any available Floating Unit Weeks in

1

CL 99000162          OR  1564/1537

the same seasonal and the same unit type category as the reserving
Owner's deeded Floating Unit Week or for any available Floating Unit
Weeks in a lower category as follows:

|  | All Season Float | Value Season Float | Four Bedroom | Three Bedroom | Two Bedroom |
|---|---|---|---|---|---|
| All Season Float 4 BR | X | X | X | X | X |
| All Season Float 3 BR | X | X |  | X | X |
| All Season Float 2 BR | X | X |  |  | X |
| Value Season Float 4 BR |  | X | X | X | X |
| Value Season Float 3 BR |  | X |  | X | X |
| Value Season Float 2 BR |  | X |  |  | X |

In the event an Owner of a Floating Unit Week reserves a Floating Unit
Week in a lower season or lower unit type category than the Owner's
deeded Floating Unit Week, thus creating availability in a higher season
or unit type category, Owners of deeded weeks in a lower season or unit
type category may make reservations into the higher season or unit type
category where the availability has been created.  Such a reservation can
only be made within forty-five (45) days of the commencement of the
desired Unit Week.

     b.    Submitting a Reservation Request.  To reserve a given Floating
Unit Week on a space-available basis, Owners who own more than one Unit
Week must mail or fax a request that is received by the Management
Company no earlier than eleven (11) months in advance of the first day
(the "Check-in Day") of the Floating Unit Week that the Floating Unit
Week Owner wants to reserve.  Owners who own only one Floating Unit Week
must mail or fax a request that is received by the Management Company no
earlier than ten (10) months in advance of the Check-in Day of the
Floating Unit Week that the owner wants to reserve.  The Management
Company, upon receipt of the reservation request, shall assign the Owner
the use of a designated Floating Unit Week if the time period requested
is available.  The last date for making reservations is thirty (30) days
prior to the commencement of the Unit Week requested.

2

CL 99000162          OR 1564/1538

During the last thirty (30) days prior to the commencement of the Unit Week, available space may be rented through the Management Company, on a discounted rental basis.

c.   **Reservation Priorities**.   Reservation requests are subject to the following priorities:

(1)   The Management Company shall have the right to reserve, at any time, any two (2) weeks it chooses for each Unit each year (two (2) weeks per Unit annually), in its sole discretion, for maintenance purposes.

(2)   For the benefit of Floating Unit Week Owners who are members of an affiliated International Exchange Company, the Management Company shall have the right to reserve a portion of the Floating Unit Weeks for bulk deposit into the exchange. This may be done as early as twenty-four (24) months prior to the commencement of any given week, providing Owners the maximum selection priority through the exchange. This advanced reservation of space will provide peak season access into other resorts through the International Exchange. Any Floating Unit Week Owner who is a member in good standing of the International Exchange may request an exchange only **AFTER** having obtained an authorization number from the Management Company. The ability to obtain an authorization number is dependent upon the availability of inventory which is dependent upon the number of weeks blocked out by the Management Company for exchange and the period of time requested.

(3)   If a reservation request is not received by the Management Company by the beginning of the thirty (30) day period preceding the Check-in Day of a given Floating Unit Week (the "Breakage Period"), the Management Company's ability to confirm an owner's reservation request for that Floating Unit Week within the Breakage Period will be severely limited by the Developers priority to use any Breakage Period Unit Weeks for its own purposes, including for exchange, promotional use, rental or any other purposes as the Developer determines in its sole discretion. All net rental proceeds, if any, received for such rentals shall be the property of the Developer. Floating Unit Week Owners are encouraged to submit requests as far in advance as possible in order to ensure that they receive a reservation and obtain the best choice of available Floating Unit Weeks.

d.   **Failure to Make a Timely Reservation**.   In the event that a Floating Unit Week Owner does not timely reserve a Floating Unit Week, such owner may lose the right to utilize a Floating Unit Week for that year. There is no accrual or carryover of unused time from one year to

3

CL 99000162          OR  1564/1539

subsequent years.   A Floating Unit Week Owner unable to utilize any
available Floating Unit Week is not relieved of the obligation to pay all
assessments and taxes associated with his ownership of a Floating Unit
Week.   The Management Company cannot guarantee that any Management
Company requested week or any authorization number for an exchange week
through the International Exchange will be available for Floating Unit
Week Owners who fail to make a timely reservation.

      e.   Reservation Required for Rental or Exchange.   Before a Floating
Unit Week Owner may rent or exchange a Floating Unit Week in the Floating
Use Plan, the Floating Unit Week Owner must first receive a confirmed
reservation from the Management Company for a particular Floating Unit
Week.

      6.   Confirmations; Unit Preferences.   Written confirmations for a
particular accommodation type will be mailed to each Floating Unit Week
Owner or Principal Contact by the Management Company to document all
confirmed reservations.   Designated Units for occupancy will be assigned
by the Management Company at the time of reservation confirmation;
however, the Management Company shall have the right to change the
designated Unit up to the time of the Check-in Day of the assigned
Floating Unit Week.

      7.   Changes, Cancellations and No-Shows.   A Floating Unit Week Owner
may change or cancel a confirmed reservation for a $35.00 charge for each
change or cancellation; provided, however, there shall be no cancellation
fee for the first cancellation provided such cancellation is made prior
to thirty (30) days before the Check-in Day for the cancelled Floating
Unit Week.   The Management Company shall have the right to increase or
decrease this charge in its sole discretion.   If the Floating Unit Week
Owner changes or cancels his reservation prior to the Breakage Period for
his reserved Floating Unit Week, he may thereafter make a new reservation
for a new Floating Unit Week within the same calendar year on a space
available basis.   If the Owner changes or cancels his reservation within
the Breakage Period, he may thereafter only make a new reservation for a
new Floating Unit Week during that calendar year within the Breakage
Period prior to the desired new Floating Unit Week on a space available
basis, subject to all priorities set forth in these Rules and Regulations
from time to time.   Floating Unit Week Owners who fail to arrive on the
Check-in Day of the reserved Floating Unit Week must notify the
Management Company that they will be arriving subsequent to such Check-in
Day or risk losing the reservation.

      8.   Maintenance Fee or Ad Valorem Property Tax Delinquency.   To use
a confirmed reservation, a Floating Unit Week Owner must pay all

4

CL 99000162          OR  1564/1540

maintenance fees and ad valorem property assessments imposed against that Owner's Floating Unit Week by the collection due date each calendar year or by thirty (30) days prior to check-in, whichever occurs earlier.  Any reservations confirmed prior to the assessment due date will be subject to cancellation if the Floating Unit Week Owner does not pay the fees and assessments imposed against his Floating Unit Week by the due date each year.  A Floating Unit Week owner who is delinquent in the payment of any maintenance fee or ad valorem property tax assessment imposed against that Owner's Floating Unit Week shall not be allowed to reserve a Unit Week under the reservation program of the Floating Use Plan, and any previously confirmed Floating Unit Week reservation may be cancelled, until the delinquency is satisfied in full in accordance with the requirements of Section 721.13(6), Florida Statutes.

9.    Amendments to the Rules and Regulations.  Except as specifically prohibited in the Declaration, these Rules and Regulations may be amended from time to time pursuant to the Declaration.  Notice of any amendments to these Rules and Regulations shall be given in writing to all Floating Unit Week Owners at their last known mailing address prior to the amendments taking effect.  In the event of a conflict between these Rules and Regulations and the Declaration, the Declaration shall control.



5

Case 6:18-cv-01893-JA-DCI   Document 16-3   Filed 1/12/18   Page 66 of 66 PageID 161

G:\KM\WTC\47200018.EXD

CL 99000162        OR  1564/1541

## EXHIBIT "D"

## IDENTIFICATION OF UNITS AND UNIT TYPES

### Building #5100

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1st Floor: | 5111-H | 5112-G | 5113-G | 5114-G | 5115-G | 5116-H | 5117-H | 5118-H |
| 2nd Floor: | 5121-A | 5122-G | 5123-G | 5124-G | 5125-G | 5126-A | 5127-A | 5128-A |
| 3rd Floor: | 5131-H | 5132-G | 5133-G | 5134-G | 5135-G | 5136-H | 5137-H | 5138-H |
| 4th Floor: | 5141-A | 5142-G | 5143-G | 5144-G | 5145-G | 5146-A | 5147-A | 5148-A |
| 5th Floor: | 5151-E | 5152-G | 5153-G | 5154-G | 5155-G | 5156-H | 5157-H | 5158-E |
| 6th Floor: | | 5162-G | 5163-G | 5164-G | 5165-G | 5166-A | 5167-A | |

### Building #5200

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1st Floor: | 5211-H | 5212-G | 5213-G | 5214-G | 5215-G | 5216-H | 5217-H | 5218-H |
| 2nd Floor: | 5221-A | 5222-G | 5223-G | 5224-G | 5225-G | 5226-A | 5227-A | 5228-A |
| 3rd Floor: | 5231-H | 5232-G | 5233-G | 5234-G | 5235-G | 5236-H | 5237-H | 5238-H |
| 4th Floor: | 5241-A | 5242-G | 5243-G | 5244-G | 5245-G | 5246-A | 5247-A | 5248-A |
| 5th Floor: | 5251-E | 5252-G | 5253-G | 5254-G | 5255-G | 5256-H | 5257-H | 5258-E |
| 6th Floor: | | 5262-G | 5263-G | 5264-G | 5265-G | 5266-A | 5267-A | |

### Building #5300

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1st Floor: | 5311-H | 5312-H | 5313-H | 5314-G | 5315-G | 5316-G | 5317-G | 5318-H |
| 2nd Floor: | 5321-A | 5322-A | 5323-A | 5324-G | 5325-G | 5326-G | 5327-G | 5328-A |
| 3rd Floor: | 5331-H | 5332-H | 5333-H | 5334-G | 5335-G | 5336-G | 5337-G | 5338-H |
| 4th Floor: | 5341-A | 5342-A | 5343-A | 5344-G | 5345-G | 5346-G | 5347-G | 5348-A |
| 5th Floor: | 5351-E | 5352-H | 5353-H | 5354-G | 5355-G | 5356-G | 5357-G | 5358-E |
| 6th Floor: | | 5362-A | 5363-A | 5364-G | 5365-G | 5366-G | 5367-G | |

### Building #5400

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1st Floor: | 5411-H | 5412-H | 5413-H | 5414-G | 5415-G | 5416-H | | |
| 2nd Floor: | 5421-A | 5422-A | 5423-A | 5424-G | 5425-G | 5426-A | | |
| 3rd Floor: | 5431-H | 5432-H | 5433-H | 5434-G | 5435-G | 5436-H | | |
| 4th Floor: | 5441-A | 5442-A | 5443-A | 5444-G | 5445-G | 5446-A | | |
| 5th Floor: | 5451-E | 5452-H | 5453-H | 5454-G | 5455-G | 5456-E | | |
| 6th Floor: | | 5462-A | 5463-A | 5464-G | 5465-G | | | |